UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10864JLT

_____
                                          )
RENATO SOUTO and OTHERS                   )
SIMILARLY SITUATED,                       )
                                          )
              Plaintiff,                   )
                                          )
v.                                        )
                                          )
SOVEREIGN REALTY ASSOCIATES               )
LTD. and STUART ROFFMAN, as               )
President, of the General Partner of      )
Sovereign Realty Associates, Ltd.,        )
Sovereign Realty Associates G.P., Inc.,   )
and Individually,                         )
                                          )
                                          )
              Defendants.                  )
_____)

**DEFENDANTS' MOTION TO DISMISS COMPLAINT
FOR FRAUD ON THE COURT AND EMERGENCY MOTION
TO STAY DISCOVERY PENDING A DECISION ON THIS MOTION**

Defendants respectfully request that the Court dismiss Plaintiff's Complaint based on his

fraud on the Court and stay discovery pending a decision on this motion to dismiss.  Plaintiff's

multiple and intentional falsehoods and refusal to correct false sworn statements, described

below, should lead this Court, not only to disbelieve all his testimony, but should be taken as

implied admissions of a consciousness that he has no case.

Fraud on the court occurs where a party tampers with the fair administration of justice by

deceiving "the institutions set up to protect and safeguard the public" or otherwise abusing or

undermining the integrity of the judicial process.  Hazel-Atlas Glass Co. v. Hartford-Empire Co.,

322 U.S. 238 (1944).  The United States Court of Appeals for the First Circuit skillfully defined the concept of fraud on the court in <u>Aoude v. Mobil Oil Corp.</u>, as follows:  "'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."  892 F.2d 1115, 1118 (1st Cir. 1989).  When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct.  The judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct.  Dismissal of claims or of an entire action may be warranted by the fraud, <u>see</u>, <u>e.g.</u>, <u>Aoude</u>, 892 F.2d at 1118 (motion to dismiss was allowed on the ground that the plaintiff service station operator had authored "a bogus purchase agreement" and annexed the agreement to the complaint).

A review of the Complaint, the deposition exhibits and Plaintiff's deposition testimony reveals that Plaintiff is attempting to perpetrate a fraud on the Court.  The following is just a sample of Plaintiff's fraudulent statements to the Court:

1)      In Plaintiff's Sworn Statement In Accordance With Local Rule 26.1(b) (Deposition Exhibit 2, attached hereto as Exhibit A) and sworn Non-Payment of Wage Complaint Form attached to the Complaint as Exhibit (Deposition Exhibit 3, attached hereto as Exhibit B), Plaintiff states that he was not paid for 15 hours worked per week in the year 2000, yet he testified at deposition that in the beginning of his relationship with Sovereign Realty Associates, Ltd. ("Sovereign"), he billed Sovereign as Renato Cleaning Service and was always

paid in full for the bills he submitted.  (Excerpts of Plaintiff's Deposition at pp. 17, 61, attached hereto as Exhibit C).

    2)    In Plaintiff's Sworn Statement (Deposition Exhibit 2, attached hereto as Exhibit A) and sworn Non-Payment of Wage Complaint Form (Deposition Exhibit 3, attached hereto as Exhibit B), Plaintiff claims that he is owed payment for earned sick, personal and vacation time. Leaving aside the issue of whether or not Sovereign was contractually obligated to pay Plaintiff for this time, which Sovereign disputes, Plaintiff testified at deposition that he did, in fact, take sick, personal and vacation time during his tenure with Sovereign without any deduction in his regular salaried paycheck.  (Exhibit C, pp. 105, 106, 107)

    3)    In Plaintiff's Sworn Statement (Deposition Exhibit 2, attached hereto as Exhibit A) and sworn Non-Payment of Wage Complaint Form (Deposition Exhibit 3, attached hereto as Exhibit B), Plaintiff states that Sovereign "promised to pay Mr. Souto $15.53 per hour, but he only received $10.00 per hour."  When pressed at deposition about this alleged "promise," Plaintiff admitted that in 2000 when he asked Mr. Stuart Roffman for more money over and above his then wage of $10.00 per hour, Mr. Roffman said "no."  He testified that he had no other conversation with either Mr. Roffman or Mr. Lee Torrey regarding pay, and that nobody at Sovereign told him that he would be paid the $15.53 per hour to which he now claims he was entitled.  (Exhibit C, pp. 78-80, 81, 160-161)  Not surprisingly, there is no written agreement between Sovereign and Plaintiff wherein Sovereign agreed to pay Plaintiff the $15.53 he is demanding.  Accordingly, based on his deposition testimony Plaintiff's contention in this action that he was owed $15.53 per hour is a fraud on the Court.

Even more troubling is Plaintiff's admissions that he did not report his taxable income at all from 1993 to 1997 (Exhibit C at pp. 13-21), has understated his income for all of the years that he has filed Federal tax returns (Exhibit C at p. 37, 39-40), has never filed tax returns with the Commonwealth of Massachusetts (Exhibit C at pp. 16, 19-20), and has never reported his wife's income (Exhibit C at pp. 23-27, 35).  Plaintiff testified that he used his inaccurate tax returns in connection with his son's financial aid application to the University of Massachusetts. Exhibit C at p. 137)  Plaintiff also testified that he fraudulently filed for unemployment while employed by both Stuart Roffman and Barbara Fitzgerald.  (Exhibit C at pp. 130-131, 135) Finally, Plaintiff's deposition testimony reveals that he has further perjured himself in this action.  In some of his most tortured testimony, Plaintiff claimed that he does not know simple things like the nature of his wife's profession or the color of her previous car (Exhibit C at pp. 151-152, 157).  Simply put, Plaintiff's hands are so unclean that he is not entitled to any relief.

