UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

*********************************************

| | |
|---|---|
| RENATO SOUTO and OTHERS SIMILARLY SITUATED, | ) ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SOVEREIGN REALTY ASSOCIATES, LTD. and STUART ROFFMAN, As President of the General Partner of Sovereign Realty Associates, Ltd., Sovereign Realty Associates G.P., Inc., and Individually, | ) ) ) ) ) |
| Defendants. | ) |

*********************************************

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT FOR FRAUD ON THE COURT AND REQUEST FOR SANCTIONS

### Introduction

The Defendants, Sovereign Realty Associates, Ltd. and Stuart Roffman have filed a Motion to Dismiss the above-captioned action on the grounds that the Plaintiff has committed fraud on the court.

The Plaintiff, Renato Souto, vigorously opposes the Defendants' Motion to Dismiss on the grounds that it is completely unwarranted and not supported by the facts or by the law in this case. The law requires clear and convincing evidence that the plaintiff has engaged in fraudulent conduct which is part of a pattern or unconscionable scheme to defraud, and the facts in this case do not support such a finding. Rockdale Management Co., Inc. v. Shawmut Bank, N.A., 418 Mass 596, 600 (1994).

In fact, defendants' motion not only falls well-short of the legal standards, but it is

also supported by an ulterior motive such that sanctions of attorney's fees are warranted. This is a blatant abuse of process and a calculated scheme to disrupt the orderly process of discovery in this case.

**<u>Argument</u>**

A.      <u>Standard for Motion to Dismiss For Fraud on the Court</u>

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." <u>Aoude v. Mobil Oil Corporation</u>, 892 F.2d 1115, 1118 (1st Cir. 1989).  When a fraud on the court is shown through clear and convincing evidence, the trial judge has the inherent power to take action in response to the fraud, including the dismissal of claims, dismissal of the entire action, or the entry of default judgment.  <u>Rockdale</u> at 598.

It is important to note, however, that the moving party must demonstrate "through clear and convincing evidence that a party's fraudulent conduct is part of a *pattern or scheme* to defraud." <u>Id</u> at 600.  "In his concurring opinion in *<u>Rockdale</u>*, Justice O'Connor offered a 'word of caution,' stating that '[t]he precious right of trial by jury is jeopardized by any suggestion that a jury case may be dismissed or the defendant may be defaulted whenever a motion judge or trial judge, after measuring a party's credibility and without the benefit of an admission…finds by 'clear and convincing evidence' that the party has committed perjury as 'part of a pattern or scheme to defraud.'" <u>Cela c. LeFleur</u>, 2005 WL

3623515, *3 (Mass.App.Div.).

Based upon this necessarily elevated standard, this Court should deny the Defendant's Motion to Dismiss for the reasons that follow.

B.      There is No Clear and Convincing Evidence That the Plaintiff Has Engaged in Fraudulent Conduct Which is Part of a Pattern or Unconscionable Scheme to Defraud.

In their motion to dismiss, the defendants proffer a number of statements made by the plaintiff over the course of his deposition which they allege reveal that plaintiff is attempting to perpetrate a fraud on the court.

In their first example, defendants claim that while plaintiff submitted a sworn statement asserting that he was not paid for 15 hours worked per week in 2000, that he actually admitted that in the beginning of his relationship with Sovereign Realty Associates, Ltd. he billed Sovereign as Renato Cleaning Service and was always paid in full for the bills he submitted.

While it is hard to imagine how this evidence could rise to the level of a scheme to defraud the court, nevertheless, this is a clear mischaracterization of the plaintiff's deposition testimony.  It is first important to note that plaintiff *began* his employment relationship with the defendants in 1994.  (See Excerpts of Plaintiff's Deposition Testimony, pg. 16 attached as Exhibit "A").  While plaintiff did state in parts of his deposition that he was called an independent contractor and that he billed Sovereign, it was never clear that the plaintiff billed the defendant in 2000, nor have the defendants produced any evidence of this fact, despite repeated requests from the plaintiff for such evidence.  But, the question

of whether an individual is an independent contractor does not rise or fall on an agreed upon title or billing relationship, rather courts review the actual duties and relationships. To do otherwise would render meaningless the State's interest in prohibiting employers from misclassifying their employees as independent contractors.

