UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

**********************************************

| | |
|---|---|
| RENATO SOUTO and OTHERS SIMILARLY SITUATED, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SOVEREIGN REALTY ASSOCIATES, LTD. and STUART ROFFMAN, As President of the General Partner of Sovereign Realty Associates, Ltd., Sovereign Realty Associates G.P., Inc., and Individually, | ) |
| Defendants. | ) |

**********************************************

## PLAINTIFF'S MOTION TO AMEND COMPLAINT

The Plaintiff, Renato Souto, pursuant to Federal and Local Rule 15 of the Rules of Civil Procedure, hereby requests that this honorable court grant him leave to amend his complaint to add Barbara Fitzgerald, as a defendant in the above-referenced action.

### Summary

The MA Wage Act defines "employer" to include "officers and agents having management of such corporation."  Courts have declined to interpret this "to allow the persons who performed the duties of president and treasurer to be able to escape their obligations timely to pay wages under the Wage Act merely by giving themselves different titles or by avoiding any formal title."  Ms. Fitzgerald maintained primary responsibility for payroll, signed checks, was involved in hiring employees, made important decisions regarding the finances, and served as the accountant and bookkeeper for Sovereign Realty Associates – in short, she performed all the duties of Treasurer. Thus, she is an "employer" for purposes of the Wage Act and should be added as a

defendant in this action.

## Introduction

This is an action wherein the Plaintiff, Renato Souto (hereinafter "Mr. Souto") seeks to recover unpaid wages from his former employer, the Defendants, Sovereign Realty Associates, Ltd. and Stuart Roffman.  Mr. Souto was employed by Sovereign Realty Associates, Ltd. and Stuart Roffman from 1994 through July 3, 2002.  During this time, Mr. Souto did not receive all of his wages which were due and owing.

Sovereign Realty Associates, Ltd. and Stuart Roffman promised to pay Mr. Souto $15.53 per hour, but only paid him $10.00 per hour.  In addition, Mr. Souto did not receive payment for overtime hours, sick days, personal days, vacation days or holidays. Mr. Souto was also required to carry a pager and respond to this pager 24 hours a day, 7 days a week and was not compensated for time spent answering calls.

Ms. Fitzgerald worked for Sovereign Realty Associates, Ltd. throughout the time of Mr. Souto's employment.  She maintained primary responsibility for payroll, signed checks, was involved in hiring employees, made important decisions regarding the finances, and served as the accountant and bookkeeper for Sovereign Realty Associates, Ltd. – in short, she performed all the duties of Treasurer during Mr. Souto's tenure. Thus, she is an "employer" of Mr. Souto for purposes of the Wage Act and should be added as a defendant in this action.

Mr. Souto worked continuously, diligently and effectively on behalf of Sovereign Realty Associates, Ltd., Barbara Fitzgerald and Stuart Roffman.  Sovereign Realty Associates, Ltd., Barbara Fitzgerald and Stuart Roffman, however, have failed to pay Mr. Souto his wages in full.  Through this action, Mr. Souto seeks to recover his

unpaid wages.

## Procedural History

1.      On or about April 13, 2005, Mr. Souto filed the Complaint in the above-captioned matter with the Middlesex Superior Court.

2.      On or about, April 28, 2005, Sovereign caused this action to be removed to the United States District Court for the District of Massachusetts.

3.      On or about February 13, 2006, Mr. Souto, through his counsel, took the deposition of the defendant, Stuart Roffman.

4.      On or about February 24, 2006, Mr. Souto, through his counsel, took the deposition of Lee Torrey.  Lee Torrey is the general manager of Sovereign Realty Associates, Ltd.

## Argument

Massachusetts General Laws Chapter 149, Section 148 provides, in relevant part, that:

> The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section.

See also Kohli v. Res Engineering, Inc., 13 Mass.L.Rptr. 108 (2000).

In drafting this statute, the Legislature made a clear decision to impose personal liability on "agents having management of the corporation."  "[T]he Legislature did not wish to allow the persons who performed the duties of president and treasurer to be able to escape their obligations timely to pay wages under the Wage Act merely by giving themselves different titles or by avoiding any formal title." Bisson v. Ptech, Inc., 2004

WL 2434638 at *2 (Mass.Super.).

The United States District Court for the District of Massachusetts dealt with this issue specifically in Nahigian v. Leonard, 233 F.Supp.2d 151 (D.Mass. 2002). In this case, the chief financial officer and treasurer argued that they were not liable under the provisions of M.G.L. c. 149 § 150. The court, however, pointed out that "[a]s there is no contrary authority, it appears that Massachusetts law applies the broad definition of employer from Section 148 (which includes corporate officers) to suits by employees under section 150 to remedy violations of section 148." Id at 161. "Accordingly, the Court [held] that corporate officers like [the CFO] and [the treasurer] can indeed be sued under Section 150 for violating Section 148." Id at 160.

It has been revealed, through discovery, that Barbara Fitzgerald was, as defined in the statute, an "officer or agent having management" of Sovereign Realty Associates, Ltd. As the "bookkeeper, accountant and primary person with the payroll service", Ms. Fitzgerald regularly made decisions regarding the employment practices and policies of Sovereign Realty Associates, Ltd., including the decision of whether an individual should be placed on the payroll as an employee or paid as an independent contractor. (See Deposition Testimony of Stuart Roffman, Pg. 15 and 171-173 attached as Exhibit "A" and Deposition Testimony of Lee Torrey, Pg. 22, 124 and 133 attached as Exhibit "B"). In addition, Ms. Fitzgerald had the authority to sign checks on behalf of Sovereign Realty Associates, Ltd. (See Deposition Testimony of Stuart Roffman, Pgs. 157-158 attached as Exhibit "A"). Ms. Fitzgerald also directly supervised Mr. Souto. (See Deposition Testimony of Lee Torrey, Pg. 85 attached as Exhibit "B").

Accordingly, it is clear that Ms. Fitzgerald was a person "having management of

the corporation" pursuant to G.L. c. 149, §148. She was the person who was supervising Mr. Souto and overseeing his compensation. Furthermore, she was doing the same for all other employees. In fact, it can be argued that Ms. Fitzgerald effectively assumed the duties of Treasurer of Sovereign Realty Associates, Ltd. as she maintained the books and made decisions surrounding the payroll. She made important decisions concerning the finances of Sovereign Realty Associates, Ltd. Accordingly, pursuant to G.L. c. 149, §148, Ms. Fitzgerald qualifies as a proper defendant in this action

Under the standard of Fed.R.Civ.P. 15(a), which allows leave to amend freely when justice so requires, this Court should permit Mr. Souto's proposed amendment. Mr. Souto intended to file this motion to amend after taking Ms. Fitzgerald's deposition, which was scheduled for February 22, 2006. Ms. Fitzgerald, however, failed to appear at her deposition. (See Affidavit of Philip J. Gordon, Esq. attached as Exhibit "C").

Mr. Souto then rescheduled Ms. Fitzgerald's deposition for March 31, 2002, but on March 29, 2006, the Defendants filed a motion requesting that discovery be stayed pending the outcome of Defendants' Motion to Dismiss. (See Affidavit of Philip J. Gordon, Esq. attached as Exhibit "C"). This request was granted on March 30, 2006. As such, counsel for the plaintiff left a message for Ms. Fitzgerald on March 30, 2006, advising her not to appear for her scheduled deposition, and the plaintiff to date has refrained from re-noticing Ms. Fitzgerald's deposition pending a ruling on the Defendants' Motion to Dismiss. (See Affidavit of Philip J. Gordon, Esq. attached as Exhibit "C").

Mr. Souto has taken the deposition of Stuart Roffman and Lee Torrey. The testimony given at both of these depositions has revealed that Ms. Fitzgerald was

essentially the Treasurer of Sovereign.  Although, Mr. Souto had preferred to take Ms. Fitzgerald's deposition prior to filing this Motion, Mr. Souto has elected to file the motion at this time, so that there will be no unnecessary or unjust delay in asserting this right.