Plaintiff's testimony is so egregiously false that the Court would be more than justified in dismissing his case as punishment for a fraud on the court.  Plaintiff's falsehoods have been exposed by documents that the Plaintiff himself signed.  Plaintiff has given no explanation for the difference between what he has sworn to in deposition testimony and in his affidavits.  It is well settled that intentionally false testimony can be considered to indicate a consciousness that the witnesses' case is without merit.  Sheehan v. Goriansky, 317 Mass. 10, 16 (1944).  It is well settled that where a party deliberately lies in furtherance of a scheme he or she has practiced a fraud on the court.  Plaintiff's conduct deserves nothing less than a dismissal of his case.

WHEREFORE, Defendants respectfully request that Plaintiff's case be dismissed with prejudice and that discovery be stayed until a decision on this motion.

> SOVEREIGN REALTY ASSOCIATES
> LTD. and STUART ROFFMAN, as
> President, of the General Partner of
> Sovereign Realty Associates, Ltd.,
> Sovereign Realty Associates G.P., Inc.,
> and Individually,
>
> By their attorneys,
>
>
> /s/ Franklin H. Levy
> Franklin H. Levy, BBO# 297720
> Bronwyn L. Roberts, BBO # 638079
> Duane Morris LLP
> 470 Atlantic Avenue, Suite 500
> Boston, MA  02210
> (617) 289-9200

## CERTIFICATION UNDER L.R. 7.1(A)(2)

The undersigned hereby certifies that counsel for defendants conferred with counsel for plaintiff in good faith to resolve or narrow the issue raised by this motion.  The parties were unable to reach agreement.

> /s/ Bronwyn L. Roberts
> Bronwyn L. Roberts, BBO# 638079

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the following registered participant as identified on the Notice of Electronic Filing (NEF) on January 24, 2006.


Kristen M. Hurley
Gordon and Balikian, LLP
535 Boylston Street, 6th Floor
Boston, MA 02116

/s/ Bronwyn L. Roberts
Bronwyn L. Roberts

# EXHIBIT A

9/10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RENATO SOUTO and OTHERS SIMILARLY       )
SITUATED,                                )
                       Plaintiffs,       )
                                         )
v.                                       )
                                         )
SOVEREIGN REALTY ASSOCIATES, LTD.        )
and STUART ROFFMAN, As President of the  )
General Partner of Sovereign Realty Associates, )
Ltd., Sovereign Realty Associates G.P., Inc., and )
Individually,                            )
                       Defendants.       )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT
Souto 2
12.20.05

## PLAINTIFF'S SWORN STATEMENT IN ACCORDANCE
## WITH LOCAL RULE 26.1(B)

Pursuant to United States District Court for the District of Massachusetts Local Rule 26.1(B), Plaintiff hereby certifies the following:

**A.      Damages Sustained Before Service of Process**

1.      Unpaid Wages

Renato Souto was employed by Sovereign Realty Associates, Ltd. from 1994 through July 3, 2002.  During this time, Sovereign Realty Associates, LTd. did not pay Mr. Souto all of his wages which were due and owing.

Sovereign Realty Associates, Ltd. promised to pay Mr. Souto $15.53 per hour, but he only received $10.00 per hour.  He did not receive payment for overtime hours, sick days, personal days, vacation days, or holidays.  Mr. Souto was also required to carry a pager and respond to this pager 24 hours a day, 7 days a week.

He is, therefore, owed at least $86,669.40 in unpaid wages:

A.      July 4, 1999 through July 3, 2000

1.      Regular Wages
        55 hours x $5.53 [$15.53 - $10.00]x 52 weeks        $15,815.80

1

|  | 2. | 5 sick days<br>40 hours x $15.53 | $   621.20 |
|--|----|--|--|
|  | 3. | 5 personal days<br>40 hours x $15.53 | $   621.20 |
|  | 4. | 4 weeks vacation<br>160 hours x $15.53 | $ 2,484.80 |
|  | 5. | Labor Day<br>8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00] | $   106.40 |

$19,649.40

B.   July 4, 2000 through July 3, 2001

1.   Regular Wages
40 hours x $5.53 [$15.53 - $10.00]     x 52          $11,502.40
15 hours x $23.30 [ $15.53 x 1.5] x 52          $18,174.00

2.   5 sick days
40 hours x $15.53                                        $   621.20

3.   5 personal days
40 hours x $15.53                                        $   621.20

4.   4 weeks vacation
160 hours x $15.53                                      $ 2,484.80

5.   Labor Day
8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00]$   106.40

$33,510.00

C.   July 4, 2001 through July 3, 2002

1.   Regular Wages
40 hours x $5.53 [$15.53 - $10.00]     x 52          $11,502.40
15 hours x $23.30 [ $15.53 x 1.5] x 52          $18,174.00

2.   5 sick days
40 hours x $15.53                                        $   621.20

3.   5 personal days
40 hours x $15.53                                        $   621.20

4.   4 weeks vacation
160 hours x $15.53                                      $ 2,484.80

2

5.    Labor Day
      8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00]$    106.40
                                                          $33,510.00

2.    Emotional Distress

Throughout his employment with Sovereign Realty Associates, Ltd. Mr. Souto was subjected to abusive working conditions.  On a regular basis, he was humiliated and degraded by his boss in front of other employees.  As a direct result of these abusive working conditions, he suffered mentally and physically.  Mr. Souto's emotional distress damages currently total approximately $40,000.00.

B.    **Knowledgable Persons**

1.    John Harvey: Mr. Harvey worked with Mr. Souto and witnessed the abusive working conditions.

2.    John Dvorak, Esq.: Attorney Dvorak represented Mr. Souto in his immigration proceedings.

3.    Dr. Joseph Burnstein: Dr. Burnstein treated Mr. Souto for his emotional distress.

4.    Dr. Marcos Palmieri:  Dr. Palmieri treated Mr. Souto for his emotional distress.

5.    Stuart Roffman: Mr. Roffman was Mr. Souto's employer.  Mr. Roffman failed to pay Mr. Souto his wages and he created an abusive working environment for Mr. Souto.

6.    Andrea (Last Name Unknown): Andrea was Mr. Roffman's girlfriend during Mr. Souto's employment and witnessed the abusive working conditions.