The evidence will show that plaintiff was in fact an employee, and despite counsel's assertions, the deposition testimony actually supports this claim. The plaintiff believed he was an employee of Sovereign Realty. He did not understand the meaning of the term independent contractor, and he believed that he was being paid at an hourly rate. (See Excerpts of Plaintiff's Deposition Testimony, pgs.17 and 30 attached as Exhibit "A"). Moreover, the high level of control Sovereign Realty maintained over the plaintiff made their relationship one of employer/employee pursuant to Massachusetts law.

In defendants' second example, they allege that the plaintiff claims that he is owed payment for earned sick, personal and vacation time, yet he testified that he did take sick, personal and vacation time during his tenure with Sovereign Realty. Once again, this is a gross mischaracterization of both the facts in this case as well as the plaintiff's deposition testimony. In his complaint, the plaintiff alleged that he was owed wages for 5 sick days, 5 personal days, and 4 weeks of vacation per year. Throughout the course of his deposition, the plaintiff testified that he received 1 sick day in 8 years, 2 vacation days, and 1 personal day. This is a total of 4 days. (See Excerpts of Plaintiff's Deposition Testimony, pgs.103-108 attached as Exhibit "A"). The plaintiff, however, alleges that he was owed 30

paid days off per year over the span of 6 years.  Again, to date, despite repeated requests, the defendants have failed to provide any documentation regarding paid days off.

And finally, the defendants allege that the plaintiff admitted that the defendants never told him that he would be paid $15.53 per hour.  It is true that the plaintiff stated that he asked for a raise and was told no, but this is not dispositive to his understanding.  Rather it merely shows that the defendants refused to meet their obligations.  Despite this fact, the plaintiff also testified that his immigration papers stated that his rate would be $15.53 per hour, and furthermore he was told that regardless of what the papers said, the defendants would not pay the plaintiff the figure which they reported to INS in connection with the plaintiff's employment. (See Excerpts of Plaintiff's Deposition Testimony, pgs.79 attached as Exhibit "A" and Copy of Immigration Posting attached as Exhibit "B"). The plaintiff still believes that he has a viable argument that the defendants can not promise immigration officials that they will pay an employee at a certain rate and turn around and refuse to pay the employee at the promised rate.  This, however, is clearly a legal argument and not an attempt to perpetrate fraud on the court.  If there is any fraud in this case, it is the fraud committed by Sovereign Bank which employed the plaintiff without first having approval from immigration authorities.

Defendants also make a number of allegations surrounding plaintiff's tax returns.  The plaintiff does not intend to argue that his tax filings have always been 100% accurate.  It is clear that the plaintiff did not always have a full

understanding of his reporting requirements and that maybe his returns were inaccurate. This does not, however, rise even close to the level of an unconscionable scheme to defraud this court.

The case law regarding fraud on the court is clear. Courts are willing to dismiss a claim when the plaintiff had taken affirmative actions to defraud the court and unfairly hamper the presentation of the opposing party's defense. See, e.g., Rockdale Management Co., Inc. v. Shawmut Bank, N.A., 418 Mass. 596 (1994) (plaintiff submitted a forged letter to support its claim for damages); see, e.g., Munshani v. Signal Lake Venture Fund II, LP, 60 Mass.App.Ct. 714 (2004) (plaintiff submitted a forged email to take his case out of the Statute of Frauds); see, e.g., Aoude v. Mobil Oil Corporation, 892 F.2d. 1115 (1st Cir. 1989) (plaintiff annexed a bogus purchase agreement to his complaint).

This is not the case in this action. The plaintiff has not submitted a forged document to support any claims in his complaint. Rather, through discovery, as is often the case, it has allegedly[1] been determined that the plaintiff's numbers are not completely accurate. This is not, however, fraud on the court.