In addition, defendants suffer no prejudice by allowing this Motion.  The issues and legal arguments both on the plaintiff's side and on the defense side remain the same after amendment of the complaint:  Mr. Souto claims that he was not paid his proper wages.  Sovereign Realty Associates, Ltd. denies that it owes Mr. Souto any money. Accordingly, by allowing Mr. Souto to amend his complaint, this action will be in compliance with G.L. c. 149, §148 and allow both sides to be clear as to this issues involved in this action.

Mr. Souto attaches hereto, as <u>Exhibit "D"</u>, and incorporates herein by this reference his Amended Complaint[1].

<u>Conclusion</u>

For the foregoing reasons, Mr. Souto respectfully requests that this Court allow the Plaintiff's Motion to Amend Complaint.

Respectfully Submitted,
RENATO SOUTO
By his attorneys,


/s/ Philip J. Gordon
Philip J. Gordon (BBO # 630989)
Kristen M. Hurley (BBO # 658237)
Gordon Law Group, LLP
535 Boylston St., 6th Fl.
Phone: 617-536-1800

---

[1] Plaintiff's Amended Complaint has been updated to remove counts V and VI which were dismissed by this court on 1/23/06

## CERTIFICATION UNDER LOCAL RULE 7.1(A)(2)

The undersigned hereby certifies that counsel for the plaintiff conferred with counsel for the defendants in good faith to resolve or narrow the issue raised by this motion.  The parties were unable to reach agreement.


/s/ Philip J. Gordon
Philip J. Gordon


## CERTIFICATE OF SERVICE

I, Philip J. Gordon, hereby certify that on June 9, 2006, I caused a copy of the foregoing document to be served, upon counsel for the defendants, David Berman, Esq., 100 George P. Hassett Drive, Medford, MA 02155, by electronic notification and first class mail.

/s/ Philip J. Gordon
Philip J. Gordon

# In The Matter Of:

*Renato Souto, et al.   v.*
*Sovereign Realty Associates, Ltd., et al.*

---

*Stuart A. Roffman*
*Vol. 1, February 13, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File ROFFMAN.V1, 223 Pages*
*Min-U-Script® File ID: 3101948853*

# Word Index included with this Min-U-Script®

Renato Souto, et al. v.
Sovereign Realty Associates, Ltd., et al.

Case: 1:05-cv-10864-JLT    Document 38-2    Filed 06/09/2006    Page 2 of 56

Stuart A. Roffman
Vol. 1, February 13, 2006

**Page 1**

Volume I
Pages 1 to 223
Exhibits 1 to 11
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864JLT
RENATO SOUTO and OTHERS SIMILARLY    :
SITUATED,                            :
      Plaintiffs,          :
     vs.                    :
SOVEREIGN REALTY ASSOCIATES, LTD.    :
  and STUART ROFFMAN, As President  :
  of the General Partner of         :
  Sovereign Realty Associates,      :
Ltd., Sovereign Realty Associates    :
  G.P., Inc., and Individually,     :
      Defendants.          :

DEPOSITION OF STUART A. ROFFMAN, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Susan E. DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gordon Law Group
LLP, 535 Boylston Street, 6th Floor, Boston,
Massachusetts, on Monday, February 13, 2006,
commencing at 11:02 a.m.
PRESENT:
  Gordon Law Group LLP
    (by Philip J. Gordon, Esq.,
    and Kristen M. Hurley, Esq.)
  535 Boylston Street, 6th Floor, Boston, MA
  02116, for the Plaintiffs.
  Law Offices of David Berman
    (by David Berman, Esq.)
    100 George P. Hassett Drive,
  Medford, MA 02155, for the Defendants.

**Page 2**

INDEX
WITNESS   DIRECT CROSS REDIRECT RECROSS
STUART A. ROFFMAN
BY MR. GORDON   5

EXHIBITS

NO.   DESCRIPTION   PAGE
1 Letter to Stuart Roffman from John  104
  K. Dvorak, dated 7/20/99
2 Document addressed "To Whom it May  106
  Concern" from Stuart Roffman dated
  7/26/99
3 Boston Herald advertisement, Tuesday  107
  July 27, 1999
4 Document with heading "The United  115
  States of America" Form I-797C
5  Letter "To Whom it May Concern"  143
6  2002 Schedule E and Statement 7  165
  Supplemental Income and Loss
  Statement for 2002 of Stuart Roffman
7 Copies of payroll records of Renato  168
  Souto
8 Second set of payroll records for  175
  Renato Souto
9 Letter addressed to "Stuart" from  180
  LT, dated Tuesday, May 8

**Page 3**

EXHIBITS, Continued
NO.   DESCRIPTION   PAGE
10  Document entitled "Employee Work  197
  Conditions"
11  Document entitled "Christmas  209
  Bonuses" dated Monday, December 17

**Page 4**

[1]           **PROCEEDINGS**
[2]   **MR. BERMAN:** It is 11:02 a.m. on Monday,
[3] February 13, 2006. We are here for the deposition
[4] of Stuart A. Roffman in the case of Souto versus
[5] Sovereign Realty Associates. Present in the room,
[6] also, is Lee Torrey, the managing director of
[7] Sovereign Realty Associates. Plaintiffs' attorney
[8] has objected to Mr. Torrey's presence. Defendants'
[9] attorney has declined to proceed without Mr. Torrey.
[10] The parties will, therefore, proceed to the United
[11] States District Court for the District of
[12] Massachusetts for a protective order. The Plaintiff
[13] will seek to have Mr. Torrey excluded from the room.
[14]   **MR. GORDON:** That's it.
[15]   (Recess taken)
[16]   **MR. BERMAN:** We should point out that there
[17] will be no need to have a motion for a protective
[18] order. Mr. Torrey has voluntarily left, and we have
[19] decided to order an expedited copy of the transcript
[20] without setting any precedent as to whether or not
[21] he has a right to be present for it.
[22]   **MR. GORDON:** Sounds good to me. Counsel,
[23] just open stipulations. Reserve —
[24]   **MR. BERMAN:** Well, because it's Federal

**Page 5**

[1] Court you really can't stipulate to very much under
[2] the rules. So the only thing I would ask for a
[3] stipulation is that the witness sign under penalties
[4] of perjury — read and sign under penalties of
[5] perjury, rather than have to hunt up the notary
[6] before whom it's taken.
[7]   **MR. GORDON:** That's fine. Just as a
[8] preliminary, do you carry a cell phone?
[9]   **THE WITNESS:** Yes.
[10]   **MR. GORDON:** Do you want to turn that off
[11] or turn it to vibrate?
[12]   **THE WITNESS:** It's on vibrate.
[13]   **MR. GORDON:** Okay. Terrific.
[14]        **STUART A. ROFFMAN**
[15] a witness called for examination by counsel for the
[16] Plaintiffs, having been satisfactorily identified and being
[17] the production of his driver's license and being
[18] first duly sworn by the Notary Public, was examined
[19] and testified as follows:
[20]      **DIRECT EXAMINATION**
[21]        **BY MR. GORDON:**
[22]   **Q:** Would you state your name and address for
[23] the record.
[24]   **A:** Stuart Roffman, 124 Farm Street, Dover,

Stuart A. Roffman
Vol. 1, February 13, 2006

Renato Souto, et al.   v.
Sovereign Realty Associates, Ltd., et al.

Page 14

[1]   A: Yes.
[2]   Q: Ever been married?
[3]   A: Yes.
[4]   Q: What year were you married?
[5]   A: Which time?
[6]   Q: Let's start with your first marriage.
[7]   A: 1964 and 1987.
[8]   Q: And are you still married today?
[9]   A: No.
[10]   Q: Do you have any children?
[11]   A: Yes.
[12]   Q: What are their names and ages?
[13]   A: Adam, who is 31, and Caroline who is 17.
[14]   Q: And those are —
[15]   A: Different wives.
[16]   Q: Adam, and the second name was?
[17]   A: Caroline.
[18]   Q: Adam is the product, if you will, of your
[19] first marriage?
[20]   A: Yes.
[21]   Q: And Caroline is from your second marriage?
[22]   A: Correct.
[23]   Q: Do you live with your family?
[24]   A: Part of the year.