7.    Barbara Fitzgerald: Ms. Fitzgerald worked with Mr. Souto and witnessed the abusive working conditions.

8.    Lee Torrey: Mr. Torrey was Mr. Souto's supervisor.  He created an abusive working environment for Mr. Souto.

C.    **Opposing Party Statements**

The Plaintiff has not obtained any statements oh his behalf from any opposing parties.

3

**D.    Governmental Agencies Who Have Investigated The Claim**

    1.       Office of the Attorney General

    2.       Massachusetts Division of Employment and Training

Respectfully submitted,
RENATO SOUTO

Renato Souto

By his attorneys,

Ara J. Balikian (BBO#630576)
Kristen M. Hurley (BBO#658237)
Gordon and Balikian, LLP
535 Boylston Street, 6th Floor
Boston, MA 02116
Tel. 617-536-1800
Fax. 617-536-1802

**CERTIFICATE OF SERVICE**

I, Ara J. Balikian, attorney for the plaintiffs in the above-captioned action, hereby certify that on September 16, 2005, I caused a true and accurate copy of the foregoing documents to be served upon Bronwyn L. Roberts, Esq., Duane Morris LLP, 470 Atlantic Avenue, Suite 500, Boston, MA 02210, by first class mail.

Ara J. Balikian

4

# EXHIBIT B

# GORDON AND BALIKIAN, LLP
### COUNSELORS AT LAW



535 Boylston Street, 6th Floor
Boston, MA 02116
Ph: 617-536-1801
Fax: 617-536-1802

Connecticut, Massachusetts, and New York

From the desk of:
**Kristen M. Hurley, Esq.**
khurley@gbassociates.com

March 11, 2005

Office of the Attorney General
200 Portland Street
Boston, MA 02114

Attention: Wage Complaint Department

**Re:   Employee: Renato Souto**
       **Employee: Sovereign Realty Associates, Ltd.**

Dear Sir/Madame:

Enclosed please find a fully completed Non-Payment of Wage Complaint Form submitted by my client, Renato Souto.

Mr. Souto requests authorization by your office to immediately proceed by right of private action.

Mr. Souto, however, also welcomes your office's simultaneous prosecution of this matter.

If I can be of any assistance, please contact me at your convenience.

Thank you for your cooperation.

Very truly yours,

Kristen M. Hurley, Esq.
KMH:nsu
Enclosure



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE, ROOM 1813
BOSTON, MA 02108
617-727-2200

## Non-Payment of Wage Complaint Form

### EMPLOYEE INFORMATION:

Name: Renato Souto    Soc. Sec. 023 / 84 / 3154

Address: 29 Park Street

City: Somerville    State: MA    Zip: 02143

Date of Birth: 4/15/54    Work Phone: _____    Home Phone: 617-628-9475

What type of work did you perform: Maintenance

### EMPLOYER INFORMATION: (complaint will not be accepted unless this section is completed.)

Company Name: Sovereign Realty Associates, Ltd.

Address: 822 Boylston Street

City: Chestnut Hill    State: MA    Zip: 02467

Phone: _____ Total number of employees in company: ≈ 5

President/Owner Name: Stuart Roffman    Title: President

Local Manager Name: Lee Torey

Town where work was performed: _____

### WAGE/BENEFIT INFORMATION:

Date of Hire: 1994    Were you discharged? Yes    Date of discharge: 7/3/02

Did you leave? _____ Date: _____ Reason for leaving: _____

If you left, did you make a personal demand for this money? Yes

If yes, what was the response of the employer: You have received all of the money you are owed.

Rate of Pay: $ 15.53 _____ per (hour/week): hour    Unpaid Wages: At Least $6,669.40

C:\Documents and Settings\Attorney General\Desktop\NonPayEnglish.wpd

What dates did you work for the money which you claim you are owed:

From: 7/4/99 ___ to 7/3/02 ___ Total amount owed: $ 96,669.40 ___

Have you signed a contract as a consultant or independent contractor? No ___

Do you have an attorney representing you in this matter? Yes, Gordon and Balikian, LLP

Have you taken any other action against your employer in this matter? No ___

If yes, please explain: _____

_____

Are you wiling to fully cooperate with the Attorney General's Office, which may include appearing in court? Yes ___

EXPLAIN IN DETAIL the facts relating to why you were not paid or why you are filing this complaint. If your complaint involves vacation pay, briefly explain how you earned vacation time (e.g. one week per year, one week <u>after</u> one year, monthly accrual, etc.)

— See Attached —

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THIS IS A TRUE STATEMENT OF THE FACTS RELATING TO MY COMPLAINT.

Signature: _____ Date: _____

Print Name: Renato Souto _____

Please attach copies of any supporting information (e.g. pay stubs, employment policy, etc...).  Important: send only copies, save the originals for your records.

Renato Souto
Description of Unpaid Wages

  I was employed by Sovereign Realty Associates, Ltd. from 1994 through July 3, 2002. During this time, my employer did not pay me all of my wages which were due and owing.

  Sovereign Realty Associates, Ltd. promised to pay me $15.53 per hour, but I only received $10.00. I never received overtime wages. In addition, Sovereign Realty Associates, Ltd. promised me 5 sick days, 5 personal days, and 4 weeks of paid vacation per year. I was never paid for any sick days, personal days, or vacation days. I was also forced to work on Labor Day, but I did not receive overtime wages for working on this holiday. I was also required to carry a pager. I was required to answer this pager 24 hours a day, 7 days a week.