The plaintiff has been nothing but forthright in the presentation of his case. He has provided the defendants with all of his documents, including his tax returns, despite their potential to impeach his character. Defendants, on the other hand, have produced scant evidence of their claims, refused to appear at deposition, and they have refused to produce their tax returns, deeming them

---

[1] Once again, it is important to note that the Defendants have not proffered any evidence of inaccurate numbers. Rather defendants rely on the deposition testimony of the plaintiff, which is admittedly confusing at times. Instead of taking affirmative actions to produce evidence, the Defendants have insisted on stalling all discovery pending the outcome of this motion.

6

irrelevant.

C.    Request for Sanctions on Account of Defendants' Abuse of Process

The plaintiff in this action seeks sanctions on account of the defendants'
clear abuse of process. "Under Massachusetts law, in order to state a claim for
abuse of process three elements must be satisfied. First, the claimant must allege
that some process was used. Second, the claimant must allege that the process was
used for an ulterior or illegitimate purpose. Third, the claimant must allege that
the use of the process resulted in damages." Gouin v. Gouin, 249 F.Supp.2d 62
(D.Mass. 2003). "Abuse of process presupposes the use of legal action for an
ulterior purpose, i.e., to achieve some end other than the apparent end of the
litigation process which has been launched." Silvia v. Building Inspector of West
Bridgewater, 35 Mass.App.Ct. 451, 453, 621 N.E.2d 686 (1993). It is important
to note, however, that "Mere knowledge that a claim is groundless is not
sufficient in and of itself to establish an abuse of process…'There must also be
proof of an ulterior motive.'" Fafard Real Estate & Development Corp. v. Metro-
Boston Broadcasting,Inc., 345 F.Supp.2d 147 (D.Mass. 2004).

In this action, the defendants have taken affirmative actions to hinder the
presentation of the plaintiff's case and strong armed the plaintiff by using its
attorneys to cause delay and file a meritless motion to dismiss. According to the
terms of a court order dated, November 1, 2005, this court permitted the plaintiff
to take the depositions of Stuart Roffman, Lee Torrey and Barbara Fitzgerald
following the defendants' deposition of Renato Souto. The defendants took Mr.

Souto's deposition on December 20, 2005. Sovereign Bank, in violation of the court order, however, refuses to appear for deposition despite initially agreeing to do so. After multiple attempts to schedule Mr. Roffman's deposition, both sides agreed to schedule Mr. Roffman's deposition on January 25, 2006. Defense counsel confirmed the scheduling of this deposition as late as January 19, 2006, by letter without any reservation of rights or indication of any problems or concerns. Despite these assurances that the deposition would proceed, this motion to dismiss along with an emergency motion to stay discovery, was filed on January 23, 2006, two (2) days before the scheduled deposition.

The defendants have had over a month since Mr. Souto's deposition to raise their claims of fraud. Instead of filing a motion in a timely manner flowing the deposition, however, the defendants allowed the plaintiff to schedule a deposition, and chose instead to file an "emergency" motion in an effort to stall the deposition one day before it was scheduled to occur. Plaintiff's counsel spent a substantial amount of time preparing for a deposition that the defendants knew would be postponed. Furthermore, Plaintiff's counsel was also forced to simultaneously prepare to go to court on very short notice, to attend a hearing on defendants' emergency motion to stay discovery.

The defendants' in this case had ample time to bring a motion to dismiss. Instead of doing so in a timely fashion, however, defendants waited until the last moment to file their motion with the illegitimate purpose of forcing plaintiff's counsel to prepare simultaneously for a deposition and a potential hearing. Furthermore, defense counsel was advised in writing prior to the re-filing of her

motion that the plaintiff intended to seek sanctions on account of defendants' abuse of process.

As a result of this abuse of process, the plaintiff has incurred damages in the form of additional and unnecessary legal fees. Accordingly, the plaintiff requests that the court award him $1,500.00 in sanctions.

## Conclusion

For the foregoing reasons, plaintiff moves that this Motion be denied and the plaintiff be allowed to complete its depositions.  Furthermore, plaintiff requests this Court award him reasonable expenses incurred on account of defendants' abuse of process, including attorney's fees, in the amount of $1,500.00.