Page 15

[1]   Q: Who do you live with?
[2]   A: I live by myself, and my daughter part of
[3] the year lives with me as well.
[4]   Q: Does anybody else live with you for any
[5] portions of the year?
[6]   A: No.
[7]   Q: What is your relationship with Barbara
[8] Fitzgerald?
[9]   A: Barbara was a bookkeeper.
[10]   Q: Has Barbara ever been married?
[11]   A: Yes.
[12]   Q: Is she married now?
[13]   A: I don't know.
[14]   Q: Do you have a relationship with Barbara
[15] outside of her work as a bookkeeper for you?
[16]   A: No.
[17]   Q: Ever had dinner with Barbara?
[18]   A: Yes.
[19]   Q: In the last two years?
[20]   A: No.
[21]   Q: When did you have dinner with Barbara?
[22]   A: I don't recall.
[23]   Q: What's the nature — do you discuss things
[24] with Barbara that are outside of the course of work?

Page 16

[1]   MR. BERMAN: When you say "do you discuss,"
[2] you mean in the present, right?
[3]   MR. GORDON: I mean in the present for now,
[4] but we —
[5]   A: No.
[6]   Q: In the past have you?
[7]   A: Most likely.
[8]   Q: Is your relationship with Barbara — has
[9] your relationship with Barbara been anything other
[10] than a business relationship?
[11]   A: She was employed for a length of time, so I
[12] classify her as a friend during that period
[13] probably. She worked I think for 15 years.
[14]   Q: Any physical intimate relationship during
[15] that period?
[16]   A: No.
[17]   Q: Ever been convicted of a felony or
[18] misdemeanor involving fraud or dishonesty?
[19]   MR. BERMAN: Well, I'm going to object to
[20] the question in that form. If you limit it to the
[21] past ten years, though, I'll let him answer it.
[22]   Q: Ever been convicted of any felony in the
[23] past ten years?
[24]   A: No.

Page 17

[1]   Q: Ever been convicted of any misdemeanors in
[2] the past ten years?
[3]   A: Other than driving? Is driving — is that
[4] a misdemeanor?
[5]   MR. BERMAN: I don't know. It depends
[6] where and when, I guess.
[7]   A: No.
[8]   Q: Have you received any honors or awards
[9] since 1990?
[10]   A: No.
[11]   Q: Do you serve on the board of any charitable
[12] organizations?
[13]   A: No.
[14]   Q: When did you graduate high school?
[15]   A: 1958.
[16]   Q: Did you attend college or university?
[17]   A: Yes.
[18]   Q: Where?
[19]   A: Boston University.
[20]   Q: Did you receive a diploma from Boston
[21] University?
[22]   A: No.
[23]   Q: Did you receive any other diplomas or
[24] degrees?

Renato Souza, etc., vs. Stuart A. Roffman
Sovereign Realty Associates, Ltd., et al.

Vol. 1, February 13, 2006

Page 154

[1] time?
[2]    A: He was.
[3]    Q: Did you have a written policy at all?
[4]    A: I don't — not that I know of.
[5]    Q: How would an employee learn of your
[6] vacation policy?
[7]    A: I don't — I assume when they were engaged.
[8]    Q: A manager would tell them; is that it?
[9]    A: Yes, a manager would tell them. Or I hope
[10] they would ask.
[11]    Q: Do you know if Mr. Souto asked?
[12]    A: I really don't know if Mr. Souto asked.
[13]    Q: Do you know what Sovereign Realty
[14] Associates actually paid Mr. Souto for the course of
[15] his engagement, whether by employee or independent
[16] contractor with Sovereign Realty Associates?
[17]    A: I believe there was — again, I've had the
[18] privilege of looking at the payroll records during
[19] his deposition. I believe there was a check of $800
[20] every other week, plus there were various other
[21] checks, varying amounts for expenses or whatever,
[22] that were not itemized. Anywhere from a few hundred
[23] dollars to several hundred dollars.
[24]    Q: But those additional checks were always for

Page 155

[1] expense reimbursement checks; they weren't always
[2] for hours or wages?
[3]    A: I believe it was categorized as expenses.
[4] I believe there was a fixed amount given to him
[5] weekly, whether toward his car or whatever. There
[6] was some amount I believe that was just given to him
[7] routinely, and add on above that.
[8]    Q: There was a —
[9]    A: Specifically he submitted his own expenses.
[10] We always paid whatever he submitted.
[11]    Q: When you talk about "he was paid
[12] routinely," you mean there was routine expenses he
[13] was reimbursed for; is that correct?
[14]    A: My recollection was that he was given an
[15] amount of money, whether it was accounted for or
[16] not. I don't know whether it was for use of his
[17] car. I don't know. I'm not sure what it was for.
[18]    Q: How often did you give him additional
[19] checks?
[20]    A: Biweekly.
[21]    Q: To cover his expenses?
[22]    A: That's correct.
[23]    Q: And every two weeks you gave him an amount
[24] of money to cover wages?

Page 156

[1]    A: I don't know whether it's characterized
[2] as — categorized as wages, but he was given a check
[3] biweekly. $800.
[4]    Q: $800 was his wage payment?
[5]    A: I don't know if it was categorized as
[6] wages.
[7]    Q: But he received an additional biweekly
[8] check for expenses; is that correct?
[9]    A: Yes.
[10]    Q: Is there any other reason he would receive
[11] a check, if it was not for wages?
[12]    A: I'm not categorizing it as wages.
[13]    Q: Is it possible it might include something
[14] other than wages?
[15]    A: Yes, it's possible that it's for his — as
[16] a general — whatever you call it, independent
[17] contractor.
[18]    Q: Those checks, which entity actually wrote
[19] those checks, do you recall?
[20]    A: Sovereign. I don't know whether it was
[21] Sovereign Realty Associates G.P. or —
[22]    Q: Mr. Souto received W-2s?
[23]    A: I don't know.
[24]    Q: Did he receive 1099s?

Page 157

[1]    A: I don't know.
[2]    Q: Do you know who signed the checks?
[3]    A: I believe I signed the checks.
[4]    Q: Did anybody else sign checks that would go
[5] to Mr. Souto?
[6]    A: I believe the bookkeeper had authority to
[7] sign my name.
[8]    Q: The bookkeeper, meaning Barbara Fitzgerald?
[9]    A: Barbara Fitzgerald.
[10]    Q: And how did Barbara Fitzgerald have
[11] authority to sign her name?
[12]    A: I think she took it upon herself — no, she
[13] had my authority. I'd be out of town, and I'd say
[14] she could just sign my name on the checks.
[15]    Q: And you gave that authority to Barbara
[16] Fitzgerald verbally?
[17]    A: At some point.
[18]    Q: And did she sign your name or her name?
[19]    A: She signed a facsimile of my name.
[20]    Q: Did she do this with anything else, as far
[21] as you know, other than checks?
[22]    A: Not that I know of.
[23]    Q: Did she sign anyone else's names to
[24] documents?

Case 1:05-cv-10864-JLT    Document 38-2    Filed 06/09/2006    Page 5 of 6

Stuart A. Roffman
Vol. 1, February 13, 2006

Renato Souto, et al.  v.
Sovereign Realty Associates, Ltd., et al.

Page 158

[1]   A: I have no idea.
[2]   Q: Did you ever have — did the bank ever deny
[3] a check signed by Barbara Fitzgerald?
[4]   A: Not to my knowledge.
[5]   Q: Would the bank accept anyone's signature
[6] other than yours on those checks? Is the bank
[7] authorized to accept anyone's signature other than
[8] yours?
[9]   A: Either mine or a facsimile of my signature.
[10]   Q: But there was no other signature cards
[11] other than —
[12]   A: That is correct.
[13]   Q: And at the close of each payroll period,
[14] who told the payroll service to make checks out to
[15] the employees at Sovereign Realty Associates?
[16]   A: I'm not certain.
[17]   Q: Did you have a payroll service?
[18]   A: You asked that.
[19]   Q: I did ask that before?
[20]   A: Yes.
[21]   Q: And you told me what payroll service it
[22] was?
[23]   A: No, I didn't recall the name of it, but I
[24] believe you have records from them.