  I am, therefore, owed:

A. July 4, 1999 through July 3, 2000

  1. Regular Wages
   55 hours x $5.53 [$15.53 - $10.00] x 52 weeks  $15,815.80

  2. 5 sick days
   40 hours x $15.53  $ 621.20

  3. 5 personal days
   40 hours x $15.53  $ 621.20

  4. 4 weeks vacation
   160 hours x $15.53  $ 2,484.80

  5. Labor Day
   8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00] $ 106.40
                      $19,649.40

B. July 4, 2000 through July 3, 2001

  1. Regular Wages
   40 hours x $5.53 [$15.53 - $10.00] x 52  $11,502.40
    15 hours x $23.30 [ $15.53 x 1.5] x 52  $18,174.00

  2. 5 sick days
   40 hours x $15.53  $ 621.20

1

3.    5 personal days
      40 hours x $15.53                        $   621.20

4.    4 weeks vacation
      160 hours x $15.53                   $ 2,484.80

5.    Labor Day
      8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00]    $   106.40
                                                       $33,510.00

C.   July 4, 2001 through July 3, 2002

    1.    Regular Wages
         40 hours x $5.53 [$15.53 - $10.00]    x 52    $11,502.40
         15 hours x $23.30 [ $15.53 x 1.5] x 52       $18,174.00

    2.    5 sick days
         40 hours x $15.53                   $   621.20

    3.    5 personal days
         40 hours x $15.53                   $   621.20

    4.    4 weeks vacation
         160 hours x $15.53               $ 2,484.80

    5.    Labor Day
         8 hours x $23.30 [$15.53 x 1.5] - $80.00 [8 x $10.00]    $   106.40
                                                       $33,510.00

I am, therefore, owed at least $86,669.40.

Throughout my employment with Sovereign Realty Associates, Ltd. I was subjected to abusive working conditions. On a regular basis, I was humiliated and degraded by my boss in front of other employees. As a direct result of these abusive working conditions, I suffered mentally and physically.

2

# EXHIBIT C

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005-CV-10864-JLT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RENATO SOUTO and OTHERS SIMILARLY          *
SITUATED,                                  *
                    Plaintiff,             *
                                           *
          V                                *
                                           *
SOVEREIGN REALTY ASSOCIATES LTD. and       *
STUART ROFFMAN, as President, of the       *
General Partner of Sovereign Realty        *
Associates, Ltd., Sovereign Realty         *
Associates G.P., Inc., and Individually    *
                    Defendants.            *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of RENATO SOUTO,

taken on behalf of the Defendants, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Duane Morris, LLP, 470 Atlantic Avenue,

Boston, Massachusetts, on December 20, 2005,

commencing at 9:10 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

APPEARANCES:

Duane Morris, LLP
[By Bronwyn L. Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
      On behalf of the Defendants.

Gordon & Balikian, LLP
[By Philip J. Gordon, Esq.]
[By Kristen M. Hurley, Esq.]
535 Boylston Street
Boston, Massachusetts 02116
      On behalf of the Plaintiff.

ALSO PRESENT:   Stuart Roffman.
                Lee Torrey.

Q.    Do you have an understanding of why your 1999

      tax return is dated November of 2005?

A.    I have no idea.

Q.    Do you have any other copies of tax returns?

A.    Yes, I do have it at home, and I give it to

      them, my lawyers.

                  MS. ROBERTS:  Ms. Hurley, will

      you produce all tax returns that Mr. Souto has?

                  MS. HURLEY:  Yes.  We'll need to

      review it when I get home -- get back to the

      office, but I believe this is all Mr. Souto

      has.  These are all the copies we have in the

      office, but I will look at anything he has in

      his -- at his home.

Q.    Mr. Souto, isn't it fair to say that you had

      income in the United States prior to 1999?

A.    Say again, please.

Q.    When did you first come to the United States?

A.    1992.

Q.    Did you have any income in 1992?

A.    No.

Q.    Did you have any income in 1993?

A.    Yes, I did, but --

Q.    Did you report that income?

A.    No.

Q.    Did you have any income in 1994?

A.    No -- yes, I mean, I did have income.  I just
      didn't file the tax.

Q.    You didn't file tax returns in 1994?

A.    No.  The first time I filed the tax was from
      1999, so I filed for 1998, '99, 2000 and then
      from there on.

Q.    Do you know what your income was in 1992?

A.    1992?

Q.    You said you had none, right?

A.    Yes.

Q.    What was your income?

A.    How much?

Q.    Yes, how much in 1992?

A.    About $10 an hour.

Q.    How many hours --

A.    Actually, no, I'm sorry.  It was about $8 an
      hour, yes, at that time.

Q.    Do you know how many hours a week you worked in
      1992?

A.    1992?  Actually, yes, it was like ten hours a
      day.  It wasn't here.  It was in Florida.

Q.    Who was your employer?

A.    I was to work for a guy who was a contractor

      with Sears Painting Service down in Orlando.

Q.    In 1992 when you were making $8 an hour for ten

      hours a day, you didn't file a tax return for

      Federal?

A.    Not at that time, no.

Q.    Did you file a tax return for the State of

      Florida?

A.    No.

Q.    In 1993 were you employed in the United States?

A.    Yes.

Q.    By whom?

A.    By the same guy, same people.

Q.    Sears Painting Service?

A.    Yeah, a guy worked for them.

Q.    Who was your manager?

A.    Larry.  I don't know his last name, my boss.

Q.    What part of Florida?

A.    Orlando.

Q.    Do you remember the address of Sears Painting

      Service?

A.    No.

Q.    Were you making $8 an hour working approxi-

      mately ten hours a day?

A.   Yes.

Q.   Did you file any state or Federal tax returns
     in 1993?

A.   No.

Q.   In 1994 were you employed?

A.   Yes.

Q.   Who was your employer in 1994?

A.   (Indicating) Stuart Roffman.

Q.   Mr. Roffman was your employer?

A.   Yes, '94, yes.  When I got here, I started
     working in the Sovereign building.

Q.   Were you working as an independent contractor?

A.   At that time I was, yes.

Q.   In 1994 approximately how much were you paid
     for your independent contracting services?

A.   $8 an hour.

Q.   How many hours a week did you work?

A.   Average about 11 hours a day, average.

Q.   Did you file state or Federal tax returns in
     1994?

A.   No.

Q.   Why not?

A.   Because at that time I wasn't legal in the
     country.

Q.    Do you have an understanding of what an
      independent contractor is?

A.    Actually, no, I don't know.

Q.    It's different than an employee, correct?

A.    Yes.  I was an employee of Stuart Roffman.

Q.    You were an employee?

A.    Yeah.

Q.    Were you billing him?

A.    No.

Q.    You weren't billing Mr. Roffman under the name
      of a different entity in 1994?

A.    Yeah, I was billing, yeah.

Q.    Were you working as a cleaning service?

A.    No, maintenance.

Q.    A maintenance service.  What was the name of
      that company that you were working for?

A.    Sovereign Realty.

Q.    It was Sovereign Realty?

A.    Yes.  I worked for Sovereign Realty for Stuart
      Roffman.

Q.    But it's your understanding you were an
      independent contractor at that time?

A.    I never signed to be an independent contractor.
      They was to tell me, but I never signed to be

an independent contractor.  I just work for
them.