RENATO SOUTO
By his attorneys,


/s/ Ara J. Balikian_____
Ara J. Balikian (BBO#630576)
Kristen M. Hurley (BBO#658237)
Gordon and Balikian, LLP
535 Boylston Street, 6th Floor
Boston, MA 02116
617-536-1800

## CERTIFICATE OF SERVICE

I, Kristen M. Hurley, hereby certify that on January 25, 2006, I caused a copy of the foregoing document to be served, upon counsel for the defendants, Bronwyn L. Roberts, Esq., Duane Morris LLP, 470 Atlantic Avenue, Suite 500, Boston, MA 02210, by first class mail by electronic notification.

/s/ Kristen M. Hurley
Kristen M. Hurley

EXHIBIT "A"

☐ COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005-CV-10864-JLT

*******************************************
RENATO SOUTO and OTHERS SIMILARLY      *
SITUATED,                              *
                    Plaintiff,         *
                                       *
          V                            *
                                       *
SOVEREIGN REALTY ASSOCIATES LTD. and   *
STUART ROFFMAN, as President, of the   *
General Partner of Sovereign Realty    *
Associates, Ltd., Sovereign Realty     *
Associates G.P., Inc., and Individually *
                    Defendants.        *
*******************************************

Deposition of RENATO SOUTO,

taken on behalf of the Defendants, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Duane Morris, LLP, 470 Atlantic Avenue,

Boston, Massachusetts, on December 20, 2005,

commencing at 9:10 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

APPEARANCES:

Duane Morris, LLP
[By Bronwyn L. Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
     On behalf of the Defendants.

Gordon & Balikian, LLP
[By Philip J. Gordon, Esq.]
[By Kristen M. Hurley, Esq.]
535 Boylston Street
Boston, Massachusetts 02116
     On behalf of the Plaintiff.

ALSO PRESENT:  Stuart Roffman.
               Lee Torrey.

A.    Yes.

Q.    Did you file any state or Federal tax returns
      in 1993?

A.    No.

Q.    In 1994 were you employed?

A.    Yes.

Q.    Who was your employer in 1994?

A.    (Indicating) Stuart Roffman.

Q.    Mr. Roffman was your employer?

A.    Yes,  '94, yes.  When I got here, I started
      working in the Sovereign building.

Q.    Were you working as an independent contractor?

A.    At that time I was, yes.

Q.    In 1994 approximately how much were you paid
      for your independent contracting services?

A.    $8 an hour.

Q.    How many hours a week did you work?

A.    Average about 11 hours a day, average.

Q.    Did you file state or Federal tax returns in
      1994?

A.    No.

Q.    Why not?

A.    Because at that time I wasn't legal in the
      country.

Q.   Do you have an understanding of what an

     independent contractor is?

A.   Actually, no, I don't know.

Q.   It's different than an employee, correct?

A.   Yes.  I was an employee of Stuart Roffman.

Q.   You were an employee?

A.   Yeah.

Q.   Were you billing him?

A.   No.

Q.   You weren't billing Mr. Roffman under the name

     of a different entity in 1994?

A.   Yeah, I was billing, yeah.

Q.   Were you working as a cleaning service?

A.   No, maintenance.

Q.   A maintenance service.  What was the name of

     that company that you were working for?

A.   Sovereign Realty.

Q.   It was Sovereign Realty?

A.   Yes.  I worked for Sovereign Realty for Stuart

     Roffman.

Q.   But it's your understanding you were an

     independent contractor at that time?

A.   I never signed to be an independent contractor.

     They was to tell me, but I never signed to be

an independent contractor.  I just work for
them.