Page 159

[1]   Q: I do. And if I recall correctly, there was
[2] no specific policy for keeping those payroll records
[3] at Sovereign Realty Associates?
[4]   A: My recollection is we would have kept them
[5] the required amount of time. I'm not sure what that
[6] was.
[7]   Q: You didn't hold them personally?
[8]   A: The records I furnished to you were in my
[9] garage when I moved out of the office at 822
[10] Boylston Street.
[11]   Q: When did you move out of the 822 Boylston
[12] office?
[13]   A: You asked that, too.
[14]   Q: No, I haven't asked that question.
[15]   MR. BERMAN: No, he hasn't.
[16]   THE WITNESS: I thought when the building
[17] was sold. I thought that came up.
[18]   A: Okay. Was it March or — best of my
[19] recollection, I think it was March of '04 or
[20] sometime in 04, I believe.
[21]   Q: And since that time, they've been sitting
[22] in your garage?
[23]   A: Yes.
[24]   Q: In Dover, Mass.

Page 160

[1]   A: Yes.
[2]   Q: Who's had access to your garage since that
[3] time? Let me ask a different question. Those are
[4] all the payroll records you have for Sovereign
[5] Realty Associates?
[6]   A: I believe some were furnished to you
[7] already.
[8]   Q: Other than what you've already furnished,
[9] you've now furnished the rest, correct?
[10]   A: That is correct. That's all I can find.
[11]   Q: And you've produced those payroll records
[12] in response to this lawsuit?
[13]   A: That is correct.
[14]   Q: And did someone tell you to produce the
[15] records?
[16]   A: I think /ROPL wood and Davis /( said there
[17] was a request for any cancelled checks.
[18]   Q: Did they give you a list of things that
[19] needed to be produced?
[20]   MR. BERMAN: We're getting close to
[21] attorney/client.
[22]   MR. GORDON: Okay.
[23]   Q: Did you personally retrieve the records?
[24]   A: I did?

Page 161

[1]   Q: Did anybody else go looking for records of
[2] Sovereign, other than you?
[3]   A: I believe Lee Torrey told me he searched
[4] Sovereign for records.
[5]   Q: Anyone other than you and Lee Torrey search
[6] for the records?
[7]   A: I believe Barbara Fitzgerald searched for
[8] records.
[9]   Q: Did you watch Lee Torrey produce the
[10] records?
[11]   A: No.
[12]   Q: Did you watch Barbara Fitzgerald search?
[13]   A: No.
[14]   Q: Just talking about the records.
[15] Did anybody else — well, who instructed
[16] Lee Torrey and Barbara Fitzgerald to produce the —
[17] search for the records?
[18]   A: I don't recall how it came down. I don't
[19] know. We were told to search for payroll records.
[20]   Q: You said earlier you had a new set of tax
[21] returns that hadn't been previously disclosed to me?
[22]   A: Can we go off the record, please.
[23]   (Discussion off the record)
[24]   MR. BERMAN: The witness has produced two

Renato Souto, et al. v.
Sovereign Realty Associates, Ltd., et al.

Stuart A. Roffman
Vol. 1, February 13, 2006

Page 170

[1] **A:** When you say "other maintenance workers," I
[2] don't understand.
[3] **Q:** Did you ever sign a check that was produced
[4] by payroll service for anyone other than Renato
[5] Souto?
[6] **A:** I assume so.
[7] **Q:** Do you recall any of them?
[8] **A:** Not necessarily, no.
[9] **Q:** Do you recall the people those payroll
[10] checks would have gone to at Sovereign Realty
[11] Associates?
[12] **A:** Yes.
[13] **Q:** Were there a lot of people that Sovereign
[14] Realty Associates sent checks to?
[15] **A:** I don't understand the question.
[16] **Q:** Were there a lot of individuals that
[17] received checks from Sovereign Realty Associates?
[18] **A:** I assume there are a number of people. I
[19] don't know how to characterize "a lot."
[20] **Q:** Let me ask the question a little
[21] differently because that may be a little bit
[22] confusing. Sorry.
[23] Where did checks that were coming out of
[24] Sovereign Realty Associates accounts come from?

Page 171

[1] **A:** I'm still not understanding you.
[2] **Q:** The payroll service sent checks out for
[3] Sovereign Realty Associates accounts?
[4] **A:** As well as the bookkeeper.
[5] **Q:** And the bookkeeper did?
[6] **A:** Yes.
[7] **Q:** Did anyone else?
[8] **A:** No.
[9] **Q:** Did the bookkeeper ever send checks to
[10] employees that he wrote?
[11] **A:** Perhaps.
[12] **Q:** Do you know when you engaged the payroll
[13] service to start providing payroll?
[14] **A:** No, I do not.
[15] **Q:** Do you know whether you did withholding for
[16] Renato Souto?
[17] **A:** I'm reading a check dated June 8, 2001,
[18] Check No. 340, and it says, "Deductions, Medicare,
[19] Social Security in Massachusetts." And it appears
[20] it's a small amount that was withheld.
[21] **Q:** And why would a payroll service withhold
[22] for Renato Souto?
[23] **A:** I'm not certain whether it was part of our
[24] sponsoring or when he became legal, or whatever, was

Page 172

[1] he then hired as a cleaner. I'm not certain if the
[2] status changed from independent contractor to —
[3] **Q:** Was it your practice to do withholding for
[4] independent contractors?
[5] **A:** No.
[6] **Q:** Do you recall doing withholding for any
[7] other independent contractors?
[8] **A:** I don't recall.
[9] **Q:** Who would have told the payroll service to
[10] do withholding for Renato Souto?
[11] **A:** I assume the bookkeeper.
[12] **Q:** And how would she have known how much to
[13] withhold?
[14] **A:** I am not certain.
[15] **Q:** These records reflect payments from periods
[16] beginning May 26, 2001, and ending July 12, 2002; is
[17] that correct?
[18] **A:** Yes.
[19] **Q:** And the pay rate didn't change during that
[20] time period; correct?
[21] **A:** That is correct.
[22] **Q:** And how did you determine what pay rates to
[23] give Mr. Souto during that time period? Was that
[24] John Harvey's choice, or Lee Torrey's choice?

Page 173

[1] **A:** 2001, I believe, would be Lee Torrey.
[2] **Q:** And Lee Torrey would have instructed the
[3] bookkeeper to pay Renato what looks like $800 a week
[4] every week through that whole year?
[5] **A:** Every other week.
[6] **Q:** Every other week. Thank you for the
[7] correction.
[8] **A:** That is correct.
[9] **Q:** And he likely would have instructed the
[10] bookkeeper to make deductions from that amount?
[11] **A:** Who would have? I don't understand —
[12] **Q:** Lee Torrey?
[13] **A:** No.
[14] **Q:** That would have been the bookkeeper's
[15] decision?
[16] **A:** I believe that for an employee there's a
[17] form that tells how many exemptions, whatever, that
[18] they submit, probably to Lee. Then it would have
[19] gone onto the bookkeeper and to the payroll.
[20] **Q:** And it looks like at some point Renato
[21] Souto became an employee of Sovereign Realty
[22] Associates; is that correct?
[23] **A:** I don't know how to characterize
[24] "employee."

# In The Matter Of:

*Renato Souto, et al.   v.*
*Sovereign Realty Associates, Ltd., et al.*

---

*Lee A. Torrey*
*Vol. 1, February 24, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File TORREY.V1, 192 Pages*
*Min-U-Script® File ID: 2941437210*

## Word Index included with this Min-U-Script®

Case 1:05-cv-10864-JLT    Document 38-3    Filed 06/09/2006    Page 2 of 6

Renato Souto, et al.  v.
Sovereign Realty Associates, Ltd., et al.

Lee A. Torrey
Vol. 1, February 24, 2006

Page 1

Volume I
Pages 1 to 192
Exhibits 1 to 18
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864JLT
RENATO SOUTO and OTHERS SIMILARLY  :
SITUATED,                          :
          Plaintiffs,              :
     vs.                           :
SOVEREIGN REALTY ASSOCIATES, LTD.  :
  and STUART ROFFMAN, As President :
  of the General Partner of        :
  Sovereign Realty Associates,     :
Ltd., Sovereign Realty Associates  :
  G.P., Inc., and Individually,    :
          Defendants.              :

DEPOSITION OF LEE A. TORREY, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Susan E. DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gordon Law Group
LLP, 535 Boylston Street, 6th Floor, Boston,
Massachusetts, on Friday, February 24, 2006,
commencing at 10:10 a.m.
     PRESENT:
        Gordon Law Group LLP
          (by Philip J. Gordon, Esq.,
          and Kristen M. Hurley, Esq.)
        535 Boylston Street, 6th Floor, Boston, MA
        02116, for the Plaintiffs.
        Law Offices of David Berman
          (by David Berman, Esq.)
          100 George P. Hassett Drive,
        Medford, MA 02155, for the Defendants.