Q.    And you billed them, correct?

A.    I did.  I did a few times, yes.

Q.    Did you do business under the title Renato's
Cleaning Service?

A.    Yes, I did, a few times, yes.

Q.    In 1995 --

A.    Just by the name.

Q.    Renato Cleaning Services?

A.    Yes.

Q.    In 1995 did you have income in the United
States?

A.    Say again, please.

Q.    In 1995 did you have any income in the United
States?

A.    Yeah.

Q.    How were you employed in 1995?

A.    For Sovereign Realty.

Q.    Were you still working as an independent
contractor for Renato's Cleaning Service?

A.    I don't think so.

Q.    You don't know?

A.    I'm not sure.  It's ten years ago.

Q.    In 1995 approximately what type of income did

      you have?

A.    What type?

Q.    Yes.

A.    How much?

Q.    Yes.

A.    Okay.  I would say $8 an hour.

Q.    How many hours?

A.    Same thing, 11, 12 hours every day.  Not every

      day, but average.  That wasn't every day.  That

      was average.

Q.    Did you report your income to -- by filing a

      Federal tax return?

A.    At that time?

Q.    Yes.

A.    No.

Q.    Did you report your income to the State of

      Massachusetts by filing a state tax return?

A.    No.

Q.    Could you describe your income in 1996?

A.    It probably was like $10 an hour.

Q.    Approximately how many hours a day?

A.    Same thing.

Q.    11 to 12 hours a day?

A.    Average of 11 to 12 hours a day.

Q.    I take it you didn't report your state or

      Federal income?

A.    No.

Q.    No tax returns?

A.    No.  This was the first time right there

      (Indicating).

Q.    1999 is the first time.  I understand that.

A.    Yes.

Q.    Could you describe your income in 1997?

A.    1997?  Same thing.

Q.    $10 an hour at approximately 11 or 12 hours a

      day?

A.    Yes.

Q.    And still no state or Federal tax returns?

A.    No.

Q.    In 1998 were you making $10 an hour?

A.    Still, yes.

Q.    Were you working approximately 11 to 12 hours a

      day?

A.    Yes.

Q.    And you didn't file any state or Federal tax

      returns, correct?

A.    Not at that time, no.

Q.   Are you aware of any of the penalties for not
     filing a tax return in the United States?

A.   Excuse me?

Q.   Are you aware of any of the penalties for not
     filing a tax return in the United States?

A.   Yes, but I couldn't because I wasn't legal.
     When you aren't legal in the country, you
     cannot file tax return.  You cannot -- you know
     that.

Q.   What's your understanding of the penalties for
     not filing a state or Federal tax return?

A.   I know it's not -- it isn't legal to do that,
     but.

Q.   You don't know any other penalties?

A.   Not really.

Q.   If you could look at your tax return for 1999,
     which is the first few pages of what's been
     marked as Exhibit No. 1, you believe that you
     filed a tax return approximately in 1999 for
     your 1999 income; that's your testimony?

A.   Yes.

Q.   And you don't know why your tax return for 1999
     is dated 2005?

A.   I have no idea.

```
          of checks on it?

A.    Yes, they gave me.

Q.    Would you have your bank statement?

A.    Not with me.

Q.    I know that.  Would you have that at home?

A.    At home, probably, yes.  I'm not sure.  Bank

      statements, you don't keep them.  You check it

      out, and you throw away.  What are you going to

      do with that?

Q.    You may have your bank statement?

A.    I may have.  May have not.

Q.    Is it fair to say that you filed jointly with

      your wife in 1999 your tax return?

A.    Yeah.

Q.    What's your wife's name?

A.    Eliana.

Q.    Is her last name Souto?

A.    Yes.

Q.    Did your wife have any income in 1999?

A.    Yes.

Q.    Did she report that in this 1999 tax return?

A.    Yes.

Q.    She did?

A.    (Nods head).
```

Q.   Approximately how much income is reported in
     the 1999 tax return that relates to your wife?

A.   $200 a week.

Q.   If you look at the third page of your tax
     return, you could turn to the third page of
     your tax return, the Profit or Loss From
     Business form says that you are filing this for
     maintenance and that your net profit is
     $12,033; do you see that?

A.   Yes.

Q.   If you look at the first page of the tax form
     for 1999, you see that same amount as the total
     income, $12,033?

A.   Uh-huh.

Q.   Yes?

A.   Yes, sorry.

Q.   What part -- is it fair to say that you did not
     report your wife's income in the 1999 tax
     return?

A.   Yes, you are right on that.  I just remembered
     that I did not -- she wasn't working at that
     time.

Q.   She was not working in 1999?

A.   No.  Not at that time, no.

Q.   When is the first time that your wife worked in
     the United States?

A.   She was working, but giving some help for
     cleaners, but it's nothing -- she wasn't
     working for a company.  She was working helping
     another woman to clean house.

Q.   Was she paid for that service?

A.   She got paid, of course, yeah.

Q.   When is the first time your wife was paid for
     work in the United States?

A.   I would say 1996.

Q.   Is it fair to say that your wife, like you,
     didn't report any income at least for 1996,
     1997, 1998?

A.   No, because it wasn't official.  She was just
     helping some girls, and she never reported for
     tax.

Q.   Your wife received income in 1996, 1997, and
     1998, correct?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   And she did not file a tax return for any of
     those years?