Q.   And you billed them, correct?

A.   I did.  I did a few times, yes.

Q.   Did you do business under the title Renato's
Cleaning Service?

A.   Yes, I did, a few times, yes.

Q.   In 1995 --

A.   Just by the name.

Q.   Renato Cleaning Services?

A.   Yes.

Q.   In 1995 did you have income in the United
States?

A.   Say again, please.

Q.   In 1995 did you have any income in the United
States?

A.   Yeah.

Q.   How were you employed in 1995?

A.   For Sovereign Realty.

Q.   Were you still working as an independent
contractor for Renato's Cleaning Service?

A.   I don't think so.

Q.   You don't know?

A.   I'm not sure.  It's ten years ago.

A.    In 2000 I ask for more money.  He said no.

Q.    He told you no, I'm not going to give you

      anymore money?

A.    No.

Q.    Did he say anything else?

A.    He just said no.

Q.    What did you say in 2000 about wanting an

      increase from $10 an hour?

A.    Because I was working a lot doing specific job

      that should make more money than $10 an hour.

Q.    Do you understand in this lawsuit that you are

      demanding payment at a rate of $15.53 an hour?

A.    Yes, I do know.

Q.    If you never had any conversation or any

      agreement with Mr. Roffman for that amount, how

      can you claim that you are entitled to that

      amount?

A.    Because it's in the papers.  It's in the papers

      that a guy like me with my skills have to make

      $15.73 an hour.

Q.    He told you no, right?

A.    He told me no.  He saw the paper and he told me

      no, I'm not going to pay this, right there

      (Indicating) at his office.

Q.  He never --

A.  In front of him.  He said, I'll keep you at
    $10.

Q.  Mr. Roffman never agreed to pay you $15.53 an
    hour?

            MS. HURLEY:  I'm going to object
    to that.  You are leading.

A.  It's in the paper.

Q.  No one at Sovereign said that they would pay
    you --

            MS. HURLEY:  I'm going to object
    to that.  Ask a question.

            MS. ROBERTS:  I'm asking the
    question if you will let me.

Q.  No one at Sovereign agreed to pay you $15.53 an
    hour; isn't that correct?

A.  No, nobody pay me.  Nobody told me that he's
    going to pay me.  They are going to say the
    paper say 15.73, but I'm not going to pay you.
    I'm going to pay you $10 an hour.

Q.  They never agreed to pay you 15.53 an hour?

A.  Not verbally.

Q.  In fact, they told you no, they are not going
    to give you an increase?

Q.    You never received it?

A.    No.

Q.    Did you ever work over 40 hours a week between

      1999 and 2002?

A.    Yes.

Q.    When?  What days?

A.    A few days a week, Saturdays, Sundays.  They

      call me, page me to go do some work, and I not

      get paid.

Q.    Did you ever receive straight time for hours

      worked over 40?

A.    No, I never received nothing after 40.

Q.    You also have a demand here for sick pay; is

      that correct?

A.    Correct.

Q.    Is it your contention that you never received

      pay for any days that you were sick?

A.    I never get sick day.  I never get sick.  I was

      working for eight years straight, no days

      off -- I mean, days off, yes, but on call on

      the pager, and I never got paid ever 40 hours.

Q.    Did you ever call in sick while you were

      employed by Sovereign?

A.    Once.

Q.    Did you get paid for that day?

A.    Only once.  No.

Q.    You didn't?

A.    No.

Q.    When was that?

A.    I cannot remember.

Q.    What year?

A.    I would say 2000.

Q.    2000?

A.    Yes.  I would say that.

Q.    And you contend that you were not paid that
      day?

A.    I don't remember that.  I'm sorry.

Q.    You might have been paid for that day?

A.    One day?

Q.    Yes.

A.    Yes, I got paid for that day.

Q.    You did?

A.    One day in eight years.

Q.    And that's the only time you ever did call in
      sick, correct?

A.    Excuse me?

Q.    That one day that you were paid for sick time
      is the only day that you ever called in sick,

correct?

A.    Yes.

Q.    You never received any deductions from your

      standard paycheck for days that you didn't come

      in because you were sick, did you?

A.    No.  It wasn't deduct.

Q.    You always --

A.    It was only one day in eight years.

Q.    You always got the same salary, the same

      paycheck, right?

A.    Yes.

Q.    And for that one day there was no deduction?

A.    No, I don't think so.

Q.    And there were no other sick days that you ever

      took?