Page 2

INDEX
WITNESS    DIRECT CROSS REDIRECT RECROSS
LEE A. TORREY
BY MR. GORDON      4        190
BY MR. BERMAN        189

EXHIBITS
NO.    DESCRIPTION                   PAGE
1    Boston Herald advertisement       69
2    Letter from John Dvorak to Stuart 71
     Roffman
3    Copies of paystubs               109
4    Copies of payroll checks         114
5    Copies of payroll checks         117
6    Copies of payroll checks         120
7    Copies of payroll checks         131
8    Copies of payroll checks         139
9    Copies of payroll checks         149
10   Copies of payroll checks         150
11   Copies of payroll checks         152

Page 3

EXHIBITS, Continued
NO.    DESCRIPTION              PAGE
12   Copies of payroll checks        162
13   Copies of payroll checks        164
14   Copies of payroll checks        170
15   Letter "To Whom It May Concern"   180
16   Document entitled "Employee Work  181
     Conditions"
17   Document describing Christmas     184
     Bonuses
18   Letter to Stuart Roffman from Lee 186
     Torrey

Page 4

[1]                    PROCEEDINGS
[2]                    LEE A. TORREY
[3] a witness called for examination by counsel for the
[4] Plaintiffs, whose identify was attested to by David
[5] Berman, and being first duly sworn by the Notary
[6] Public, was examined and testified as follows:
[7]      MR. BERMAN: My name is David Berman, and I
[8] am counsel for the Defendants in the case now
[9] pending. I know Lee A. Torrey from several previous
[10] meetings with him and can identify him positively
[11] for the record.
[12]     MR. GORDON: Thank you, Mr. Berman. Do you
[13] want to waive notarization?
[14]     MR. BERMAN: He can sign it under penalties
[15] of perjury, and I don't think he has to sign it in
[16] front of Ms. DiFraia. I think he can just sign it.
[17]     MR. GORDON: Acceptable with us.
[18]               DIRECT EXAMINATION
[19]               BY MR. GORDON:
[20]     Q: Could you state your name for the record.
[21]     A: Lee A. Torrey. My residence currently is
[22] at 1440 Beacon Street in Brookline, Massachusetts,
[23] 02446.
[24]     Q: You have counsel representing you today?

Lee A. Torrey
Vol. 1, February 24, 2006

Renato Souto, et al.  v.
Sovereign Realty Associates, Ltd., et al.

Page 21

[1] **Q:** How often do you do that?

[2] **A:** Every two weeks. Payroll. If we've got

[3] payroll. And we pay bills every two weeks, so I

[4] tell him what has to be paid, he does it, send him

[5] the proper checks, make sure they're the proper

[6] amount, put them in the mail.

[7] **Q:** So the payroll is not automatic?

[8] **A:** When I say "payroll" that includes vendors

[9] and all my accounts payable. So we do have an

[10] automatic payroll service. I am the only employee.

[11] I am on that. I get the same amount every week. If

[12] there was going to be an adjustment I'd be the

[13] person to call the payroll service and say, "Hey,

[14] look, give me more or give me less." But

[15] otherwise — it's been that way forever.

[16] **Q:** Since you've been there you have always

[17] been on payroll?

[18] **A:** Yes. It's called ADP. And I've had the

[19] same amount of money since day one.

[20] **Q:** Currently, is there anyone else?

[21] **A:** Currently, no. Others have come and gone.

[22] **Q:** How would people get added to the payroll

[23] service?

[24] **A:** I would call them. Say, "We have a new"

Page 22

[1] employee. This is their information."

[2] **Q:** And since the day you started have you

[3] always been the one to add people to payroll?

[4] **A:** No, I started as a janitor. So in the

[5] beginning Barbara Fitzgerald was the bookkeeper and

[6] accountant, and she was the primary person with the

[7] payroll service and did that until December 2005.

[8] **Q:** When did you add your first person to

[9] payroll?

[10] **A:** I don't remember who that might be or when

[11] it was. The business is cyclical. We have turnover

[12] in the summer, so if I'm going to have large

[13] turnover I will hire employees during the summer

[14] months. I will call the payroll service, make those

[15] adjustments, and then we will lay them off and fire

[16] them in the winter. This year and the year previous

[17] has been very slow, so we haven't needed any, but in

[18] the past we have.

[19] **Q:** Okay. Prior to your employment with

[20] Sovereign, where did you work?

[21] **A:** First Boston Management Group on Charles

[22] Street Boston, Mass., and before that with

[23] Management Recruiters at 607 Boylston Street, right

[24] down the corner here in Copley Square.

Page 23

[1] **Q:** And what was your position with those

[2] entities?

[3] **A:** I was an executive recruiter.

[4] **Q:** When did you finish — you finished

[5] executive recruiting in 1999?

[6] **A:** That's right. Went right to Sovereign

[7] Realty.

[8] **Q:** What was the circumstance of your

[9] termination in those jobs?

[10] **A:** I was not terminated. I made enough money.

[11] I quit.

[12] **Q:** How did you meet Stuart?

[13] **A:** Through the Boston Globe.

[14] **Q:** You answered an ad?

[15] **A:** Yes.

[16] **Q:** Is that the way he hires most employees?

[17] **A:** In my case, yes.

[18] **Q:** Has he hired any other people through

[19] The Globe?

[20] **A:** I believe so.

[21] **Q:** Do you know who else he's hired?

[22] **A:** I do not.

[23] **Q:** Anyone else for Sovereign?

[24] **A:** He may have. I don't know offhand.

Page 24

[1] **Q:** During your time period?

[2] **A:** No. I have, however, used the Boston Globe

[3] to hire employees, if that's what you're getting at.

[4] **Q:** Okay. And when did you — when have you

[5] used The Globe? Under what circumstances have you

[6] used The Globe to hire employees; do you recall?

[7] **A:** Yes, a couple of years ago I took out an ad

[8] for maintenance workers, and I told them describe

[9] the job, fax me the resume. Resumes were coming to

[10] my fax machine. I would respond to the resumes, do

[11] interviews. Anybody who seemed reasonable I'd hire

[12] them.

[13] **Q:** This was in 2003?

[14] **A:** Yes, 2003-2004.

[15] **Q:** Get a lot of answers to those ads?

[16] **A:** Yes, pretty good.

[17] **Q:** And what did the ads say?

[18] **A:** I forget exactly the language, but it would

[19] say, "Brookline high rise looking for maintenance

[20] workers." You know, "Fax resumes." And you always

[21] get a million.

[22] **Q:** And how many did you hire from it?

[23] **A:** I don't recall. Just one or two from time

[24] to time.

Case 1:05-cv-10864-JLT    Document 38-3    Filed 06/09/2006    Page 4 of 6

Lee A. Torrey
Vol. 1, February 24, 2006

Renato Souto, et al. v.
Sovereign Realty Associates, Ltd., et al.

---

Page 85

[1] report to, just to you?

[2] A: Yes.

[3] Q: Did he ever report to Barbara?

[4] A: Well, you know, Barbara had some seniority

[5] there, and if Barbara would call him up to do

[6] something he would comply. So if that's reporting

[7] to her, yes.

[8] Q: What would Barbara call him to do?

[9] A: Oh, "Please deliver this to Lee," a

[10] package. Something urgent. "Please deliver this to

[11] Stuart." He was an unskilled laborer. So he was a

[12] for. "Please go for this. Please go for that."

[13] Q: And how did he get there?

[14] A: In his car.

[15] Q: Did you reimburse him for mileage?

[16] A: Yes, those receipts you saw every other

[17] week. Mileage, gas receipts. We would help him

[18] with other repairs. Once we loaned him money for a

[19] new transmission. We tried to treat him fair and

[20] square.