A.   No.

Q.   At some point did your wife come to employ
     other workers?

A.   No.

Q.   Never?

A.   No.

Q.   She never hired three other individuals and
     paid them for their services?

A.   After 1999, yes, she had some helpers.

Q.   What year did she start having helpers?

A.   I cannot respond to that.  I don't remember.

Q.   In 1999 did she have helpers?

A.   1999?  No, she was by herself.

Q.   It's fair to say that your 1999 tax return is
     false, isn't it, because it didn't record your
     wife's --

A.   You're saying that.

Q.   Excuse me?

A.   You are saying that.

Q.   I'm asking you.

A.   Is it false?

Q.   Yes.

A.   I have nothing false.  Everything I put on the
     tax, it was true.

Q.   As you sit here today, though, you know that
     you were filing jointly, and your wife's income
     is not included, correct?

A.   Yes.

Q.   So you know it's false?  You omitted your
     wife's income, correct?

A.   Excuse me?

Q.   You left out your wife's income?

A.   Yes, because it wasn't official.  She makes a
     little money helping another womans (sic) to
     clean house.

Q.   So it's fair to say that you lied to the
     Federal government in your 1999 tax return?

A.   You are saying that.

Q.   I'm asking you, Mr. Souto.  You are here to
     answer questions today.

A.   No.

Q.   No, you didn't lie?

A.   No.

Q.   Why do you say you didn't lie?

A.   Because she wasn't making money officially.
     She was helping other people and making a
     little money, so.

Q.   What do you mean by "officially"?

Q.   Is it fair to say that you and your wife did
     not report the money that she made in 2001?

A.   Can you ask again, please?

Q.   Is it fair to say that you and your wife did
     not report to the Federal government the money
     that she made in 2001?

A.   No.

Q.   It's not fair to say that or you didn't?

A.   I didn't.

Q.   You did not report your wife's income in 2001?

A.   I did.

Q.   You did?

A.   Not my wife's.  My wife wasn't making money
     officially, understand?

Q.   I understand that you're drawing a distinction
     between official and unofficial income.  I
     understand that.  Your wife made money in 2001,
     correct?

A.   No.

Q.   She did not make money in 2001?

A.   Not officially.

Q.   Was your wife paid for cleaning services in
     2001?

A.   Yes, but not officially.  She help, just help a

A.    I don't know.

Q.    Who does she do cleaning jobs for?

A.    Different persons.

Q.    Who?

A.    I don't know.

Q.    You have no idea?

A.    No.

Q.    What towns does she do cleaning in?

A.    Boston area.

Q.    None of the money your wife made in 2001 is
      listed in your 2001 tax return, correct?

A.    Yeah.

Q.    And approximately $7,000 of what you made at
      Sovereign isn't included in your 2001 tax
      return, correct?

A.    Say again.

Q.    Approximately $7,000 of what you made at
      Sovereign is not reported in your 2001 tax
      return, correct?

A.    Correct.

Q.    So your 2001 tax return includes lies and
      misstatements about the income you and your
      wife made, correct?

A.    I don't know.

A.    No.

Q.    That's not fair to say?

A.    No.

Q.    How much did you make in 2002 per hour?

A.    $10 an hour until July when I got fired by that
      man right there (Indicating).

Q.    By Mr. Torrey?

A.    Yes.

Q.    So in 2002 approximately how many weeks did you
      work?

A.    Half a year.

Q.    Does your 2002 tax return include any of the
      money that your wife made?

A.    Ask again, please.

Q.    Sure.  Does your 2002 Federal tax return
      include any of the money that your wife made
      for cleaning --

A.    No.

Q.    -- services in 2002?

A.    No.

Q.    Does your 2002 Federal tax return include any
      income you made for car-parking services,
      painting or other employment?

A.    No.

Q.    Did you do any other work --

A.    Can I say something?

Q.    You may.

A.    I had a broken legs.  I can't stand, so I
      didn't work at that time.  I wasn't doing
      painting.  I wasn't doing nothing after July
      when I broke my legs working for them.

Q.    Before July did you do any car parking or
      painting?

A.    No.

Q.    And as you sit here today, do you have any idea
      why all of your tax returns from 1999 through
      2002 are all dated as of November of 2005?

A.    No.

Q.    Could you describe your education for me, Mr.
      Souto?

A.    My education?

Q.    Yes.

A.    It wasn't in the United States, so you're not
      going to understand what's in my country.

Q.    I may not.

A.    I never went to school in the United States.

Q.    If you could do your best to tell me --

A.    Eight years of school in Brazil.

Q.    Approximately how many other people?

A.    I don't know.

Q.    When you were working as an independent

      contractor for Sovereign, you submitted bills,

      correct, to Sovereign?

A.    A few times in the beginning.

Q.    Were you paid in full for the bills that you

      submitted?

A.    Yes.

Q.    How much were you paid per hour when you were

      working as an independent contractor submitting

      bills to Sovereign?

A.    It start at 8, and in the end it was $10 an

      hour.

Q.    Did you have an interview before becoming an

      employee of Sovereign?

A.    Not really.

Q.    No?

A.    No.

Q.    Did Sovereign just hire you based on the

      recommendation of John Harvey?

A.    Yes.

Q.    Who did you report to?

A.    Excuse me?

the $10 an hour, you discussed with Mr. Roffman
that you wanted a raise?

A.    Yes.

Q.    Did you say how much you wanted?

A.    No.

Q.    Did he tell you how much he was willing to give
you?

A.    No.

Q.    Did he tell you how much other employees were
being paid?

A.    No.

Q.    Did you have any conversation regarding a
specific number?

A.    No.

Q.    Is that the only conversation you have ever had
with Mr. Roffman about getting a raise?

A.    Yes, once.

Q.    Once?

A.    Yeah.

Q.    After you received the $10 an hour, you never
again discussed a wage increase with Mr.
Roffman, correct?

A.    Yes, I did.

Q.    When is that?

A.    In 2000 I ask for more money.  He said no.

Q.    He told you no, I'm not going to give you
      anymore money?

A.    No.

Q.    Did he say anything else?

A.    He just said no.

Q.    What did you say in 2000 about wanting an
      increase from $10 an hour?

A.    Because I was working a lot doing specific job
      that should make more money than $10 an hour.

Q.    Do you understand in this lawsuit that you are
      demanding payment at a rate of $15.53 an hour?

A.    Yes, I do know.

Q.    If you never had any conversation or any
      agreement with Mr. Roffman for that amount, how
      can you claim that you are entitled to that
      amount?