A.    No.

Q.    In your sworn statement, Exhibit No. 2, and in

      your Attorney General complaint, Exhibit No. 3,

      you make a claim for payment for personal days;

      is that accurate?

A.    Yeah, personal days, vacation, sick days.

Q.    Did you ever take a personal day between --

A.    No.

Q.    -- between 1999 and 2002?

A.    Only once, and I went from Friday to Tuesday, I
      think it was 2000.

Q.    So you took Friday off, Monday off, and Tuesday
      off?

A.    Yes.

Q.    When did you --

A.    Not Tuesday, though.  Monday.  Friday to Monday
      when I went to Florida.

Q.    You went to Florida?

A.    Yes, with my wife.  That's the only vacation in
      eight years on that place.

Q.    So you are calling that a vacation day as
      opposed to a personal day?

A.    Yeah, kind of, because I think four days, five
      days not a vacation.  It was like a few days of
      personal day they gave me finally.

Q.    And you were paid for that -- those two days
      off, right?

A.    I don't remember that.

Q.    You don't know?

A.    No, I don't.

Q.    Do you recall in 2000 at any time receiving any
      deductions from your standard salary check?

A.    I don't remember that either.

Q.    Would your paychecks reveal whether you had any
      deduction for those two days off?

A.    No.

Q.    They wouldn't?

A.    No, it wasn't deducted.

Q.    It was not deducted?

A.    Yes.

Q.    So you got that paid two days off?

A.    Yes, for four days, yes, I got paid.  The only
      time in eight years.

Q.    There was no other vacation that you took?

A.    Never.

Q.    Did you take any personal days with respect to
      your INS issues that you had?

A.    Yes, once.

Q.    One personal day?

A.    Once, yes, and I was getting paged all the time
      inside the immigration office, paged by Lee
      Torrey.

Q.    By Lee Torrey?

A.    Yes.

Q.    Were you paid for that one personal day that
      you took to go to INS?

A.    Yes.

Q.   Were you paid for any days that you took to go
     to doctors' appointments for you and your
     family in connection --

A.   No.

Q.   -- with your immigration?

A.   No.

Q.   No, you were not paid?

A.   No, because I went at night, and they paged me,
     too.

Q.   You worked at night?

A.   I worked for them that night. I remember. Do
     you want me to say what happened?

Q.   I want you to remember.

A.   I was in the doctor for my exams for the
     immigration, and Lee Torrey paged me many
     times. He say, Stuart wants you in his house
     right now to take his girlfriend out of the
     snow. They was stuck in the snow.

             I went there I would say 8
     o'clock, working until 1 o'clock in the morning
     taking her car from there because she's stuck
     there. He live on a hill driveway. She back
     up and stuck in the grass full of snow, ice. I
     spend like five or six hours, I don't know, to

# EXHIBIT "B"

# POSTING

## Maintenance Repairer

1. Repair & maintain rental units, including total reconditioning & repair of all aspects of unit - electrical/plumbing/carpentry/fixtures/tile/linoleum - as well as plastering, painting, cleaning, rug shampooing and basic repairs for unit occupancy. Respond to maintenance complaints & requests with 24-hr. turnaround repairs.

2. Rate of Pay - Basic: . $15.53/hr, 35 hrs/wk. 7:00 a.m. - 3:00 p.m.; no overtime.

3. Minimum Experience: 2 years experience required.

4. The posting herein is being provided as a result of the filing of an Application for Permanent Alien Labor Certification for the job opportunity above stated in accordance with 20 CFR 656.

5. Any applicant or person may provide documentary evidence bearing on the application to the local Employment Service Office at the Charles F. Hurley Building, 19 Staniford Street, Government Center, Boston, MA 02114.

6. All applicants should apply to Soverign Realty Associates, 822 Boylston Street, Chestnut Hill, MA 02167.

7. The within posting is herein submitted in accordance with Title 20 Code of Federal Regulations, Section 656.


The within posting was placed at our business in an area visible to anyone from _____ to _____. No one applied for this position.


_____

Stuart Roffman, Manager