[21] Q: So beginning in 2000 he would — when he

[22] became an employee, he —

[23] MR. BERMAN: I object to the question. You

[24] assume that he became an employee in 2000, but I

---

Page 86

[1] don't think there is any evidence of that. The

[2] evidence is he doesn't know when he transitioned —

[3] A: That's correct. I'm vague on the date.

[4] Q: That's all right. But the recollection was

[5] that he was working from 8:00 to 4:00 since 1999?

[6] A: That is correct.

[7] Q: Okay. Did Mr. Souto keep an office or a

[8] desk on the property?

[9] A: No.

[10] Q: Did he receive any training from you?

[11] A: Training? No training.

[12] Q: Did he receive any training from anybody

[13] else?

[14] A: We would give him instruction. "Take the

[15] garbage out."

[16] Q: I mean, training on how to do the work.

[17] A: No, it's fairly self explanatory.

[18] Q: What quality control measures did you keep?

[19] A: I was on site, and we have fussy tenants in

[20] both buildings, and if something was amiss, we'd

[21] hear about it right away.

[22] Q: Was he required to keep work record orders?

[23] A: No, it was not structured like that. It

[24] was just repetitive. Remove every trash bin in

---

Page 87

[1] every room. Take it outside and put it in a

[2] dumpster. If you failed to take out garbage, a

[3] tenant would call and say, "Renato screwed up

[4] again." We'd say, "Fine." Call Renato, "Report to

[5] tenant X."

[6] Q: Did the tenants at 1440 Beacon Street ever

[7] call Renato directly?

[8] A: No.

[9] Q: Did he ever do any work at any of their

[10] apartments while they were in there?

[11] A: He may have.

[12] Q: Do you recall any of the times he did that?

[13] A: No.

[14] Q: Did he ever do any work in anyone's

[15] apartments while they were tenants while they were

[16] not home after hours?

[17] A: He may have done work when tenants were not

[18] home during normal hours, because it's a

[19] professional building and it empties out during the

[20] day.

[21] Q: 1440 is a professional —

[22] A: Right. They're 9:00 to 5:00. The building

[23] is empty.

[24] Q: Did tenants ever call him?

---

Page 88

[1] A: They shouldn't. It's all in writing.

[2] Q: To whom?

[3] A: To the rent box. So we have a —

[4] Q: Who empties out the rent box?

[5] A: I do.

[6] Q: You're the only person who does the rent

[7] box?

[8] A: Yes.

[9] Q: Did Mr. Souto have the ability to refuse

[10] any work that you assigned him?

[11] A: Could he refuse work? No, he cannot refuse

[12] work.

[13] Q: Had he ever?

[14] A: Well, he may have objected from time to

[15] time. Everyone objects, but the nature of his work

[16] was so simple that, you know, there wasn't a lot of

[17] discussion.

[18] Q: Did he ever need any materials to do his

[19] work?

[20] A: Did he ever what?

[21] Q: Did he ever need any materials to do his

[22] work?

[23] A: Materials? Not really. We have everything

[24] there. We have cleaning solutions, vacuum cleaners.

---

Renato Souto, et al. v.
Sovereign Realty Associates, Ltd., et al.

Case 1:05-cv-10864-JLT    Document 38-3    Filed 06/09/2006    Page 5 of 6    Lee A. Torrey
Vol. 1, February 24, 2006

Page 121

[1] is?

[2] A: It appears to be Sovereign Realty

[3] Associates.

[4] Q: And the payee appears to be Jermaine

[5] Robinson; is that correct?

[6] A: Correct.

[7] Q: And why would Sovereign Realty Associates

[8] be making out checks to Jermaine Robinson?

[9] A: I assume because he was an employee.

[10] Q: Do you recall Mr. Robinson?

[11] A: Yes.

[12] Q: What did Mr. Robinson do?

[13] A: He was a maintenance worker.

[14] Q: And when did Mr. Robinson work for

[15] Sovereign Realty Associates?

[16] A: I don't recall.

[17] Q: Was he a maintenance worker on the 1440

[18] Beacon Street site?

[19] A: Yes.

[20] Q: You testified earlier he worked for three

[21] summers in the 2003 to 2005 time frame?

[22] A: I believe so.

[23] Q: Does this refresh your recollection that he

[24] worked for you earlier than that?

Page 122

[1] A: He may have.

[2] Q: Would you have hired Mr. Robinson?

[3] A: Yes, I would.

[4] Q: Do you recall hiring Mr. Robinson?

[5] A: Vaguely.

[6] Q: What is your recollection of hiring Mr.

[7] Robinson?

[8] A: He was a happy guy.

[9] Q: Did you interview Mr. Robinson?

[10] A: Yes.

[11] Q: Did you ask Mr. Robinson to fill out an

[12] employment application?

[13] A: To the best of my — I don't remember.

[14] Q: Do you remember requesting identification

[15] from Mr. Robinson?

[16] A: I don't remember.

[17] Q: What do you recall what Mr. Robinson's

[18] hours of employment were?

[19] A: I don't remember.

[20] Q: 8:00 to 4:00?

[21] A: Good guess.

[22] Q: Was he also an employee earning $10 an

[23] hour?

[24] A: That's a good guess.

Page 123

[1] Q: Why would you deviate from that? Would you

[2] deviate from that?

[3] MR. BERMAN: He — objection. He never

[4] said he deviated from that. You asked why would he

[5] deviate.

[6] MR. GORDON: He said it's a guess.

[7] A: It's a good guess.

[8] Q: Would you ever deviate from that policy?

[9] A: I see no reason to, but we have — may

[10] have. There may be exceptions.

[11] Q: If Mr. Robinson worked on an 8:00 to 4:00

[12] basis at $10 an hour, he should be receiving checks

[13] for at least $800; is my math right?

[14] A: That's correct; after taxes.

[15] Q: For a period of time, though, he was paid

[16] out of Sovereign Realty Associates general accounts,

[17] if you will, and then he was paid later from Payroll

[18] Advantage; is that correct?

[19] A: I don't know.

[20] Q: Let's look at the checks for a moment. Is

[21] that first check processed by Payroll Advantage?

[22] A: No.

[23] Q: Is the second check processed by Payroll

[24] Advantage?

Page 124

[1] A: No.

[2] Q: Is the third check processed by Payroll

[3] Advantage?

[4] A: Yes.

[5] Q: And why would you switch?

[6] A: I don't know.

[7] Q: Why would the amounts change?

[8] A: Don't know.

[9] Q: Who would know the answer to that question?

[10] A: I don't know.

[11] Q: Anybody else?

[12] A: Other than — employees?

[13] Q: Would Barbara Fitzgerald know the answer to

[14] that?

[15] A: She may well.

[16] Q: Only you and Barbara were responsible for

[17] putting people on payroll; is that correct?

[18] A: That's correct.

[19] Q: So it could only be you and Barbara?

[20] A: Yes. I could guess.

[21] Q: But if it wasn't you, it had to be Barbara?

[22] A: That's correct.

[23] Q: So when you say you don't know, it had to

[24] be Barbara?

Lee A. Torrey
Vol. 1, February 24, 2006

Renato Souto, et al.    v.
Sovereign Realty Associates, Ltd., et al.

---

Page 133

[1] paychecks?

[2] **A:** I don't recall authorizing any of these

[3] paychecks.

[4] **Q:** Do you recall directing Barbara to issue

[5] any of these paychecks?

[6] **A:** I don't have a specific memory, no.

[7] **Q:** Do you recall a reason why the paychecks

[8] would sometimes come from Sovereign Realty

[9] Associates and sometimes come from Advantage

[10] Payroll?

[11] **A:** No.

[12] **Q:** Whose choice would it have been to switch

[13] from paying out from Sovereign directly to using the

[14] payroll service?

[15] **A:** Barbara Fitzgerald.

[16] **Q:** Did you ever direct Barbara Fitzgerald to

[17] change someone from checks directly from Sovereign

[18] Realty Associates to checks made out to Payroll

[19] Advantage Services?

[20] **A:** No.

[21] **Q:** Do you know any reason why Barbara would

[22] switch?

[23] **A:** Do I know any reason?

[24] **Q:** Yes, why Barbara would switch from paying

---

Page 135

[1] **Q:** On some of these checks you'll see an

[2] identification number at the top of them. Check No.