A.    Because it's in the papers.  It's in the papers
      that a guy like me with my skills have to make
      $15.73 an hour.

Q.    He told you no, right?

A.    He told me no.  He saw the paper and he told me
      no, I'm not going to pay this, right there
      (Indicating) at his office.

Q.    He never --

A.    In front of him.  He said, I'll keep you at
      $10.

Q.    Mr. Roffman never agreed to pay you $15.53 an
      hour?

                    MS. HURLEY:  I'm going to object
      to that.  You are leading.

A.    It's in the paper.

Q.    No one at Sovereign said that they would pay
      you --

                    MS. HURLEY:  I'm going to object
      to that.  Ask a question.

                    MS. ROBERTS:  I'm asking the
      question if you will let me.

Q.    No one at Sovereign agreed to pay you $15.53 an
      hour; isn't that correct?

A.    No, nobody pay me.  Nobody told me that he's
      going to pay me.  They are going to say the
      paper say 15.73, but I'm not going to pay you.
      I'm going to pay you $10 an hour.

Q.    They never agreed to pay you 15.53 an hour?

A.    Not verbally.

Q.    In fact, they told you no, they are not going
      to give you an increase?

A.    No.  Stuart Roffman told me no.

               MS. HURLEY:  I'm going to

      object.

Q.    You asked him --

A.    I can --

Q.    Let me ask a question.

               MS. HURLEY:  I'm going to

      object.  We're getting a little bit too

      argumentative here.

               MS. ROBERTS:  You've made your

      objection.  That's all you're entitled to.

               MS. HURLEY:  I'll continue to

      object to all of these questions.

               MS. ROBERTS:  Fine.  Let me ask

      the question before you object, okay?

               MS. HURLEY:  Ask your next

      question.

Q.    Mr. Souto, isn't it fair to say that you asked

      for an increase and it was denied by Mr.

      Roffman?

A.    Yes.

Q.    Thank you.

A.    It was on the paper to say Renato, as a

      maintenance and with my skills, his salary is

correct?

A.   Yes.

Q.   You never received any deductions from your
standard paycheck for days that you didn't come
in because you were sick, did you?

A.   No.  It wasn't deduct.

Q.   You always --

A.   It was only one day in eight years.

Q.   You always got the same salary, the same
paycheck, right?

A.   Yes.

Q.   And for that one day there was no deduction?

A.   No, I don't think so.

Q.   And there were no other sick days that you ever
took?

A.   No.

Q.   In your sworn statement, Exhibit No. 2, and in
your Attorney General complaint, Exhibit No. 3,
you make a claim for payment for personal days;
is that accurate?

A.   Yeah, personal days, vacation, sick days.

Q.   Did you ever take a personal day between --

A.   No.

Q.   -- between 1999 and 2002?

A.    Only once, and I went from Friday to Tuesday, I
      think it was 2000.

Q.    So you took Friday off, Monday off, and Tuesday
      off?

A.    Yes.

Q.    When did you --

A.    Not Tuesday, though.  Monday.  Friday to Monday
      when I went to Florida.

Q.    You went to Florida?

A.    Yes, with my wife.  That's the only vacation in
      eight years on that place.

Q.    So you are calling that a vacation day as
      opposed to a personal day?

A.    Yeah, kind of, because I think four days, five
      days not a vacation.  It was like a few days of
      personal day they gave me finally.

Q.    And you were paid for that -- those two days
      off, right?

A.    I don't remember that.

Q.    You don't know?

A.    No, I don't.

Q.    Do you recall in 2000 at any time receiving any
      deductions from your standard salary check?

A.    I don't remember that either.

Q.   Would your paychecks reveal whether you had any
     deduction for those two days off?

A.   No.

Q.   They wouldn't?

A.   No, it wasn't deducted.

Q.   It was not deducted?

A.   Yes.

Q.   So you got that paid two days off?

A.   Yes, for four days, yes, I got paid.  The only
     time in eight years.

Q.   There was no other vacation that you took?

A.   Never.

Q.   Did you take any personal days with respect to
     your INS issues that you had?

A.   Yes, once.

Q.   One personal day?

A.   Once, yes, and I was getting paged all the time
     inside the immigration office, paged by Lee
     Torrey.

Q.   By Lee Torrey?

A.   Yes.

Q.   Were you paid for that one personal day that
     you took to go to INS?

A.   Yes.

A.    I don't remember that.  I think so.

Q.    You think so?

A.    I had to have the receipt, yes.

Q.    Did they ever give it to you when you just gave
      them an estimation of what you spent?

A.    Say again, please.

Q.    If you just gave them an estimation of the
      money you spent, if you verbally said, I
      estimate that I spent $100 --

A.    I was to write everything.

Q.    So you could write it down, and they would pay
      you?

A.    Yes.

Q.    If you could turn to what's marked as Exhibit 4
      and turn to the second page of Exhibit No. 4.

A.    (Witness complies).  I got it.

Q.    At the top of that document do you see a check
      from Barbara Fitzgerald made payable to you for
      $270 in July of 2002?

A.    Yes.

Q.    Is that for work that you did for Barbara
      Fitzgerald after your termination from
      Sovereign?

A.    Yes.

Q.   Is that during the time that you had filed for
     unemployment?

A.   Yes.

Q.   If you could turn to it's a check halfway
     through --

A.   What page?

Q.   Actually, is it your contention that you
     weren't paid a Christmas bonus?

A.   Christmas bonus, yes, I was to get it.

Q.   You got Christmas bonuses?

A.   Yes, sometimes.  They used to give more money
     for bonuses for everybody than me.  I used to
     get $100 sometimes.  $200 once I remember that.