[3] 246 is the first one that I saw.

[4] **A:** Okay. What's the question?

[5] **Q:** Do you see it on top of some of the checks

[6] there's handwriting?

[7] **A:** That thing (indicating)?

[8] **Q:** Okay. We'll start with that. That's Check

[9] No. —

[10] **A:** I have no idea. That's a scribble.

[11] **Q:** Okay. Let's move on then. We're now

[12] looking at Check No. 246; is that correct?

[13] **A:** That's correct.

[14] **Q:** What do you see on the top of that check?

[15] **A:** Something about "veteran's identification

[16] number" such and such.

[17] **Q:** Do you know what that identification number

[18] is?

[19] **A:** Clueless. No idea.

[20] **Q:** Do you know why that's written on the top

[21] of his check?

[22] **A:** I have no idea.

[23] **Q:** Do you recognize the handwriting?

[24] **A:** No.

---

Page 134

[1] out a check that looks like it came from Sovereign

[2] Realty Associates to one that looks like it was

[3] processed by Advantage Payroll Services?

[4] **A:** I don't know what's going on here. So I

[5] don't know. I don't want to guess.

[6] **Q:** Do you know any reasons why the amounts

[7] would differ on these checks?

[8] **A:** The payroll checks all seem to be identical

[9] amounts.

[10] **Q:** The ones from Payroll Services?

[11] **A:** Yes, plus or minus.

[12] **Q:** Well, did his deal change at some point?

[13] **A:** I don't recall exactly what the story was.

[14] It could have been similar to Mr. Souto's situation

[15] where he had payroll checks and a second check for

[16] expenses, but I do not know.

[17] **Q:** Did you ever pay expenses out of Advantage

[18] Payroll?

[19] **A:** No.

[20] **Q:** So if he switched from $263.49 to $473.02

[21] that would not be expenses; that would be for some

[22] other reason?

[23] **A:** I don't know how to answer that. I just

[24] don't know.

---

Page 136

[1] **Q:** Do you know who might have written

[2] something like that on the top of a check?

[3] **A:** I do not know, but I can guess.

[4] **Q:** On the second check, 12398, do you

[5] recognize the numbers at the top of that?

[6] **MR. BERMAN:** I'm sorry. What's the number?

[7] **Q:** 12398.

[8] **A:** No, I do not recognize the handwriting nor

[9] do I know what it's about.

[10] **Q:** Nor do you recognize the numbers?

[11] **A:** No, sir.

[12] **Q:** At the top of the next check, 250, on the

[13] left-hand side, you'll see what appears to be a

[14] signature. Do you know what that is?

[15] **A:** No.

[16] **Q:** Do you recognize the handwriting?

[17] **A:** I don't think that's mine.

[18] **Q:** I'm sorry?

[19] **A:** I don't think that's my writing. Clueless.

[20] **Q:** Does it look like it says "Lee Torrey?"

[21] **A:** No. I was thinking for a minute it was,

[22] but —

[23] **Q:** But it's not your handwriting; it's not

[24] your signature?

---

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

**********************************************
RENATO SOUTO and OTHERS SIMILARLY )
SITUATED, )
                        Plaintiffs, )
           )
v. )
           )
SOVEREIGN REALTY ASSOCIATES, LTD. )
and STUART ROFFMAN, As President of the )
General Partner of Sovereign Realty Associates, )
Ltd., Sovereign Realty Associates G.P., Inc., and )
Individually, )
                      Defendants. )
**********************************************

## <u>AFFIDAVIT OF PHILIP J. GORDON</u>

I, Philip J. Gordon, under oath hereby depose and state as follows:

1.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I do so as a partner of the law firm of Gordon Law Group, LLP, 535 Boylston Street, 6th Floor, Boston, MA 02116.

2.      I represent the Plaintiffs in the above-captioned action.

3.      On or about April 13, 2005, Mr. Souto filed the Complaint in the above-captioned matter with the Middlesex Superior Court.

4.      On or about, April 28, 2005, Sovereign caused this action to be removed to the United States District Court for the District of Massachusetts.

5.      On or about February 7, 2006, I noticed the deposition of Barbara Fitzgerald for February 22, 2006. Ms. Fitzgerald, however, failed to appear at her deposition.

6.      On or about February 13, 2006, I took the deposition of the defendant, Stuart Roffman.

7.      On or about February 24, 2006, I took the deposition of Lee Torrey.  Lee Torrey is the general manager of Sovereign Realty Associates, Ltd.

1

8.    On or about March 13, 2006, I re-noticed the deposition of Barbara Fitzgerald for March 31, 2006.

9.    On or about March 29, 2006, the Defendants filed a motion requesting that discovery be stayed pending the outcome of Defendants' Motion to Dismiss. This request was granted on March 30, 2006.

10.    On or about March 30, 2006, my associate Kristen Hurley, left a voicemail message for Barbara Fitzgerald advising her not to appear for her scheduled deposition.

11.    To date, plaintiff has refrained from re-noticing Ms. Fitzgerald's deposition pending a ruling on the Defendants' Motion to Dismiss.


Signed under the pains and penalties of perjury this 9th day of June, 2006.


  /s/ Philip J. Gordon                .
Philip J. Gordon (BBO# 630989)
Gordon Law Group, LLP
535 Boylston Street, 6th Floor
Boston, MA 02116
(617)536-1800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

*********************************************

RENATO SOUTO and OTHERS SIMILARLY )
SITUATED, )
                          Plaintiffs, )
                                    )
v.                                   )
                                    )
SOVEREIGN REALTY ASSOCIATES, LTD. )
and STUART ROFFMAN, As President of the )
General Partner of Sovereign Realty Associates, )
Ltd., Sovereign Realty Associates G.P., Inc., and )
Individually, )
                          Defendants. )
*********************************************

## Nature of the Case

1.   This is a cause of action pursuant to MGL c. 149 and 150 seeking damages and
     injunctive relief for non-payment of wages in the form of regular pay, overtime
     and holiday wages. Plaintiff, Renato Souto, is a former employee of Defendant,
     Sovereign Realty Associates, Ltd.

## The Parties

2.   The Plaintiff, Renato Souto, is an individual residing at 29 Park Street,
     Somerville, Middlesex County, Massachusetts.

3.   Defendant, Sovereign Realty Associates, Ltd., is a Massachusetts limited
     partnership with a principal place of business located at 822 Boylston Street,
     Chestnut Hill, Middlesex County, Massachusetts.

4.   Defendant, Stuart Roffman, is an individual residing at 124 Farm Street, Dover,
     Norfolk County, Massachusetts. At all relevant times Stuart Roffman was either
     the general partner of Sovereign Realty Associates, Ltd. or the president of
     Sovereign Realty Associates G.P., Inc., a Massachusetts corporation organized in
     2003 for the purposes of replacing Stuart Roffman as the general partner of
     Sovereign Realty Associates, Ltd.

5.   Defendant, Barbara Fitzgerald, is an individual with a permanent address at 170
     Nehoiden Street, Needham, Norfolk County, Massachusetts. Upon information
     and belief, Barbara Fitzgerald is currently residing at 80 North Hill, Needham,
     Norfolk County, Massachusetts. At all relevant times Barbara Fitzgerald was an

1

individual having management of Sovereign Realty Associates, Ltd. to the extent that she was essentially the treasurer of Sovereign Realty Associates, Ltd.

## Facts

6.  From on or about 1994 until July 3, 2002, Renato Souto was employed as a maintenance repairer for Sovereign Realty Associates, Ltd.

7.  During the course of his employment, Renato Souto worked continuously, diligently and effectively on behalf of Sovereign Realty Associates, Ltd.

8.  In 1998, Sovereign Realty Associates, Ltd., through Stuart Roffman its president agreed to sponsor Renato Souto's Application for Labor Certification.

9.  Thereafter, Stuart Roffman used his position to force Renato Souto to perform a number of tasks that were well beyond Mr. Souto's job duties.

10. Renato Souto was required to wear a pager 24 hours a day, 7 days a week, during his employment with Sovereign Realty Associates, Ltd.  Mr. Roffman would page Mr. Souto at all hours of the day and night and insist that Mr. Souto perform his personal chores, such as picking him up at the airport, picking up soda and delivering it to his house, and pushing his girlfriend's car out of the snow.