               MS. ROBERTS:  If you could mark
     that as the next exhibit.

               (Exhibit 7, Complaint,

               marked for identification.)

Q.   Mr. Souto, I'm placing before you your
     complaint in this action, which has been marked
     as Exhibit 7.  If you could turn to the second
     page of your complaint and read paragraph 10 to
     yourself, I would appreciate it.

A.   Read everything?

Q.   Just paragraph 10 would be fine.

```
        Sovereign Realty to Souto's Trash Removal

        Service; do you see that?

A.      Yes, I see that.

Q.      Does that refresh your recollection that you

        were employed as a trash removal service in

        July of 2002?

A.      That's what they wrote down, not me.

Q.      You were paid, correct?

A.      Yeah, a few times, yes.

Q.      This is after you were --

A.      This is right here.

Q.      This is after you were fired by Lee Torrey,

        correct?

A.      Yes, after that.  I just don't remember exactly

        what I did as a trash removal service.

Q.      And this is while you were receiving

        unemployment, correct?

A.      No, I wasn't receiving it yet.  I just claim,

        filed the paper.  I didn't get anything from

        that, that date.

                MS. ROBERTS:  I think this is a

        good time to take a lunch break.  Does that

        work with all of you?

                MS. HURLEY:  It does.
```

Q.    Yes.

A.    Financial aid.

Q.    Which child has financial aid?

A.    Only one.

Q.    Which one?

A.    Filipe Souto.  One he is applying for.

Q.    Where does Filipe have financial aid?

A.    Where?

Q.    Yes.

A.    I don't know.

Q.    Does he attend school somewhere?

A.    He is going to school, yes.

Q.    What school?

A.    UMass.

Q.    Does he have financial aid from University of
      Massachusetts?

A.    It should be from them, yes.

Q.    Is that on the basis of the income information
      that you provided to UMass.?

A.    No, he does his own income-tax stuff.

Q.    Did you give your income-tax information for
      him to use in connection with his application
      to University of Mass.?

A.    I did.

reported anywhere in your tax returns for 2002?

A. I don't remember that. This is her business, not mine.

Q. You filed a joint tax return, didn't you?

A. Excuse me?

Q. You filed a joint tax return, didn't you?

A. Yes. It's right there.

Q. And you know that your joint tax return for 2002, as you previously testified, didn't include any income made by your wife?

A. I don't know about her. I know about myself.

Q. Is the payment submitted pursuant to this invoice considered unofficial pursuant to your previous testimony?

A. I don't know about that.

Q. You don't know. Is it fair to say that your wife has been operating a cleaning service for several years?

A. You have to ask her.

Q. You don't know?

A. No.

Q. You have no idea what your wife does?

A. No idea.

Q. Does your wife tell you --

A.    That's her business, not my business.

Q.    Does your wife tell you how she spends her
      time?

A.    No.

Q.    You don't know whether she has a cleaning
      service or not, Mr. Souto?

A.    No.

Q.    Do you dispute that your wife has a cleaning
      service?

A.    I don't know.  She's not here for me to ask
      her.  Whatever she does it's her business, not
      my business.

Q.    Do you have a car, Mr. Souto?

A.    A car?

Q.    Yes.

A.    Yes.

Q.    In 1999 did you have a car?

A.    I don't remember that.

Q.    In 2000 did you have a car?

A.    Probably I did.

Q.    Do you know what type of car you had in 2000?

A.    No.  I had so many cars before.  I don't
      remember which one.

Q.    Did you have a car in 2001?

Q.    Did she have a car before she had the gold car?

A.    Yes, I had.

Q.    Did she?

A.    I don't know.

Q.    You don't know whether your wife had a car
      before that?

A.    She probably does.  Okay.  I would say so, yes.

Q.    What color was her car before the gold car?

A.    I don't remember.

Q.    You don't know what color your wife's car was?

A.    No, I don't remember, no.

Q.    In 2002?

A.    No.  Her car is now a Honda.

Q.    It's a Honda now?

A.    Gold colored, yes.

Q.    Do you know the make of the car before the gold
      Honda?

A.    Before?

Q.    Before your wife drove the gold Honda, do you
      have any idea of what make of a car she drove?

A.    No.

Q.    Did you ever see her in it?

A.    No.

Q.    You never saw your wife driving her own car?

A.    Say again, please.

Q.    Do you know what car sales place sold the Ford
      Explorer to your wife?

A.    No, I don't remember that.

Q.    You don't remember the dealership?

A.    No.

Q.    Do you remember what town it was in?

A.    No.

Q.    You testified previously about a conversation
      you had with Mr. Roffman wherein you wanted to
      get a raise over and above $10 an hour, and he
      said no; is that correct?

A.    Can you say again?

Q.    Earlier on in the morning you had testified
      regarding a conversation you had with Mr.
      Roffman where you asked for a raise over the
      $10 an hour --

A.    Yes, I remember.

Q.    And you remember testifying that he said no, no
      raise?

A.    He said no.

Q.    You didn't have any other conversations with
      Mr. Roffman regarding pay, did you?

A.    No.

Q.   You didn't have any conversations with Mr.
     Roffman about being paid time and a half, did
     you?

A.   No.

Q.   Did you have any conversations with Mr. Torrey
     regarding pay?

A.   No.

Q.   You didn't have any conversations with Mr.
     Torrey about being paid time and a half, did
     you?

A.   No.  They are supposed to do that by
     themselves.  I don't have to say nothing.

Q.   Do you have any records of the hours you worked
     while at Sovereign?

A.   Approximately I would say 55 to 60 hour a week,
     including -- that's including nights work,
     weekends, I'm sorry, holidays.  That's what I
     would say average.

Q.   Your testimony is that you worked 50 to 60
     hours --

A.   55 to 60.

Q.   55 to 60?

A.   Yes.

Q.   Do you have any journals or written time