11. On a daily basis during his employment, Sovereign Realty Associates, Ltd. and Stuart Roffman humiliated Renato Souto.  Stuart Roffman and Lee Torrey, Mr. Souto's manager at Sovereign Realty Associates, Ltd., would refer to Mr. Souto as a moron in front of other employees.  In addition, Mr. Torrey once published a list of employee bonuses which stated that Mr. Souto would receive nothing, not even a lump of coal, even though other employee got bonuses and were treated with respect.

12. On or about July 3, 2002, Sovereign Realty Associates, Ltd. terminated Renato Souto's employment upon learning that Mr. Souto had contacted the Massachusetts Division of Employment and Training to learn his rights as an employee.

13. Despite demands from Renato Souto for payment, Sovereign Realty Associates, Ltd. failed, refused, and/or neglected to pay Renato Souto wages, which are due and payable.

14. Others similarly situated have also worked for Sovereign Realty Associates, Ltd. and have not received the proper compensation as required by law.

15. Renato Souto has satisfied all prerequisites and conditions precedent necessary to entitle him to seek remedy against Sovereign Realty Associates, Ltd. by this action.

16.    Attached hereto as Exhibit "A" is a letter from the Office of the Attorney General authorizing Mr. Souto to pursue his claim for unpaid wages through a civil complaint lawsuit.

## COUNT I
### (Souto v. Defendants)
### M.G.L. c. 149, 151 and FLSA

17.    Renato Souto repeats and re-alleges the allegations set forth in Paragraphs 1 to 16 above and incorporates them by reference herein.

18.    Sovereign Realty Associates, Ltd. is statutorily obligated to pay overtime wages to Renato Souto at the required overtime premium rate of one and a half times his regular rate of compensation for all hours worked in excess of 40 hours a week and holiday wages at the holiday premium rate of one and a half times his regular rate for all hours worked on a legal holiday.

19.    Sovereign Realty Associates, Ltd. has failed, refused and/or neglected to pay the regular, overtime and holiday wages due and owing Renato Souto in violation of Massachusetts General Laws Chapter 149, 151 and the Federal Labor Standards Act.

20.    As a result of Sovereign Realty Associates, Ltd.'s violation of M.G.L. c. 149, 151 and FLSA, Renato Souto has incurred harm and loss in the sum of at least $86,669.40.

## COUNT II
### (Others Similarly Situated v. Defendants)
### M.G.L. c. 149, 151 and FLSA

21.    Renato Souto repeats and re-alleges the allegations set forth in Paragraphs 1 to 20 above and incorporates them by reference herein.

22.    Sovereign Realty Associates, Ltd. is statutorily obligated to pay overtime wages to others similarly situated to Renato Souto at the required overtime premium rate of one and a half times their regular rate of compensation for all hours worked in excess of 40 hours a week and holiday wages at the holiday premium rate of one and a half times their regular rate for all hours worked on a legal holiday.

23.    Sovereign Realty Associates, Ltd. has failed, refused and/or neglected to pay others similarly situated to Renato Souto the wages due and owing them in violation of Massachusetts General Laws Chapter 149, 151 and the Federal Labor Standards Act.

24.    As a result of Sovereign Realty Associates, Ltd.'s violation of M.G.L. c.149, 151 and FLSA, others similarly situated to Renato Souto have incurred harm and loss in an amount to be determined.

## COUNT III
(Souto v.Defendants)
Breach of Contract

25.   Renato Souto repeats and re-alleges the allegations set forth in Paragraphs 1 to 24
      above and incorporates them by reference herein.

26.   Sovereign Realty Associates, Ltd. entered into an unambiguous and enforceable
      contract that requires Sovereign Realty Associates, Ltd. to pay Renato Souto in
      the form of regular pay, overtime and holiday wages.

27.   In breach of its contract with Renato Souto, Sovereign Realty Associates, Ltd.,
      has failed to pay Renato Souto the wages promised.

28.   As a result of Sovereign Realty Associates, Ltd.'s breach of its contract, Renato
      Souto has incurred harm and loss in the sum of at least $86,669.40.

## COUNT IV
(Souto v. Defendants)
Fraud/Misrepresentation/Deceit

29.   Renato Souto repeats and re-alleges the allegations set forth in Paragraphs 1 to
      28 above and incorporates them by reference herein.

30.   Sovereign Realty Associates, Ltd. represented to Renato Souto that he would be
      paid wages in the form of regular pay, overtime and holiday wages.

31.   Renato Souto relied upon the representations made by Sovereign Realty
      Associates, Ltd.

32.   Sovereign Realty Associates, Ltd.'s representations were false, and made with the
      intention to deceive Renato Souto and induce him to work for Sovereign Realty
      Associates, Ltd.

33.   As a result of Sovereign Realty Associates, Ltd.'s fraud, misrepresentation and
      deceit, Renato Souto has incurred harm and loss in the sum of at least $86,669.40.

## COUNT VII
(Souto v. Defendants)
Estoppel

34.   Renato Souto repeats and re-alleges the allegations set forth in Paragraphs 1 to 33
      above and incorporates them by reference herein.

35.   Sovereign Realty Associates, Ltd. and Stuart Roffman promised to pay Renato
      Souto wages in the form of regular pay, overtime and holiday wages.

36.    In reliance on Sovereign Realty Associates, Ltd. and Stuart Roffman's promises, Renato Souto joined Sovereign Realty Associates, Ltd. and worked continuously, diligently and effectively on behalf of Sovereign Realty Associates, Ltd.

37.    Despite Renato Souto's commitment and sacrifices Sovereign Realty Associates, Ltd. and Stuart Roffman intentionally failed and refused in bad faith to pay Renato Souto's wages.

38.    Accordingly, Sovereign Realty Associates, Ltd. and Stuart Roffman are estopped from denying that it promised to pay Renato Souto wages.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs pray that this Court enter judgment as follows:

A.    Against Defendants for the damage owed to the Plaintiffs, plus interest, costs and reasonable attorney fees provided by Massachusetts General Law Chapter 149;

B.    Against Defendants for treble damages pursuant to Massachusetts Chapter 149;

C.    Issue a preliminary injunction enjoining Sovereign Realty Associates, Ltd. from failing to pay wages to its present employees;

D.    Issue a permanent injunction enjoining Sovereign Realty Associates, Ltd. from failing to pay wages to its present and future employees; and

E.    Provide such other and further relief as the Court deems just and proper.

Respectfully submitted,
PLAINTIFFS
By their attorneys,

/s/ Philip J. Gordon
Philip J. Gordon (BBO # 630989)
Kristen M. Hurley (BBO # 658237)
Gordon Law Group, LLP
535 Boylston St., 6th Fl.
Phone: 617-536-1800

5

# EXHIBIT "A"



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

March 16, 2005

(617) 727-2200
www.ago.state.ma.us

Renato Souto
c/o Kristen M. Hurley
Gordon & Balikian, LLP
535 Boylston Street, 6th Floor
Boston, MA  02116

### Re: Authorization for Immediate Private Suit - Sovereign Realty Associates, Ltd.

Dear Mr. Souto:

Thank you for contacting the Office of the Attorney General's Fair Labor and Business Practices Division.

This letter is to inform you that we have carefully reviewed your complaint and have determined that the proper resolution of this matter may be through a private suit in civil court. Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

Massachusetts General Laws chapter 149, § 150, and chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws. If you elect to sue in civil court, you may bring an action on your own behalf and others similarly situated, and you may obtain injunctive relief, treble damages for any loss of wages and other benefits, as well as the costs of litigation and reasonable attorneys' fees.

Without making a judgment on the merits of your complaint, this correspondence represents this office's written assent to sue and grants you the authority to pursue this matter against your employers immediately, as permitted by Massachusetts General Laws chapters 149 and 151. This office will not take further enforcement action at this time.

Thank you for your attention to this matter.

Sincerely,

Bruce Trager
Assistant Attorney General
Fair Labor and Business Practices Division
(617) 727-2200, extension 2336

BT/pk

NewPRA.frm (11/22/02)