# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

### Civil Action No. 2005-10864JLT

_____

| | |
|---|---|
| RENATO SOUTO and OTHERS | ) |
| SIMILARLY SITUATED**,** | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| SOVEREIGN REALTY ASSOCIATES, LTD. | ) |
| and STUART ROFFMAN, as president of the | ) |
| General Partner of Sovereign Realty Associates, | ) |
| Ltd., Sovereign Realty Associates G.P., Inc. and | ) |
| Individually, | ) |
| **Defendants** | ) |

_____)

### AFFIDAVIT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, David Berman, being under oath, state the following:

**1.**  I am counsel for the above-named Defendants.

**2.**  I attach hereto true copies of the following documents:

**(1)**  A transcript of the deposition of the Plaintiff taken on December 20, 2005;

**(2)**  A transcript of the continued deposition of the Plaintiff taken on June 30, 2006 with exhibits;

**(3)**  The cover page, pages 104-106 and Exhibits 1 and 2 marked at the deposition of Defendant Stuart Roffman taken on February 13, 2006;

Page 2 of 2: Affidavit in Support of Defendants' Motion for Summary Judgment

**(4)** The cover page and pages 50-63, 71-72, and 189-190, and Exhibit 2 of the deposition of Lee W. Torrey taken on February 24, 2006.

*Signed under penalties of perjury this 21st day of September 2006.*

/s/ David Berman

David Berman

Sovereign.09/14/06.(805).Affidavit in Support of Defts Mot. For S.J.

- 2 -

**1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005-CV-10864-JLT

***************************************

RENATO SOUTO and OTHERS SIMILARLY
SITUATED,
    Plaintiff,

V

SOVEREIGN REALTY ASSOCIATES LTD. and
STUART ROFFMAN, as President, of the
General Partner of Sovereign Realty
Associates, Ltd., Sovereign Realty
Associates G.P., Inc., and Individually
    Defendants.

***************************************

Deposition of RENATO SOUTO,

taken on behalf of the Defendants, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Duane Morris, LLP, 470 Atlantic Avenue,

Boston, Massachusetts, on December 20, 2005,

commencing at 9:10 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

**2**

APPEARANCES:

Duane Morris, LLP
[By Bronwyn L. Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
  On behalf of the Defendants.

Gordon & Balikian, LLP
[By Philip J. Gordon, Esq.]
[By Kristen M. Hurley, Esq.]
535 Boylston Street
Boston, Massachusetts 02118
  On behalf of the Plaintiff.

ALSO PRESENT:  Stuart Roffman.
            Lee Torrey.

**3**

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Renato Souto

By Ms. Roberts  4

EXHIBITS

| Id. | Description | Page |
|---|---|---|
| 1 | Tax Returns | 9 |
| 2 | Plaintiff's Sworn Statement | 98 |
| 3 | Letter March 11, 2005 | 100 |
| 4 | Copies of Checks | 118 |
| 5 | Check Stubs | 118 |
| 6 | Standard Payroll Sheets | 118 |
| 7 | Complaint | 131 |
| 8 | Invoice | 149 |
| 9 | Calendar | 162 |

**4**

## STIPULATION

It is agreed by and between counsel for the respective parties that the reading and signing of the deposition will not be waived. All objections, except as to the form of the question, and motions to strike will be reserved until the time of trial.

MS. ROBERTS: Could you swear in Mr. Souto?

## RENATO SOUTO,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

## EXAMINATION BY MS. ROBERTS

**Q.** Good afternoon, Mr. Souto.

A. How are you doing?

**Q.** I'm well, thank you. My name is Bronwyn Roberts. I'm an attorney here at Duane Morris. I represent Stuart Roffman and Sovereign Realty. Do you understand that?

A. Yes.

**Q.** Are you represented here today? Do you have a

5

lawyer here today with you?

A. Right there (Indicating).

Q. Are you referring to Ms. Hurley and Mr. Gordon?

A. Philip Gordon and Kristin.

MR. GORDON: Do you want to do stipulations?

MS. ROBERTS: Yes, why don't we do that. Can we agree to reserve all objections until the time of trial, as well as motions to strike, and be able to state objections as to the form of the question?

MR. GORDON: Fine.

MS. ROBERTS: Who is going to be defending this deposition?

MR. GORDON: Kristen is going to be. I'll be here for a short period and leave after about an hour.

MS. ROBERTS: Thank you.

Q. Mr. Souto, could you state your full name?

A. My phone?

Q. Your name.

A. My full name. Renato Souto.

Q. I'm going to be asking you a number of questions today.

6

A. Okay.

Q. If you don't understand my question or you can't hear my question, please let me know.

A. Sure.

Q. I'm going to understand that the answers you give are responsive to the questions I ask unless you ask me to rephrase or restate my question; is that fair?

A. Yes.

Q. Also, one other sort of guideline, if you could make sure that you answer verbally so that our court reporter today can take down everything that's said, and avoid uh-huh and uhn-uhn, okay?

A. Yes.

Q. Also, if you need a break at any time, let me know and we can do that.

A. Yes.

Q. Mr. Souto, have you ever been deposed before? Have you ever had your deposition taken before?

A. Never.

Q. Have you ever testified in court?

A. No. Actually, I did two times, about -- it was just about money. I sued for money for credit

7

cards and stuff. Nothing big.

Q. When you sued in court for money, were you the plaintiff?

A. Yes.

Q. Who did you sue?

A. Stuart Roffman.

Q. You --

A. Not before. I'm saying today, right?

Q. Other than today --

A. No, nothing. Never before.

Q. Never before?

A. I never sued nobody before.

Q. Have you ever testified before in court?

A. No.

Q. Have you ever testified in an administrative proceeding?

A. No.

Q. Have you ever testified in an arbitration?

A. No.

Q. Are you on any medication that would prevent you from answering questions truthfully today?

A. No.

Q. Have you ever been involved in any other litigation, other than this litigation?

A. No.

Q. What did you do to prepare for today's deposition?

A. Can you ask it again, please?

Q. Yes. What did you do to prepare for today's deposition?

A. Nothing.

Q. Did you review any documents?

A. Yes. Inside my head. Inside my brain, my mind.

Q. You reviewed things in your brain?

A. I know everything.

Q. Did you review any documents in connection wi' today's deposition?

A. No. My lawyers, they have everything. They have all the evidence and stuff.

Q. Did you meet with your lawyers to prepare for today's deposition?

A. Yes.

Q. Approximately for how long?

A. A week ago.

Q. Did you meet with them i their office?

A. Yes.

Q. For how long?

**1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005-CV-10864-JLT

*****************************************

RENATO SOUTO and OTHERS SIMILARLY
SITUATED,
          Plaintiff,

          v

SOVEREIGN REALTY ASSOCIATES LTD. and
STUART ROFFMAN, as President, of the
General Partner of Sovereign Realty
Associates, Ltd., Sovereign Realty
Associates G.P., Inc., and Individually
          Defendants.

*****************************************

          Deposition of RENATO SOUTO,

taken on behalf of the Defendants, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janica A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Duane Morris, LLP, 470 Atlantic Avenue,

Boston, Massachusetts, on December 20, 2005,

commencing at 9:10 a.m.


          MAGGIOLI REPORTING SERVICES, INC.
                48 Watson Street
          Braintree, Massachusetts 02184
                (781) 356-2636

**2**

APPEARANCES:

Duane Morris, LLP
[By Bronwyn L. Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
     On behalf of the Defendants.

Gordon & Balikian, LLP
[By Philip J. Gordon, Esq.]
[By Kristen M. Nurley, Esq.]
535 Boylston Street
Boston, Massachusetts 02116
     On behalf of the Plaintiff.

ALSO PRESENT:  Stuart Roffman.
               Lee Torrey.

**3**

               I N D E X

Witness        Direct Cross Redirect Recross

Renato Souto

By Ms. Roberts  4


               EXHIBITS

| Id. | Description | Page |
|-----|-------------|------|
| 1 | Tax Returns | 9 |
| 2 | Plaintiff's Sworn Statement | 98 |
| 3 | Letter March 11, 2005 | 100 |
| 4 | Copies of Checks | 118 |
| 5 | Check Stubs | 118 |
| 6 | Standard Payroll Sheets | 118 |
| 7 | Complaint | 131 |
| 8 | Invoice | 149 |
| 9 | Calendar | 162 |

**4**

## STIPULATION

It is agreed by and between counsel
for the respective parties that the reading
and signing of the deposition will not be
waived. All objections, except as to the form
of the question, and motions to strike will be
reserved until the time of trial.

          MS. ROBERTS:  Could you swear in
Mr. Souto?


## RENATO SOUTO,
having been satisfactorily
identified and duly sworn by the
Notary Public, was examined and
testified as follows:
## EXAMINATION BY MS. ROBERTS
Q. Good afternoon, Mr. Souto.
A. How are you doing?
Q. I'm well, thank you. My name is Bronwyn
   Roberts. I'm an attorney here at Duane Morris.
   I represent Stuart Roffman and Sovereign
   Realty. Do you understand that?
A. Yes.
Q. Are you represented here today? Do you have a

**5**

lawyer here today with you?

A. Right there (Indicating).

Q. Are you referring to Ms. Hurley and Mr. Gordon?

A. Philip Gordon and Kristin.

　　　MR. GORDON: Do you want to do stipulations?

　　　MS. ROBERTS: Yes, why don't we do that. Can we agree to reserve all objections until the time of trial, as well as motions to strike, and be able to state objections as to the form of the question?

　　　MR. GORDON: Fine.

　　　MS. ROBERTS: Who is going to be defending this deposition?

　　　MR. GORDON: Kristen is going to be. I'll be here for a short period and leave after about an hour.

　　　MS. ROBERTS: Thank you.

Q. Mr. Souto, could you state your full name?

A. My phone?

Q. Your name.

A. My full name. Renato Souto.

Q. I'm going to be asking you a number of questions today.

**6**

A. Okay.

Q. If you don't understand my question or you can't hear my question, please let me know.

A. Sure.

Q. I'm going to understand that the answers you give are responsive to the questions I ask unless you ask me to rephrase or restate my question; is that fair?

A. Yes.

Q. Also, one other sort of guideline, if you could make sure that you answer verbally so that our court reporter today can take down everything that's said, and avoid uh-huh and uhn-uhn, okay?

A. Yes.

Q. Also, if you need a break at any time, let me know and we can do that.

A. Yes.

Q. Mr. Souto, have you ever been deposed before? Have you ever had your deposition taken before?

A. Never.

Q. Have you ever testified in court?

A. No. Actually, I did two times, about -- it was just about money. I sued for money for credit

**7**

cards and stuff. Nothing big.

Q. When you sued in court for money, were you the plaintiff?

A. Yes.

Q. Who did you sue?

A. Stuart Roffman.

Q. You --

A. Not before. I'm saying today, right?

Q. Other than today --

A. No, nothing. Never before.

Q. Never before?

A. I never sued nobody before.

Q. Have you ever testified before in court?

A. No.

Q. Have you ever testified in an administrative proceeding?

A. No.

Q. Have you ever testified in an arbitration?

A. No.

Q. Are you on any medication that would prevent you from answering questions truthfully today?

A. No.

Q. Have you ever been involved in any other litigation, other than this litigation?

**8**

A. No.

Q. What did you do to prepare for today's deposition?

A. Can you ask it again, please?

Q. Yes. What did you do to prepare for today's deposition?

A. Nothing.

Q. Did you review any documents?

A. Yes. Inside my head. Inside my brain, my mind.

Q. You reviewed things in your brain?

A. I know everything.

Q. Did you review any documents in connection with today's deposition?

A. No. My lawyers, they have everything. They have all the evidence and stuff.

Q. Did you meet with your lawyers to prepare for today's deposition?

A. Yes.

Q. Approximately for how long?

A. A week ago.

Q. Did you meet with them i their office?

A. Yes.

Q. For how long?

**9**

A. About an hour.

Q. Did you review documents?

A. No. They have my documents, my evidence.

Q. So during that one-hour meeting, you did not review documents with your attorneys?

A. No.

Q. Did you meet with anyone, other than your attorneys, to prepare for your deposition today?

A. Only them (Indicating).

Q. Did you bring anything with you today?

A. No.

Q. Did you bring your Passport?

A. Yes, I did.

Q. Did you bring any signed tax returns?

A. No. I got that at home.

      MS. ROBERTS: Could you mark this as the first exhibit?

      (Exhibit 1, Tax Returns, marked for identification.)

Q. The court reporter has placed before you what's been marked as Exhibit No. 1 to your deposition. I'm going to represent to you that those are some documents that your lawyer has

**10**

sent to me and represented to me that those are your tax returns. I'm going to ask you to take a minute to review each page of Exhibit No. 1 and let me know whether those are your tax returns for 1999, 2000, 2001, and 2002?

A. That's mine, yes.

Q. Those are your tax returns?

A. Oh, yeah. My name is Renato Souto. My wife Eliana Souto, my son Rodrigo and Naiara Souto.

Q. If you could turn to the second page of what's been marked as Exhibit No. 2, your tax return for 1999 does not appear to be signed by you; do you see that?

A. No, I see that, but those guys at the tax-return office, they know about that.

Q. Did you hire a tax-preparation company to prepare your tax returns?

A. Yes, I did.

Q. What is the name of that company?

A. Genesis.

Q. Who did you work with at Genesis?

A. Igor.

Q. Igor?

A. Igor, yes.

**11**

Q. Do you know his last name?

A. No, not E.

Q. I-G-O-R?

A. Yes.

Q. And he is an employee of Genesis Tax House?

A. He is the owner.

Q. When did you first meet with Igor?

A. About that time, 1999.

Q. If you could look at your -- the second page of Exhibit 1, which is the second page of your tax return for 1999, it appears to be dated November 14, 2005; do you see that? At the bottom --

A. I don't understand.

Q. At the bottom of the page it says, "For preparer's use only" --

A. Start again, please.

Q. At the bottom of the page on page 2 of Exhibit No. 1 the second page of your 1999 tax return it appears to be dated November 14, 2005; do you see that?

A. 2005, yeah, I see that.

Q. Does that refresh your recollection as to when you met with Igor at Genesis Tax House?

**12**

A. Yes, in 1999.

Q. You met with him in 1999?

A. Yes, when I did my first tax returns.

Q. Did he file something on your behalf other than what's been marked as Exhibit No. 1 in 1999?

A. They have everything. They have all the papers.

Q. If you look at the first six pages --

      MS. ROBERTS: Can we go off the record for a minute?

      (Discussion off the record.)

      MS. ROBERTS: Let's start over.

Q. Mr. Souto, when is the first time you filed Federal tax returns in the United States? What year?

A. 1999.

Q. Do you have --

A. If I remember very well, yes. I'm not good -- too good a memory about these things. That's papers, but they have everything. If you need some information, just call them up. They know everything. I just went over there. They went on the computer, and I just signed, and that's it.

**13**

**Q.** Do you have an understanding of why your 1999 tax return is dated November of 2005?
**A.** I have no idea.
**Q.** Do you have any other copies of tax returns?
**A.** Yes, I do have it at home, and I give it to them, my lawyers.
    MS. ROBERTS: Ms. Hurley, will you produce all tax returns that Mr. Souto has?
    MS. HURLEY: Yes. We'll need to review it when I get home -- get back to the office, but I believe this is all Mr. Souto has. These are all the copies we have in the office, but I will look at anything he has in his -- at his home.
**Q.** Mr. Souto, isn't it fair to say that you had income in the United States prior to 1999?
**A.** Say again, please.
**Q.** When did you first come to the United States?
**A.** 1992.
**Q.** Did you have any income in 1992?
**A.** No.
**Q.** Did you have any income in 1993?
**A.** Yes, I did, but --
**Q.** Did you report that income?

**14**

**A.** No.
**Q.** Did you have any income in 1994?
**A.** No -- yes, I mean, I did have income. I just didn't file the tax.
**Q.** You didn't file tax returns in 1994?
**A.** No. The first time I filed the tax was from 1999, so I filed for 1998, '99, 2000 and then from there on.
**Q.** Do you know what your income was in 1992?
**A.** 1992?
**Q.** You said you had none, right?
**A.** Yes.
**Q.** What was your income?
**A.** How much?
**Q.** Yes, how much in 1992?
**A.** About $10 an hour.
**Q.** How many hours --
**A.** Actually, no, I'm sorry. It was about $8 an hour, yes, at that time.
**Q.** Do you know how many hours a week you worked in 1992?
**A.** 1992? Actually, yes, it was like ten hours a day. It wasn't here. It was in Florida.
**Q.** Who was your employer?

**15**

**A.** I was to work for a guy who was a contractor with Sears Painting Service down in Orlando.
**Q.** In 1992 when you were making $8 an hour for ten hours a day, you didn't file a tax return for Federal?
**A.** Not at that time, no.
**Q.** Did you file a tax return for the State of Florida?
**A.** No.
**Q.** In 1993 were you employed in the United States?
**A.** Yes.
**Q.** By whom?
**A.** By the same guy, same people.
**Q.** Sears Painting Service?
**A.** Yeah, a guy worked for them.
**Q.** Who was your manager?
**A.** Larry. I don't know his last name, my boss.
**Q.** What part of Florida?
**A.** Orlando.
**Q.** Do you remember the address of Sears Painting Service?
**A.** No.
**Q.** Were you making $8 an hour working approximately ten hours a day?

**16**

**A.** Yes.
**Q.** Did you file any state or Federal tax returns in 1993?
**A.** No.
**Q.** In 1994 were you employed?
**A.** Yes.
**Q.** Who was your employer in 1994?
**A.** (Indicating) Stuart Roffman.
**Q.** Mr. Roffman was your employer?
**A.** Yes, '94, yes. When I got here, I started working in the Sovereign building.
**Q.** Were you working as an independent contractor?
**A.** At that time I was, yes.
**Q.** In 1994 approximately how much were you paid for your independent contracting services?
**A.** $8 an hour.
**Q.** How many hours a week did you work?
**A.** Average about 11 hours a day, average.
**Q.** Did you file state or Federal tax returns in 1994?
**A.** No.
**Q.** Why not?
**A.** Because at that time I wasn't legal in the country.

**17**

**Q.** Do you have an understanding of what an independent contractor is?

**A.** Actually, no, I don't know.

**Q.** It's different than an employee, correct?

**A.** Yes. I was an employee of Stuart Roffman.

**Q.** You were an employee?

**A.** Yeah.

**Q.** Were you billing him?

**A.** No.

**Q.** You weren't billing Mr. Roffman under the name of a different entity in 1994?

**A.** Yeah, I was billing, yeah.

**Q.** Were you working as a cleaning service?

**A.** No, maintenance.

**Q.** A maintenance service. What was the name of that company that you were working for?

**A.** Sovereign Realty.

**Q.** It was Sovereign Realty?

**A.** Yes. I worked for Sovereign Realty for Stuart Roffman.

**Q.** But it's your understanding you were an independent contractor at that time?

**A.** I never signed to be an independent contractor. They was to tell me, but I never signed to be

**18**

an independent contractor. I just work for them.

**Q.** And you billed them, correct?

**A.** I did. I did a few times, yes.

**Q.** Did you do business under the title Renato's Cleaning Service?

**A.** Yes, I did, a few times, yes.

**Q.** In 1995 --

**A.** Just by the name.

**Q.** Renato Cleaning Services?

**A.** Yes.

**Q.** In 1995 did you have income in the United States?

**A.** Say again, please.

**Q.** In 1995 did you have any income in the United States?

**A.** Yeah.

**Q.** How were you employed in 1995?

**A.** For Sovereign Realty.

**Q.** Were you still working as an independent contractor for Renato's Cleaning Service?

**A.** I don't think so.

**Q.** You don't know?

**A.** I'm not sure. It's ten years ago.

**19**

**Q.** In 1995 approximately what type of income did you have?

**A.** What type?

**Q.** Yes.

**A.** How much?

**Q.** Yes.

**A.** Okay. I would say $8 an hour.

**Q.** How many hours?

**A.** Same thing, 11, 12 hours every day. Not every day, but average. That wasn't every day. That was average.

**Q.** Did you report your income to -- by filing a Federal tax return?

**A.** At that time?

**Q.** Yes.

**A.** No.

**Q.** Did you report your income to the State of Massachusetts by filing a state tax return?

**A.** No.

**Q.** Could you describe your income in 1996?

**A.** It probably was like $10 an hour.

**Q.** Approximately how many hours a day?

**A.** Same thing.

**Q.** 11 to 12 hours a day?

**20**

**A.** Average of 11 to 12 hours a day.

**Q.** I take it you didn't report your state or Federal income?

**A.** No.

**Q.** No tax returns?

**A.** No. This was the first time right there (Indicating).

**Q.** 1999 is the first time. I understand that.

**A.** Yes.

**Q.** Could you describe your income in 1997?

**A.** 1997? Same thing.

**Q.** $10 an hour at approximately 11 or 12 hours a day?

**A.** Yes.

**Q.** And still no state or Federal tax returns?

**A.** No.

**Q.** In 1998 were you making $10 an hour?

**A.** Still, yes.

**Q.** Were you working approximately 11 to 12 hours a day?

**A.** Yes.

**Q.** And you didn't file any state or Federal tax returns, correct?

**A.** Not at that time, no.

**21**

**Q.** Are you aware of any of the penalties for not filing a tax return in the United States?

**A.** Excuse me?

**Q.** Are you aware of any of the penalties for not filing a tax return in the United States?

**A.** Yes, but I couldn't because I wasn't legal. When you aren't legal in the country, you cannot file tax return. You cannot -- you know that.

**Q.** What's your understanding of the penalties for not filing a state or Federal tax return?

**A.** I know it's not -- it isn't legal to do that, but.

**Q.** You don't know any other penalties?

**A.** Not really.

**Q.** If you could look at your tax return for 1999, which is the first few pages of what's been marked as Exhibit No. 1, you believe that you filed a tax return approximately in 1999 for your 1999 income; that's your testimony?

**A.** Yes.

**Q.** And you don't know why your tax return for 1999 is dated 2005?

**A.** I have no idea.

**22**

**Q.** Did you pay Mr. Igor at Genesis Tax House for the preparation of your tax returns?

**A.** Yes.

**Q.** Approximately how much did you pay per year?

**A.** I didn't pay for it. I paid for the total. I paid for the total of his job.

**Q.** When did you pay him?

**A.** At this time when I first filed for taxes.

**Q.** In 1999 you paid Igor at Genesis Tax House for the preparation of your 1999 tax return?

**A.** Yeah.

**Q.** Do you know how much you paid him?

**A.** I don't remember. I'm sorry.

**Q.** Do you know the date that you paid him?

**A.** No.

**Q.** Would you have paid him by check?

**A.** Yes, by check.

**Q.** Do you have a copy of that check?

**A.** No.

**Q.** No?

**A.** No.

**Q.** You don't keep copies of checks?

**A.** No.

**Q.** Does your bank give you statements with copies

**23**

of checks on it?

**A.** Yes, they gave me.

**Q.** Would you have your bank statement?

**A.** Not with me.

**Q.** I know that. Would you have that at home?

**A.** At home, probably, yes. I'm not sure. Bank statements, you don't keep them. You check it out, and you throw away. What are you going to do with that?

**Q.** You may have your bank statement?

**A.** I may have. May have not.

**Q.** Is it fair to say that you filed jointly with your wife in 1999 your tax return?

**A.** Yeah.

**Q.** What's your wife's name?

**A.** Eliana.

**Q.** Is her last name Souto?

**A.** Yes.

**Q.** Did your wife have any income in 1999?

**A.** Yes.

**Q.** Did she report that in this 1999 tax return?

**A.** Yes.

**Q.** She did?

**A.** (Nods head).

**24**

**Q.** Approximately how much income is reported in the 1999 tax return that relates to your wife?

**A.** $200 a week.

**Q.** If you look at the third page of your tax return, you could turn to the third page of your tax return, the Profit or Loss From Business form says that you are filing this for maintenance and that your net profit is $12,033; do you see that?

**A.** Yes.

**Q.** If you look at the first page of the tax form for 1999, you see that same amount as the total income, $12,033?

**A.** Uh-huh.

**Q.** Yes?

**A.** Yes, sorry.

**Q.** What part -- is it fair to say that you did not report your wife's income in the 1999 tax return?

**A.** Yes, you are right on that. I just remembered that I did not -- she wasn't working at that time.

**Q.** She was not working in 1999?

**A.** No. Not at that time, no.

25

**Q.** When is the first time that your wife worked in the United States?

A. She was working, but giving some help for cleaners, but it's nothing -- she wasn't working for a company. She was working helping another woman to clean house.

**Q.** Was she paid for that service?

A. She got paid, of course, yeah.

**Q.** When is the first time your wife was paid for work in the United States?

A. I would say 1996.

**Q.** Is it fair to say that your wife, like you, didn't report any income at least for 1996, 1997, 1998?

A. No, because it wasn't official. She was just helping some girls, and she never reported for tax.

**Q.** Your wife received income in 1996, 1997, and 1998, correct?

A. Uh-huh.

**Q.** Yes?

A. Yes.

**Q.** And she did not file a tax return for any of those years?

26

A. No.

**Q.** At some point did your wife come to employ other workers?

A. No.

**Q.** Never?

A. No.

**Q.** She never hired three other individuals and paid them for their services?

A. After 1999, yes, she had some helpers.

**Q.** What year did she start having helpers?

A. I cannot respond to that. I don't remember.

**Q.** In 1999 did she have helpers?

A. 1999? No, she was by herself.

**Q.** It's fair to say that your 1999 tax return is false, isn't it, because it didn't record your wife's --

A. You're saying that.

**Q.** Excuse me?

A. You are saying that.

**Q.** I'm asking you.

A. Is it false?

**Q.** Yes.

A. I have nothing false. Everything I put on the tax, it was true.

27

**Q.** As you sit here today, though, you know that you were filing jointly, and your wife's income is not included, correct?

A. Yes.

**Q.** So you know it's false? You omitted your wife's income, correct?

A. Excuse me?

**Q.** You left out your wife's income?

A. Yes, because it wasn't official. She makes a little money helping another womans (sic) to clean house.

**Q.** So it's fair to say that you lied to the Federal government in your 1999 tax return?

A. You are saying that.

**Q.** I'm asking you, Mr. Souto. You are here to answer questions today.

A. No.

**Q.** No, you didn't lie?

A. No.

**Q.** Why do you say you didn't lie?

A. Because she wasn't making money officially. She was helping other people and making a little money, so.

**Q.** What do you mean by "officially"?

28

A. Officially like get paid by check, stuff like that. She got cash, a little bit sometimes a week. That's it.

**Q.** I know you are not a lawyer, Mr. Souto. I know that?

A. Excuse me?

**Q.** I know that you're not a lawyer or an accountant, but you know that your wife made income in 1999 and you didn't report it, right?

A. Yes.

**Q.** Okay. If you could turn to your 2000 tax return?

A. Which page?

**Q.** It is beginning -- actually, just turn to the first page one more time, but hold that page. If you could just turn to the first page.

A. Yes.

**Q.** The first page of Exhibit 1, which states that you made as income in 1999 13 -- excuse me, $12,033; is that accurate?

A. Yeah.

**Q.** Do you need a break?

A. No, I'm okay.

**Q.** If you could look at your 2000 tax return -- I

29

think that you need to go a few more pages.

A. Yes.

Q. Take a minute to review the 2000 portion of Exhibit 1.

A. (Witness complies)
(Pause).

Q. Have you seen that?

A. Yes.

Q. Is it fair to say that in 2000 you also filed a joint tax return with your wife?

A. Say again, please.

Q. In 2000 did you file a joint tax return with your wife?

A. Yes (Indicating), it's right here.

Q. Can you tell me how much your income in your 2000 tax return says that you made?

A. No.

Q. You can't? Does your 2000 tax return state that you made $13,195 in income?

A. I can see this.

Q. Is that right?

A. That's right here (Indicating).

Q. Is that an accurate statement of what you and your wife made for income in 2000?

30

A. I file with my wife, but she wasn't making that money. That's why I put 13,000, by myself.

Q. You allege that you made $13,195 in 2000?

A. Say again, please.

Q. Do you --

A. Sorry. Sometimes I don't understand much English. I'm not 100 percent yet. That's why sometimes I ask you.

Q. Please feel comfortable to ask me to rephrase or restate my question at any time. I want you to understand my questions.

A. Okay.

Q. Is this accurate? Did you, Mr. Souto, make $13,195 in the year 2000?

A. Yes.

Q. What amount of money did your wife make in 2000?

A. I don't know. I don't know.

Q. Do you know approximately?

A. No.

Q. Do you know that she did, in fact, make money in 2000?

A. Yes.

Q. What did your wife make for an hour of cleaning

31

in 2000?

A. I cannot answer that because I don't know.

Q. More or less than $10 an hour?

A. I don't know.

Q. Did you have any other employment in 2000 other than doing cleaning and maintenance?

A. Some side jobs.

Q. What side jobs did you have?

A. Some paint.

Q. Some painting?

A. Yes.

Q. Any car parking?

A. Yes, I did.

Q. Anything else?

A. No.

Q. Is the painting and car parking included in your 2000 tax return?

A. Yes.

Q. It is?

A. Yes.

Q. If you could turn to the third page of the 2000 tax return that says, "Profit or Loss From Business;" do you see that, "Sole Proprietorship"? Yes?

32

A. Where is it?

Q. Do you see that? If you don't mind me turning for you.

A. No.

Q. Here you go. "Profit or Loss From Business, Sole Proprietorship." Is it fair to say that in 2000 you were a sole proprietor doing maintenance work and not an employee of Sovereign Realty?

A. I was employed by Sovereign.

Q. If you were employed by Sovereign, why did you file a sole proprietorship tax return, do you know?

A. No.

Q. If you could turn to the 2000 portion of your tax return called "Self-Employment Tax," do you admit that you were employed by yourself in 2000?

A. I was employed by Sovereign Realty.

Q. Why did you file a self-employment form in 2000?

A. Because I wasn't officially employed by them because I was illegal.

Q. You weren't solely employed by Sovereign. You

33

had other jobs in 2000, right?

A. A few, yeah. A few side jobs.

Q. If you could turn to your tax return for 2001.

THE WITNESS: Can I ask you something (Indicating)?

Q. Yes, let's take a break.

THE WITNESS: Can I talk to you?

(Short break was taken.)

MS. ROBERTS: Can I have the last question?

(The reporter read the requested testimony.)

Q. Mr. Souto, if you could turn to your tax return for 2001.

A. First page?

Q. Yes. In 2001 you were doing your work primarily for Sovereign, correct?

A. Yes.

Q. And in 2001 you were paid approximately -- you were paid $400 a week, weren't you?

A. Yes.

Q. And you worked approximately 52 weeks that year, right?

A. Yes.

Q. Is it fair to say you made approximately

34

$20,800 in 2001?

A. Probably.

Q. Why do you report in your 2001 tax return that you only made $13,600?

A. I don't know. I didn't make my thing. Those guys did.

Q. You authorized Genesis to file your tax returns, correct?

A. Yes.

Q. Did you review your tax returns before they were filed?

A. No.

Q. You didn't?

A. No.

Q. Have you amended your tax returns since 2001?

A. I cannot understand.

Q. Have you redone your tax returns for 2001 so that they would be accurate to reflect your approximate $20,000 income?

A. I don't know.

Q. In 2001 was your wife employed?

A. No.

Q. Did your wife make any money in 2001?

A. Not officially.

35

Q. Is it fair to say that you and your wife did not report the money that she made in 2001?

A. Can you ask again, please?

Q. Is it fair to say that you and your wife did not report to the Federal government the money that she made in 2001?

A. No.

Q. It's not fair to say that or you didn't?

A. I didn't.

Q. You did not report your wife's income in 2001?

A. I did.

Q. You did?

A. Not my wife's. My wife wasn't making money officially, understand?

Q. I understand that you're drawing a distinction between official and unofficial income. I understand that. Your wife made money in 2001, correct?

A. No.

Q. She did not make money in 2001?

A. Not officially.

Q. Was your wife paid for cleaning services in 2001?

A. Yes, but not officially. She help, just help a

36

few times some people, and sometimes she had her own house and she made a few money, but not officially.

Q. Give me your definition of what official income is.

A. Official is meaning like when you get a paycheck by a company and you have check stubs like I do.

Q. And unofficial money, what's that?

A. Unofficial money means --

Q. Is meaningless?

A. I didn't say that.

Q. Excuse me?

A. I said my wife was to work a few times for some womans helping them.

Q. How much money did your wife make --

A. I have no idea.

Q. -- in 2001?

A. I don't know.

Q. How many cleaning jobs does she do a week?

A. A few.

Q. How many?

A. I don't know.

Q. More than three?

37

A. I don't know.
Q. Who does she do cleaning jobs for?
A. Different persons.
Q. Who?
A. I don't know.
Q. You have no idea?
A. No.
Q. What towns does she do cleaning in?
A. Boston area.
Q. None of the money your wife made in 2001 is listed in your 2001 tax return, correct?
A. Yeah.
Q. And approximately $7,000 of what you made at Sovereign isn't included in your 2001 tax return, correct?
A. Say again.
Q. Approximately $7,000 of what you made at Sovereign is not reported in your 2001 tax return, correct?
A. Correct.
Q. So your 2001 tax return includes lies and misstatements about the income you and your wife made, correct?
A. I don't know.

38

Q. You don't know?
A. I don't know.
Q. You know it's not accurate, though, right?
A. Yeah, I don't know.
Q. You don't know?
A. I don't know.
Q. Of course you do.
A. You say that.
Q. You know that you made, as you just testified, over $20,000 in 2001.
        MS. HURLEY: I'm going to object. Argumentative.
        MS. ROBERTS: I'm trying to get the answer.
        MS. HURLEY: It seems like he's answered your question.
Q. Do you know that your 2001 tax return is inaccurate?
A. I don't know.
Q. In 2002, if you could turn to that tax return.
A. (Witness complies).
Q. Is it fair to say that in 2002 you were paid $400 a week for approximately 52 weeks by Sovereign?

39

A. No.
Q. That's not fair to say?
A. No.
Q. How much did you make in 2002 per hour?
A. $10 an hour until July when I got fired by that man right there (Indicating).
Q. By Mr. Torrey?
A. Yes.
Q. So in 2002 approximately how many weeks did you work?
A. Half a year.
Q. Does your 2002 tax return include any of the money that your wife made?
A. Ask again, please.
Q. Sure. Does your 2002 Federal tax return include any of the money that your wife made for cleaning --
A. No.
Q. -- services in 2002?
A. No.
Q. Does your 2002 Federal tax return include any income you made for car-parking services, painting or other employment?
A. No.

40

Q. Did you do any other work --
A. Can I say something?
Q. You may.
A. I had a broken legs. I can't stand, so I didn't work at that time. I wasn't doing painting. I wasn't doing nothing after July when I broke my legs working for them.
Q. Before July did you do any car parking or painting?
A. No.
Q. And as you sit here today, do you have any idea why all of your tax returns from 1999 through 2002 are all dated as of November of 2005?
A. No.
Q. Could you describe your education for me, Mr. Souto?
A. My education?
Q. Yes.
A. It wasn't in the United States, so you're not going to understand what's in my country.
Q. I may not.
A. I never went to school in the United States.
Q. If you could do your best to tell me --
A. Eight years of school in Brazil.

**41**

**Q.** Eight years?

A. Yes, in my country.

**Q.** Does eight years take you through high school --

A. No.

**Q.** -- or the equivalent?

A. High school, probably, yes, because the first four years is the elementary, the next four years probably is like high school over here in the United States.

**Q.** So you have the functional equivalent of a high-school education?

A. I have a what?

**Q.** Have the -- almost the same thing as a high-school education in the United States?

A. I'm not sure about that.

**Q.** I think that you have already given me your employment history, but could you describe from the first time you came to the United States who you worked for?

A. I worked for a painting company 1992 for a few months.

**Q.** And that's in Orlando?

A. No.

**42**

**Q.** Okay.

A. Boston area.

**Q.** What's the name of that company?

A. I don't remember anymore. It was a long time ago.

**Q.** Do you remember who you worked for?

A. No.

**Q.** What was your next employer?

A. Orlando, Sears Painting Service for a guy who had a subcontract with Sears.

**Q.** And that was part of 1992?

A. Yes.

**Q.** And you worked 1992 and 1993 for that gentleman in Orlando?

A. Yes, in Homestead after the hurricane. First I went to Homestead.

**Q.** Homestead?

A. After the Hurricane Andrew, remember?

**Q.** I do.

A. Just two days after the hurricane, I was down there working.

**Q.** The resort club the Homestead?

A. Excuse me?

**Q.** The Homestead?

**43**

A. Homestead is in sea, where the hurricane destroyed the city. I done that for like a few months. Then I went to Orlando and worked for the guy painting.

**Q.** And what was your next employment?

A. After that?

**Q.** Yes.

A. 1994.

**Q.** Yes.

A. I was working for Sovereign building for Stuart Roffman.

**Q.** Were those the years that you had -- that you had your own service and you billed them in 1994?

A. Billed -- I billed a few times, yes.

**Q.** When is the first time you became an employee of Sovereign?

A. 2000 -- no. 2001. Yes, when I got my papers of the United States. I think I was hired in 2001 -- no, no. I'm sorry. Let me see if I can remember. I cannot remember that exactly.

**Q.** But --

A. I can check my papers at home.

**Q.** That's fine.

**44**

A. They have my papers when I got there, when I was hired by Sovereign (Indicating).

**Q.** Thank you. After -- when is the last time that you worked for Sovereign?

A. It was July 2002.

**Q.** Who did you work for after July of 2002?

A. Excuse me?

**Q.** Who did you work for after July of 2002?

A. No more. It was a broken leg for like one year. I got -- I was collecting unemployment. I wasn't working because I had -- my legs was broken working for them.

**Q.** So you had one year of unemployment?

A. About that, yeah.

**Q.** What was your next job?

A. Next job Home Depot where I'm still working for.

**Q.** You're still working there?

A. Yes.

**Q.** Where is the Home Depot located?

A. Everett.

**Q.** Who is your supervisor?

A. Excuse me?

**Q.** Who is your supervisor?

**45**

A. The manager or the supervisor?

Q. Whoever your supervisor is is fine.

A. Jeudidh.

Q. Can you spell that?

A. J-E-U-D-I-D-H. They call Jeudi. I don't have his last name.

Q. When did you begin at Home Depot?

A. April 2004. Yes, April 2004.

Q. What's your title? What's your job?

A. I work in the Painting Department.

Q. What do you do in the Painting Department?

A. Mix paints, helping people how to paint, how to use the supplies.

Q. How much are you paid an hour?

A. 9.75 an hour.

Q. How many hours a week do you work?

A. 40 hours a week.

Q. Do you ever work overtime?

A. A few times.

Q. Can you describe your relationship with Stuart Roffman?

A. With whom?

Q. Stuart Roffman.

A. Well, I cannot. I don't want to say something

**46**

bad.

Q. Well, unfortunately --

A. I have to?

Q. I need you to answer my questions.

A. My relationship with him is like he is the boss and I was his slave, paid slave.

Q. You were a paid slave?

A. Yes.

Q. How long have you known Stuart?

A. Excuse me?

Q. How long have you known Stuart?

A. How long I know him?

Q. Yes.

A. Since 1994.

Q. How did you meet him?

A. By the supervisor of the Sovereign building, John Harvey.

Q. Who is John Harvey?

A. He used to be Stuart Roffman's supervisor on the building.

Q. Which building?

A. Sovereign.

Q. The Sovereign -- what's the address?

A. 1440 Beacon Street in Brookline.

**47**

Q. How do you know John Harvey?

A. Because he was living with my sister at that time.

Q. Was he married to her?

A. No.

Q. When did he introduce you to Mr. Roffman?

A. 1994 sometime.

Q. Under what circumstances?

A. To see him doing some work at his offices, Reservoir Office Park.

Q. Did Mr. Harvey tell you that Mr. Roffman was looking to hire another person?

A. I don't remember that.

Q. Did Mr. Harvey tell you that Mr. Roffman was looking to hire a cleaning service?

A. I don't know about that.

Q. What's your best memory of your first conversation with Mr. Roffman?

A. I cannot remember.

Q. You don't know what he said to you?

A. Ten years ago.

Q. You don't know what he said to you?

A. I don't remember.

Q. Do you remember anything that you said to him?

**48**

A. I don't remember.

Q. Were you friends with Mr. Roffman?

A. Huh?

Q. Were you friends with Mr. Roffman?

A. No.

Q. No?

A. Friends?

Q. Yes.

A. No.

Q. Has Mr. Roffman been good to you?

A. No.

Q. No?

A. No.

Q. You think he's been bad to you?

A. Yes.

Q. Why do you think that?

A. Because I cannot say that.

Q. You must.

A. Because he is a boss that everybody works for him is a slave.

Q. Everybody that works for Mr. Roffman is a slave?

A. As far as I know.

Q. Is Mr. Torrey a slave?

**49**

A. Worse.

Q. Of course?

A. Worse. He's worse.

Q. Is Mr. Torrey Mr. Roffman's slave?

A. No, they are not slave. They make the people slave, paid slave. You know what that means?

Q. Was John Harvey a slave?

A. He was.

Q. In your opinion?

A. Yes.

Q. Who else was?

A. I don't know who else worked for him, but I'm sure everybody works for him is like a paid slave. Do you understand that?

Q. Do you know any other person who has worked for Mr. Torrey or Mr. Roffman?

A. As a subcontractor, yes.

Q. Who?

A. John Lafstids.

Q. Could you say that again?

A. John Lafstids.

Q. Could you spell his last name?

A. L-A, I guess, F-S-T-I-D-S.

Q. You think that John was a paid slave?

**50**

A. Yes. He worked for him as a contractor, a painter of his building, house and building.

Q. Why do you think that Mr. John Lafstids was in your opinion a paid slave?

A. Because he wasn't got paid enough and sometimes never get paid.

Q. Did Mr. Lafstids ever complain to you?

A. Yes.

Q. What did he say?

A. That's what I'm saying.

Q. When did he tell you that?

A. He got paid a little money and work a lot, and a few times he didn't get paid.

Q. Anyone else?

A. That's it.

Q. That's the only other person that you think falls into --

A. As far as I remember, yes. As far as I remember, but I know it's more people, but I don't know everybody else.

Q. Did you ever complain to Mr. Roffman about -- about Mr. Roffman to anyone?

A. Yes.

Q. Who did you complain --

**51**

A. My wife, my kids.

Q. Anyone else?

A. Friends.

Q. Anyone else?

A. No.

Q. Did you ever tell anyone at Sovereign that you felt that Mr. Roffman wasn't treating you fairly?

A. Yes, tenants.

Q. You told tenants?

A. Sometimes.

Q. Which tenants did you tell?

A. I don't remember. 500 tenants, maybe thousands.

Q. You told thousands of tenants?

A. Yes --

MS. HURLEY: I'm going to object. That's a misquote of what he's saying.

Q. Did you tell 500 to a thousand people that you thought that Mr. Roffman was mistreating you?

A. Yes.

MS. HURLEY: Do you understand what she's asking you?

THE WITNESS: Yeah. I

**52**

understand.

Q. Isn't it fair to say that Mr. Roffman assisted you with obtaining your Green Card?

A. Yes. The only good thing he did for me was this. That's it.

Q. Why did he do that for you, do you know?

A. Because he wants me to work for him. I ask him to be my sponsor. He say yes and he signed for me. That's it.

Q. Didn't he pay for you to obtain your Green Card?

A. Not a penny.

Q. Not a penny?

A. No.

Q. You paid for your Green Card?

A. Everything.

Q. How much did you pay?

A. 15 to $16,000.

Q. Who did you --

A. For myself, and my kids, and my wife.

Q. Who did you pay that amount to?

A. For the immigration lawyer.

Q. Mr. John Dvorak?

A. John Dvorak, yes.

53

**Q.** And your contention is neither Sovereign nor Mr. Roffman paid any amounts related to your Green Card?

**A.** No.

**Q.** Did you ever hear Mr. Roffman call you names?

**A.** No. Actually, not. I have no reason for that.

**Q.** Was Mr. Roffman respectful to you?

**A.** Not really.

**Q.** Why not?

**A.** Because he is a rude man.

**Q.** He made rules with respect to your employment?

**A.** Excuse me?

**Q.** He made rules with respect to your employment?

**A.** Yes.

**Q.** He is the boss. He is allowed to do that, right?

**A.** Yes.

**Q.** What is your present residential address?

**A.** 29 Park Street, number 3, Somerville.

**Q.** How long have you lived there?

**A.** I would say almost three years.

**Q.** How did you get to the United States from Brazil?

**A.** I came from Mexico.

54

**Q.** Do you remember the date that you came from Mexico?

**A.** 1992. I don't remember the date. Probably it was about April.

**Q.** How physically did you get to the United States from Mexico?

**A.** Like everybody.

**Q.** How is that?

**A.** Crossing the dessert.

**Q.** You crossed the dessert?

**A.** Yes.

**Q.** With your entire family?

**A.** No.

**Q.** Just you?

**A.** Yeah.

**Q.** Did you cross the dessert with any friends or family members at all?

**A.** No.

**Q.** Just you?

**A.** Yes.

**Q.** Do you own or rent where you live at 29 Park Street?

**A.** Rent.

**Q.** Prior to living at 29 Park Street, where did

55

you live?

**A.** Before?

**Q.** Yes.

**A.** 37 Oak Street, Somerville.

**Q.** Did you own or rent at 37 Oak Street?

**A.** Rent.

**Q.** Approximately what dates did you live at 37 Oak Street?

**A.** From '94 to 2001.

**Q.** Do you remember what your rent was at 37 Oak Street?

**A.** In the beginning?

**Q.** Yes, in 1994.

**A.** I would say $600.

**Q.** Per month?

**A.** Yes.

**Q.** Did that change while you lived there?

**A.** Yes.

**Q.** What was the last rent that you paid in 2001?

**A.** 995.

**Q.** Approximately --

**A.** Actually, I'm sorry. 1200, sorry.

**Q.** Do you remember if it changed between 1994 and 2001?

56

**A.** Yes.

**Q.** In 1999 do you remember what your rent was?

**A.** A thousand.

**Q.** What's your rent now at 29 Park Street?

**A.** How much?

**Q.** Yes.

**A.** $1500.

**Q.** What was it in 2002 when you first moved there?

**A.** $1800.

**Q.** 800?

**A.** $1800.

**Q.** It was 1800?

**A.** Yes. Can you believe it?

**Q.** No. Do you remember who your landlord was at 37 Oak Street?

**A.** A guy named -- I just remember his first name, Dave.

**Q.** And who is your landlord now?

**A.** It's -- it's a company, Investment Limited.

**Q.** Investment Limited?

**A.** Yes.

**Q.** Are you still married?

**A.** Yes.

**Q.** And your wife's name you said is Eliana Souto?

57

A. Yes.

Q. And she resides at the same address as you?

A. Yes.

Q. Do you have any children?

A. Yes.

Q. How many children do you have?

A. Four.

Q. What are the names of your children?

A. Bella, B-E-L-L-A; Filipe, F-I-L-I-P-E; Rodrigo; and Naiara.

Q. Could you spell that?

A. Naiara, N-A-I-A-R-A.

Q. How old is Bella?

A. 24.

Q. How old is Filipe?

A. 22.

Q. How old is Rodrigo?

A. 19.

Q. And Naiara, how old is she?

A. 17.

Q. Do you have child-care responsibilities, Mr. Souto?

A. Child care?

Q. Yes. Are you responsible for the care of your

58

children?

A. Of two now.

Q. Who are you responsible for caring for?

A. For Filipe and Naiara.

Q. When you were employed by Sovereign, which of your children were you responsible for the care of?

A. Four.

Q. All four?

A. Yes.

Q. Could you describe your child-care responsibilities when you were employed by Sovereign?

A. A house, food, everything else, clothes as usual.

Q. Were you responsible for physically being in the house and watching your children?

A. Can you say again, please?

Q. Sure. From day to day were you responsible for being in your home and caring for your children?

A. Definitely, yes.

Q. Approximately what hours during the workweek were you responsible for being home and taking

59

care of your children?

A. After my work.

Q. Approximately what hour?

A. After 6, 7.

Q. Did you have any child-care responsibilities in the morning while you were employed by Sovereign for your children?

A. No. I was working.

Q. What types of things were you responsible for doing after 6 or 7 for your children in the home?

A. Say again, please.

Q. What responsibilities did you have in the home after you got home from work --

A. Okay.

Q. -- for caring for your children?

A. To cook, to watch them, to enjoy them.

Q. Cook dinner?

A. Yeah.

Q. Did you help them with their homework?

A. Not really because I'm not good with English.

Q. You helped them with their clothing?

A. No.

Q. Did you do any cleaning?

60

A. My wife did it. Cleaning? Oh, yes.

Q. What is Eliana Cleaning Service?

A. What's Eliana's Cleaning Service.

Q. Yes?

A. She file for a company at the City Hall in Somerville, but she's not working for it, just open the business, but she is not using that name on her work.

Q. She's not using that name?

A. No.

Q. Is somebody else using it?

A. She still helping people to clean. She open just for to be legal.

Q. So she filed some paperwork at City Hall in Somerville?

A. Yes.

Q. Does your wife Eliana pay other individuals for cleaning work that they do for her?

A. Sometimes.

Q. Who are the names of the individuals?

A. I don't know.

Q. There are approximately three other individuals --

A. No.

**61**

**Q.** Approximately how many other people?
**A.** I don't know.
**Q.** When you were working as an independent contractor for Sovereign, you submitted bills, correct, to Sovereign?
**A.** A few times in the beginning.
**Q.** Were you paid in full for the bills that you submitted?
**A.** Yes.
**Q.** How much were you paid per hour when you were working as an independent contractor submitting bills to Sovereign?
**A.** It start at 8, and in the end it was $10 an hour.
**Q.** Did you have an interview before becoming an employee of Sovereign?
**A.** Not really.
**Q.** No?
**A.** No.
**Q.** Did Sovereign just hire you based on the recommendation of John Harvey?
**A.** Yes.
**Q.** Who did you report to?
**A.** Excuse me?

**62**

**Q.** As an employee of Sovereign, who did you report to?
**A.** John Harvey.
**Q.** He was your manager?
**A.** In the beginning, yes.
**Q.** Approximately what dates did you report to John Harvey?
**A.** From 1994 to 2000.
**Q.** Did you ever complain to John Harvey about the conditions of your work?
**A.** Yes.
**Q.** What did you say to John Harvey?
**A.** I'm working a lot, not getting paid enough, and be bad treated by the boss.
**Q.** What did Mr. Harvey say to you?
**A.** Huh?
**Q.** What did Mr. Harvey say to you?
**A.** What did he say to me?
**Q.** Yes. Did he respond to you?
**A.** Yes. He agreed with me.
**Q.** Did Mr. Harvey, as your manager, say that he would talk to the boss?
**A.** Yes.
**Q.** Do you know if he did that?

**63**

**A.** I don't know.
**Q.** Did Mr. Harvey ever get back to you after he had a conversation with the boss about your complaints?
**A.** No. I cannot remember. Yes, he did.
**Q.** What did he say to you?
**A.** He said that the guy is just like that, a bad boss, a bad person.
**Q.** When you say you were treated badly, could you describe everything you mean about being treated badly, every poor treatment that you received?
**A.** How many you want?
**Q.** As many as you know.
**A.** Okay.
        MS. ROBERTS: Can we actually go off the record? We're going to take a little break.
**A.** Okay.
        (Short break was taken.)
**Q.** Mr. Souto, you were about to tell me every circumstance where you feel like you were treated badly at Sovereign.
**A.** There's so many that I can't remember.

**64**

**Q.** If you can do your best.
**A.** One time I was at his house moving some rocks, heavy ones, and I ask him if I can have wheel dolley, a dolley, trash barrel I mean. He said no. You carry with your hands like this (Indicating), just like that, you carry, big ones, big rocks.
        So many times I was going home and he call me, get your ass over here now. Bring me a Coca Cola, a Coca Cola to my house, change one light bulb.
        I was at home at night. I was working for him for almost a year in his house doing brickwork at zero degrees out there digging holes, frozen dirt, frozen ground. Many times he trapped me to get me to immigration because I was illegal at that time, and he knew it.
        Many times I had to pick him up at the airport like 11 o'clock at night, get back 2 o'clock in the morning, wait for him. I had to pay sometimes for the toll, for the parking space at the Logan Airport.
        Him and Lee Torrey -- Lee Torrey

65

is the worst. Stuart is a bad guy. He is an asshole, but -- I'm sorry about that.

**Q.** Let's try not to use swears today.

**A.** Yeah, but the one thing, only thing he did good to me, at least I can recognize, at least I can tell, he signed for me to be my sponsor in this country. That's the only thing I have to say to him. Everything else was bad, especially the other guy over there, Lee Torrey.

**Q.** Do you have other incidents to describe about poor treatment that you contend you suffered?

**A.** Yes.

**Q.** Can you describe those for me?

**A.** Yes, like you have to work overnight not get paid. Many, many nights I was home or doing everything else like shopping. My people went crazy. They call me for one light bulb is off at the building, at his house.

**Q.** Anything else?

**A.** Yes.

**Q.** What else?

**A.** One time I was working for him at his house, and before I make a phone call to my sister in Florida, and I didn't know how much, and then I

66

was working for him. He say, "Hey, where is my $10?" So I was working like a dog at his house in cold weather, and he was charging me for $10. I said, "Okay, Stuart, will you deduct from my paycheck, okay?" So things like that.

**Q.** He told you it was going to be deducted from your paycheck?

**A.** I told him.

**Q.** You never received any deductions from your paycheck, did you?

**A.** Excuse me?

**Q.** You never received any deductions from your paycheck, did you?

**A.** Yes, I did.

**Q.** We'll talk about that later. Didn't you tell Stuart Roffman that you wanted to work for Lee Torrey?

**A.** I want to work for Lee Torrey?

**Q.** Yes.

**A.** I was working there already.

**Q.** At --

**A.** I had no choice.

**Q.** At any point did you tell Mr. Roffman that you wanted to work for Mr. Roffman and not Lee

67

Torrey?

**A.** I was working at the building where Lee Torrey was the manager.

**Q.** Did you ask to work for Mr. Roffman personally?

**A.** No.

**Q.** You never said, Mr. Roffman, can I work for you, not Lee Torrey?

**A.** Not really.

**Q.** Have you described all of the poor treatment that you received?

**A.** Excuse me?

**Q.** Have you described today all of the poor treatment that you received?

**A.** Not all because I cannot remember. So many things I cannot remember the rest.

**Q.** Have you described all the poor treatment that you can remember today?

**A.** As I did now because if you want, I can write down for you and then I can remember better. For now, so many different treatment to me.

**Q.** You said previously that you worked for John Harvey between 1994 and 2000, correct?

**A.** For the Sovereign building, which John Harvey was the manager.

68

**Q.** John Harvey is the manager?

**A.** Yes, supervisor, whatever you call it.

**Q.** At some point did you become supervised by Lee Torrey?

**A.** Say again, please.

**Q.** At some point did you become supervised by Lee Torrey?

**A.** I supervise?

**Q.** No. Did Mr. Torrey supervise you?

**A.** Yes.

**Q.** When?

**A.** From 2000 -- from 1999 to 2002. 2002, yes.

**Q.** You had previously testified that John Harvey was your supervisor in 1999 and 2000.

**A.** Yeah, I think he quit by the end of '99, something like that.

**Q.** So Mr. Harvey was your supervisor from 1994 to 1999?

**A.** Yeah, I would say that.

**Q.** And then Torrey from 1999 to 2002, right?

**A.** Yes.

**Q.** When you were an employee at Sovereign, could you describe your average day, your responsibilities each day?

69

A. My responsibilities?
Q. Yes.
A. Maintenance, everything about maintenance.
Q. Could you be more specific? Because I don't know everything about maintenance at Sovereign. I need to know.
A. Change light bulbs, change ceiling tiles, paint, do floors, sanding floors, cleaning snow, everywhere Stuart's office, office park, and Sovereign.
Q. Anything else?
A. Clean up clogged toilets, so many things, clean up, take the trash down, clean the building, take trash down, fix windows.
Q. Fix broken windows?
A. Yes.
Q. Do you mean repair glass?
A. Not repair, to cover. It was broken until the company comes to replace the glass.
Q. So you would place a piece of plywood --
A. Plexiglas.
Q. So you weren't really fixing windows. You were covering broken windows?
A. Yes.

70

Q. Anything else?
A. Fix cranks, window opener, how you call that.
Q. You fixed cracks in a window opener?
A. Not cracks.
          MS. HURLEY: Are you saying cranks?
Q. You fixed window cranks?
A. Yes.
Q. How did you fix those?
A. The broke one, take it off, put a new one back.
Q. Anything else?
A. Working for landscaping at the building, at the Sovereign, at Stuart's house, at office park.
Q. Anything else?
A. So many things. Clean the building.
Q. Right. You mentioned that.
A. I said that. Change light bulbs, did I mention that?
Q. Yes.
A. Change ceiling tiles?
Q. Yes.
A. I'm just repeating. I'm sorry.
Q. It's okay.
A. Actually, that's about it.

71

Q. Is it fair to say --
A. Everything else that I cannot remember, so many years ago.
Q. Is it fair to say that your average day at Sovereign from 8 to 12 you parked cars and did cleaning at 822 to 826 Boylston Street?
A. Can you ask again, please?
Q. From approximately 8 a.m. to 12 a.m. -- 8 a.m. to 12 p.m. while you were employed at Sovereign, isn't it fair to say that you spent the mornings of that time parking cars and cleaning 822 to 826 Boylston Street?
A. Yes, cleaning, fixing leak in the roof at this office park.
Q. You did that in the morning?
A. Yes. While I was parking cars, they paying me, ask to do this and that and that. Actually, I was not parking very much cars. I was just watching for the parking lot. While I was doing this, they ask me to change this, change the ceiling tile, change the light bulbs, fix that toilet, unclog that toilet, things like that.
Q. Did you have a lunch break?

72

A. Yes.
Q. Approximately what hour did you have lunch?
A. Probably around 12.
Q. 12 to what?
A. 12:30.
Q. Did you have any other breaks, besides lunch?
A. No.
Q. No other breaks?
A. No.
Q. You didn't get two, 15-minute breaks?
A. No.
Q. In the afternoons is it fair to say that you did errands, changed light bulbs, and did trash removal?
A. Yes.
Q. And you did that at 1440 Beacon?
A. And Stuart's office, Stuart's house, everywhere.
Q. And you worked until approximately 4 p.m.?
A. Usually was, but --
Q. Usually what?
A. Was -- the time was 8 to 4, but they usually call at nights to go in his house, to go back to the office park, to do some work, so that's

**73**

why I say the average is like 11 to 12 hours a day if you put an average. I was working Saturday, Sunday. I was not getting paid.

**Q.** Approximately how many times a week did you work at night?

A. Probably three, four times average.

**Q.** Approximately how many times a month did you work --

A. Some Saturdays, some Sundays.

**Q.** How many Saturdays and Sundays per month?

A. I cannot remember, maybe I would say 100.

**Q.** 100?

A. In eight years, yes.

**Q.** In eight years?

A. Probably hundreds.

**Q.** Hundreds in eight years?

A. Yes.

**Q.** You said that you sometimes were responsible for driving Mr. Roffman to the airport; is that correct?

A. Yes.

**Q.** If Mr. Roffman needed a ride to work during the day --

A. Not to work.

**74**

**Q.** Were you permitted to go home after dropping him off at the airport?

A. Yes.

**Q.** Were you permitted to leave early after dropping him off at the airport?

A. No, because every time I was dropping him at the airport, if it was my working time, I was back into the building, and sometime -- many times he called me at night to pick him up like 11 o'clock at night and come back like 2 o'clock in the morning home, sometimes more than that.

**Q.** Mr. Souto, if you could answer the question that I pose to you, that would be helpful.

A. Okay.

**Q.** If Mr. Roffman had an afternoon flight before 4 o'clock and you drove him to the airport, were you permitted to go home early?

A. No.

**Q.** You never were permitted to go home early?

A. No.

**Q.** Not once?

A. Not once.

**Q.** Did you have any conversations with anyone at

**75**

Sovereign regarding your wage?

A. Yes.

**Q.** Who did you discuss your wage with?

A. $10 an hour.

**Q.** Who? Which person?

A. Tenants, friends to tenants.

**Q.** Other than friends and tenants --

A. John Harvey.

**Q.** You discussed your wage with John Harvey?

A. Yeah.

**Q.** Your wage went from $8 an hour to $10 an hour?

A. Yes.

**Q.** Did you have any discussions with Mr. Harvey about that raise?

A. Yes.

**Q.** What did he say to you?

A. He said that's not enough.

**Q.** He said that's not enough?

A. Yeah.

**Q.** What did you say to him?

A. I say, "I agree with you," but I have to take it.

**Q.** Did you have any conversations with Mr. Roffman when you got an increase from $8 an hour to $10

**76**

an hour regarding your wage?

A. Yes. I ask him for a raise.

**Q.** You asked him for a raise?

A. Yes.

**Q.** And he gave you a raise, right?

A. He gave me like four or five years before I get another job.

**Q.** You made $8 an hour?

A. In the beginning.

**Q.** And then you got $10?

A. Yes.

**Q.** And you asked for that $2 an hour raise from Mr. Roffman?

A. I didn't ask how much. I don't say how much I want. He give me from 8 to 10. After I would say about six years, he gave me $2 raise, and never again.

**Q.** Did he have any conversations with you about that raise?

A. Not really.

**Q.** You requested an increase?

A. I requested an increase.

**Q.** Do you remember when that request took place?

A. I don't remember.

**77**

**Q.** So you had a conversation -- you had a conversation at least before your wage changed. You testified previously that you were making $8 an hour in 1995?

**A.** I guess.

**Q.** And that you went up to $10 an hour in 1996; is that correct?

**A.** Probably 1998. I cannot remember the dates. It was a long time ago.

**Q.** So you previously testified that in 1996 your rate went up to $10 an hour. I want your best memory as you sit here today. When did you get that raise?

**A.** I don't remember.

**Q.** So you think it might be 1996 or 1998?

**A.** Approximately.

**Q.** And you had one conversation with Mr. Roffman saying that you wanted an increase?

**A.** Yes.

**Q.** Approximately how long before you got the increase did you have that conversation with Mr. Roffman?

**A.** A few months.

**Q.** So approximately a few months before you got

**78**

the $10 an hour, you discussed with Mr. Roffman that you wanted a raise?

**A.** Yes.

**Q.** Did you say how much you wanted?

**A.** No.

**Q.** Did he tell you how much he was willing to give you?

**A.** No.

**Q.** Did he tell you how much other employees were being paid?

**A.** No.

**Q.** Did you have any conversation regarding a specific number?

**A.** No.

**Q.** Is that the only conversation you have ever had with Mr. Roffman about getting a raise?

**A.** Yes, once.

**Q.** Once?

**A.** Yeah.

**Q.** After you received the $10 an hour, you never again discussed a wage increase with Mr. Roffman, correct?

**A.** Yes, I did.

**Q.** When is that?

**79**

**A.** In 2000 I ask for more money. He said no.

**Q.** He told you no, I'm not going to give you anymore money?

**A.** No.

**Q.** Did he say anything else?

**A.** He just said no.

**Q.** What did you say in 2000 about wanting an increase from $10 an hour?

**A.** Because I was working a lot doing specific job that should make more money than $10 an hour.

**Q.** Do you understand in this lawsuit that you are demanding payment at a rate of $15.53 an hour?

**A.** Yes, I do know.

**Q.** If you never had any conversation or any agreement with Mr. Roffman for that amount, how can you claim that you are entitled to that amount?

**A.** Because it's in the papers. It's in the papers that a guy like me with my skills have to make $15.73 an hour.

**Q.** He told you no, right?

**A.** He told me no. He saw the paper and he told me no, I'm not going to pay this, right there (Indicating) at his office.

**80**

**Q.** He never --

**A.** In front of him. He said, I'll keep you at $10.

**Q.** Mr. Roffman never agreed to pay you $15.53 an hour?

       MS. HURLEY: I'm going to object to that. You are leading.

**A.** It's in the paper.

**Q.** No one at Sovereign said that they would pay you --

       MS. HURLEY: I'm going to object to that. Ask a question.

       MS. ROBERTS: I'm asking the question if you will let me.

**Q.** No one at Sovereign agreed to pay you $15.53 an hour; isn't that correct?

**A.** No, nobody pay me. Nobody told me that he's going to pay me. They are going to say the paper say 15.73, but I'm not going to pay you. I'm going to pay you $10 an hour.

**Q.** They never agreed to pay you 15.53 an hour?

**A.** Not verbally.

**Q.** In fact, they told you no, they are not going to give you an increase?

81

A. No. Stuart Roffman told me no.
         MS. HURLEY: I'm going to
object.
Q. You asked him --
A. I can --
Q. Let me ask a question.
         MS. HURLEY: I'm going to
object. We're getting a little bit too
argumentative here.
         MS. ROBERTS: You've made your
objection. That's all you're entitled to.
         MS. HURLEY: I'll continue to
object to all of these questions.
         MS. ROBERTS: Fine. Let me ask
the question before you object, okay?
         MS. HURLEY: Ask your next
question.
Q. Mr. Souto, isn't it fair to say that you asked
for an increase and it was denied by Mr.
Roffman?
A. Yes.
Q. Thank you.
A. It was on the paper to say Renato, as a
maintenance and with my skills, his salary is

82

$15.73. Does that answer your question?
Q. No. He told you he wouldn't pay you more than
$10 an hour, didn't he?
A. He told me, yes.
Q. Okay. Thank you. Your job at Sovereign was
primarily cleaning and taking garbage out,
correct?
A. Yes, in the beginning it's correct. I was
learning maintenance and other things.
Q. Are you familiar with your wife having a
cleaning business of the going rate for paying
cleaners per hour?
A. No.
Q. Do you know any cleaner who makes $15 an hour?
A. No.
Q. As an employer, was Sovereign free to increase
or decrease your salary?
A. Say again, please.
Q. As an employer, was Sovereign -- did Sovereign
have the right to increase or decrease your
salary, do you know?
A. I know. They can give me whatever they want.
Q. You didn't have any written agreement with
Sovereign to be paid more than $10 an hour,

83

correct?
A. No, not -- verbally.
Q. You didn't have any written agreement that
Sovereign agreed to pay you more than $10 an
hour?
A. I'm sorry, I don't understand your question,
the first one.
Q. Was there any written document between you and
Sovereign wherein Sovereign agreed to pay you
$15.53 an hour?
A. The immigration paper.
Q. That's the only document that you are talking
about?
A. When he sign for sponsor, it's in the paper. I
have that. I have that with them.
Q. You are talking about immigration papers?
A. Yes, and they say when he hire me, he sponsor
me, that was in the paper right there. Renato
have to make $15.73 an hour, and he said to me,
no.
Q. Mr. Souto --
A. He show me like this, see, this, I'm not going
to pay you this. I'm going to pay you $10 an
hour still.

84

Q. Mr. Souto, you don't have a written
agreement --
A. What written means? I'm not sure.
Q. Do you know what writing means?
A. No, sorry.
Q. You don't know what writing means?
A. No.
Q. Do you have a paper document, not the
immigration papers, that says that Sovereign
will pay you $15.53 an hour?
A. Not on the paper.
Q. Do you know what other employees at Sovereign
were paid?
A. Say again, please.
Q. Do you know what amount per hour other
employees of Sovereign were paid?
A. Only -- in the beginning or in the end?
Q. Well, let's focus on 1999. Do you know what
other employees were being paid?
A. Yes, Larry Dorsey I think was over there.
Q. What was Larry Dorsey paid?
A. I don't know. It's not my business.
Q. Maybe you didn't understand my question. Do
you know what amount per hour any other

85

employees of Sovereign were paid during any time you were employed there?

A. Yeah, between 10 and 12. Even guys that start working over there didn't know everything, nothing, and they paid them more than I was to get.

Q. Do you know any --

A. They didn't know nothing about maintenance.

Q. Do you know any person at Sovereign that was paid $15.53 an hour?

A. No, because it's not my business. I don't ask people how much they make in an hour. That's not my business.

Q. In connection with your Green Card labor certification, did you specifically tell the INS that you were making $15.53 an hour?

A. No.

Q. You never represented what your salary was to the INS?

A. No.

Q. During normal work hours, did you ever drive your sister to Mr. Roffman's house to clean?

A. Yes, in the beginning.

Q. Were you paid for those hours during normal

86

work hours?

A. Yes.

Q. Your testimony is that you were never permitted to leave work early in all the years that you worked at Sovereign?

A. No.

Q. Not once?

A. Not once, in eight years.

Q. What are the names of other employees who had the same position that you held at Sovereign?

A. In the beginning it was only me and John Harvey for like I would say six years, almost five years to six years, only me and him. Then they hired Larry Dorsey. Then after Lee Torrey start to manage the place, then he hired some more people and hired people, fire people. People quit. Nobody can take him.

Q. Anyone else?

A. That's it.

Q. Did Lee Dorsey and John Harvey have the same skill set that you had?

A. Not Lee Dorsey. Lee Torrey.

Q. Who is Dorsey?

A. Dorsey was another employee.

87

Q. Did Dorsey and Harvey have the same skill sets that you have?

A. Say again, please.

Q. Did Mr. Dorsey and Mr. Harvey have the same skill sets that you have?

A. Basically, yes.

Q. And you don't know what either of them are paid, do you?

A. No.

Q. Did you supervise anyone?

A. Uhn-uhn.

Q. No?

A. I'm sorry, no.

Q. Could you describe how your employment with Sovereign terminated?

A. You say when?

Q. When?

A. July 2002.

Q. How?

A. Because I didn't -- everybody gets the weekend off and everybody was -- Independence Day like I think it was a Thursday. On Friday he told everybody -- I was told by Larry Dorsey that everybody was getting the weekend off. So I

88

didn't go to work like everybody else, like four guys or five guys. He pays me on Saturday. You are asking me why? I didn't go to work, and he got mad, and he fired me.

Q. Did Mr. Torrey tell you in person that you were fired?

A. Yes.

Q. Was that over the phone?

A. Yes, on the phone, yes.

Q. Did you have any conversations with John Harvey regarding your termination?

A. Yeah, probably -- I comment with him, I just told him.

Q. What did you say to Mr. Torrey when he told you that you were fired?

A. I said, "Now, please, don't fire me. I need the job. I have a family to take care. I need the job. I need to stay."

   He said, "No, you are fired. You out of here." Okay. What are you going to do?

Q. How long was the telephone conversation?

A. A few minutes.

Q. Do you remember anything else about the

89

telephone conversation?

A. No, just simple -- as simple as that. He fired me because I didn't go to work.

Q. After you worked --

A. Because everybody was off, including me. Do you understand?

Q. Yes. Have you finished your answer?

A. Yes.

Q. After -- immediately after you worked -- sorry. Immediately after you were terminated by Mr. Torrey from your employment at Sovereign, did you go to work for Barbara Fitzgerald?

A. Yes, I did.

Q. Where was your work for Barbara Fitzgerald?

A. Where?

Q. Yes.

A. Needham.

Q. What were you doing for Ms. Fitzgerald?

A. A few paint jobs on the side of her house. I broke my legs. I can stand on the side of her house.

Q. Were you working for Ms. Fitzgerald full time?

A. No.

Q. Part time?

90

A. I would say six hours.

Q. Six hours?

A. But after I was fired from them, I work for myself.

Q. So in July of 2002 you're fired by Mr. Torrey?

A. Yes.

Q. At that time you were also working for yourself?

A. No.

Q. Describe -- I may be confused. If you could describe for me the day after you were terminated from Sovereign, did you go to work somewhere else?

A. No, only for Barbara at that time.

Q. You were already working for Barbara at that time?

A. No, not before. After I terminated.

Q. The next day you went to go work for Barbara --

A. A few days later. I can't remember exactly. A few days later. Painting work.

Q. How much painting work did you do for Ms. Fitzgerald?

A. Paint some walls. I cannot remember. Walls, ceiling.

91

Q. Was that full time?

A. Yeah, I would say so.

Q. Did Ms. Fitzgerald pay you?

A. Yes.

Q. Did she pay you $10 an hour?

A. I know that.

Q. I'm sorry?

A. She didn't pay me an hour. I give her my price for my job. I was working for myself.

Q. You billed her?

A. Yes, kind of.

Q. As a painting company, you billed her?

A. Not a painting company.

Q. As a painter, you billed her?

A. A painter, yes.

Q. Do you remember what you billed her?

A. Excuse me?

Q. Do you remember what rate you billed her at?

A. I don't remember anymore.

Q. Did you perform the painting services yourself?

A. For Barbara?

Q. Yes.

A. Yes, I did.

Q. Did anyone else help you?

92

A. No.

Q. While you were working for Barbara, did you file for unemployment?

A. No.

Q. Did you ultimately file for unemployment?

A. No.

Q. You never filed for unemployment?

A. No, because I was doing side job I would say for Barbara.

Q. At no time have you ever filed for unemployment?

A. At this time?

Q. As you sit here today, in your whole life have you ever filed for unemployment?

A. Oh, for unemployment?

Q. Yes.

A. Yes, I did.

Q. When did you file for unemployment?

A. Just one day after I get fired.

Q. Why did you do that when you were working for Ms. Fitzgerald?

A. I wasn't working. I was working for Barbara as a side job for a couple of days.

Q. Did you file a workmen's compensation claim?

93

A. Workmen's compensation claim? No.
   Unemployment only.
Q. You only filed for unemployment?
A. Yes.
Q. You said that you complained to approximately
   500 to 1,000 tenants about your termination.
   Do you remember any of the tenants specifically
   that you complained to?
A. For what? Can you say again, please?
Q. Previously today during your deposition, you
   testified that you complained to approximately
   500 to 1,000 tenants about your termination.
A. No.
Q. No?
A. No.
Q. Did I mischaracterize your testimony?
A. No.
Q. Did you complain to any tenants about your
   termination?
A. No.
Q. Did you have any conversations with Stuart
   Roffman regarding your termination?
A. Yes.
Q. What conversations did you have with him?

94

A. I ask him to give my job back because I'm a
   father of a family and I did the job. He say
   no. I almost get on my knees to ask him to
   give me my job back. He said, No, no, no, no.
Q. Didn't --
A. And I was working for him at his house, and he
   found out that I was -- apply for unemployment.
   He got mad and he said no. I don't want you.
   After eight years as his slave almost like a
   slave for him, he just said no, just like that.
   I ask him 10 times, 20 times.
Q. Did Mr. Roffman explain to you that he was
   upset that you would file for unemployment when
   he knew you were employed working for both Ms.
   Fitzgerald and for him?
            MS. HURLEY: I'm going to
   object.
Q. He didn't explain that to you?
A. No.
Q. You don't remember that?
A. No.
Q. Is it your testimony, though, that Mr. Roffman
   told you that he would not hire you back
   because he learned that you had filed for

95

   unemployment when you were employed by Ms.
   Fitzgerald?
A. Yes.
Q. Did you enter Mr. Roffman's office at the
   Reservoir Office Park and take any documents
   from the fax machine or from his files?
A. No.
Q. In this litigation you have produced documents
   from your employment file. How did you get
   those?
A. My documents?
Q. Yes.
A. From -- I keep everything with me.
Q. How did you get personal notes between Mr.
   Torrey and Mr. Roffman? Did you take those?
A. Yeah, I take one, one, because I saw it. He
   was calling me brain dead, all kind of shit.
   So I take it just for evidence like I can show
   you now, that's why.
Q. Where did you take it from?
A. From a fax machine because I was going inside
   the office all the time to do some work.
Q. Were you responsible for sending or receiving
   faxes?

96

A. No.
Q. Why were you looking at the fax machine?
A. Because it was right in front of me.
Q. So you -- it's your testimony that you had
   taken documents from Sovereign without
   permission?
            MS. HURLEY: Objection.
A. I don't answer this question.
Q. You have to answer this question.
A. Okay. So I would say I don't know.
Q. You don't know whether you had permission to
   take documents?
A. I don't know.
Q. Were you ever warned about entering Mr.
   Roffman's office without permission?
A. I had the keys to do some work in his office
   all the time.
Q. Were you ever warned about --
A. Check thermostat for the temperature.
Q. Were you ever warned not to take Mr. Roffman's
   documents?
A. No.
Q. You had a key to the office, correct?
A. Yes.

**97**

**Q.** Did you have permission to take documents from Mr. Roffman's office?

**A.** I don't know.

**Q.** You don't know?

**A.** No.

**Q.** Do you remember any conversations wherein anyone at Sovereign told you you could take documents from Mr. Roffman's office?

**A.** No.

**Q.** What else have you taken from Mr. Roffman's office?

**A.** Nothing else, nothing.

**Q.** One fax?

**A.** I'm not a robbery. I'm just working there.

**Q.** Did you take copies of paychecks?

**A.** Yes. Copies of my paychecks?

**Q.** Yes.

**A.** Yes, I have everything.

**Q.** Did you take them from Mr. Roffman's office?

**A.** No, out of the payment check, check stub.

**Q.** You were given those?

**A.** Yeah, I get those, everything.

         MS. ROBERTS: Could you mark this as the next exhibit, please?

**98**

         (Exhibit 2, Plaintiff's Sworn Statement, marked for identification.)

**Q.** I'm placing before you what has been marked as Exhibit No. 2 to your deposition, and it's a document filed or served by your lawyer entitled "Plaintiff's Sworn Statement in Accordance With Local Rule 26.1(b)," and I'm just going to address first my comments to Ms. Hurley.

         MS. HURLEY: Sure.

         MS. ROBERTS: In reviewing this document, it's become clear that you have produced a sworn statement that's actually not sworn.

         MS. HURLEY: It's not?

         MS. ROBERTS: No.

         MS. HURLEY: Because it's not signed.

         MS. ROBERTS: It's not signed. If you want to take a quick break, review it with your client, and have him sign it, that's fine.

         MS. HURLEY: Okay. That will be fine.

**99**

         (Short break was taken.)

         MS. ROBERTS: Going back on the record.

         MS. ROBERTS: Have you had a chance to look at Exhibit No. 2?

         MS. HURLEY: Yes.

         MS. ROBERTS: Have you reviewed it for authenticity?

         MS. HURLEY: Are you speaking to me?

         MS. ROBERTS: Yes.

         MS. HURLEY: Yes, we have.

         MS. ROBERTS: And is it now signed?

         MS. HURLEY: It is. It's signed.

**Q.** Mr. Souto, what's been placed before you has been marked as Exhibit No. 2 to your deposition. It's your sworn statement in this action that goes through your damages that you're alleging in this case. Does this document accurately reflect the damages that you claim you sustained in this case?

**A.** Yes.

**100**

         MS. ROBERTS: Could you mark this as the next exhibit?

         (Exhibit 3, Letter March 11, 2005, marked for identification.)

**Q.** Mr. Souto, what's been placed before you by the court reporter has been marked Exhibit No. 3 to your deposition, and it appears to be a wage complaint that your attorney filed on your behalf and includes a sworn statement by you regarding wages that you claim were not paid to you. I'm going to ask you to take a look at this document and ask you whether it accurately reflects the wages that you are claiming are owed to you in this case?

**A.** I have to read this?

**Q.** Yes. Take your time.

         (Pause).

**Q.** Mr. Souto, have you had an opportunity to review that?

**A.** Yes.

**Q.** Does that accurately --

**A.** (Indicating). It was 5 or 6, not 3, just after that holiday.

**Q.** You see the date of discharge is wrong on the

| 101 | 103 |
|---|---|
| second page of that document? | **Q.** You never received it? |
| A. Yes. | A. No. |
| **Q.** It should be 7 what? | **Q.** Did you ever work over 40 hours a week between |
| A. 7/5 or 6. It was after the holiday. | 1999 and 2002? |
| **Q.** 7/5 or 6? | A. Yes. |
| A. Yeah. 5 or 6. | **Q.** When? What days? |
| **Q.** Of 2002? | A. A few days a week, Saturdays, Sundays. They |
| A. I think it was 6, yes. | call me, page me to go do some work, and I not |
| **Q.** Other than that, does everything in this | get paid. |
| nonpayment of wage complaint form filed with | **Q.** Did you ever receive straight time for hours |
| the Attorney General's office accurately | worked over 40? |
| reflect the damages that you claim you are owed | A. No, I never received nothing after 40. |
| in this case with respect to wages? | **Q.** You also have a demand here for sick pay; is |
| A. Yes, everything is okay. | that correct? |
| **Q.** Do you see your signature on the third page of | A. Correct. |
| that document? | **Q.** Is it your contention that you never received |
| A. Yes. | pay for any days that you were sick? |
| **Q.** Did you sign that? | A. I never get sick day. I never get sick. I was |
| A. This one or the other one? | working for eight years straight, no days |
| **Q.** On what's been marked as Exhibit No. 3, do you | off -- I mean, days off, yes, but on call on |
| see your signature there? | the pager, and I never got paid ever 40 hours. |
| A. No -- oh, right here (Indicating). | **Q.** Did you ever call in sick while you were |
| **Q.** And do you see your signature on the document | employed by Sovereign? |
| that's been marked as Exhibit No. 2? | A. Once. |

| 102 | 104 |
|---|---|
| A. Yes, I do. | **Q.** Did you get paid for that day? |
| **Q.** You've signed that today, correct? | A. Only once. No. |
| A. Yes, number 4, right (Indicating). | **Q.** You didn't? |
| **Q.** On the first page of Exhibit No. 2 and the | A. No. |
| fourth page of Exhibit No. 1 -- I'm sorry, | **Q.** When was that? |
| Exhibit No. 3 -- | A. I cannot remember. |
| A. Which page this again, please? | **Q.** What year? |
| **Q.** That's the first page of that document, Exhibit | A. I would say 2000. |
| No. 2, and the fourth page of what's been | **Q.** 2000? |
| marked as Exhibit No. 3 you write, "Sovereign | A. Yes. I would say that. |
| Realty Associates Limited promised to pay me | **Q.** And you contend that you were not paid that |
| $15.53 an hour," and you say that again on the | day? |
| first page of Exhibit No. 2. That's not | A. I don't remember that. I'm sorry. |
| correct, right? Stuart Roffman told you that | **Q.** You might have been paid for that day? |
| he was only going to pay you $10 an hour? | A. One day? |
| MS. HURLEY: Objection. | **Q.** Yes. |
| A. That's correct. | A. Yes, I got paid for that day. |
| **Q.** You have demanded overtime payment in both the | **Q.** You did? |
| sworn statement and the complaint filed with | A. One day in eight years. |
| the Attorney General's office for overtime | **Q.** And that's the only time you ever did call in |
| payments between 1999 and 2002. Do you contend | sick, correct? |
| that you never received any payment for hours | A. Excuse me? |
| worked over 40? | **Q.** That one day that you were paid for sick time |
| A. No, I never received it. | is the only day that you ever called in sick, |

**105**

correct?

A. Yes.

Q. You never received any deductions from your standard paycheck for days that you didn't come in because you were sick, did you?

A. No. It wasn't deduct.

Q. You always --

A. It was only one day in eight years.

Q. You always got the same salary, the same paycheck, right?

A. Yes.

Q. And for that one day there was no deduction?

A. No, I don't think so.

Q. And there were no other sick days that you ever took?

A. No.

Q. In your sworn statement, Exhibit No. 2, and in your Attorney General complaint, Exhibit No. 3, you make a claim for payment for personal days; is that accurate?

A. Yeah, personal days, vacation, sick days.

Q. Did you ever take a personal day between --

A. No.

Q. -- between 1999 and 2002?

**106**

A. Only once, and I went from Friday to Tuesday, I think it was 2000.

Q. So you took Friday off, Monday off, and Tuesday off?

A. Yes.

Q. When did you --

A. Not Tuesday, though. Monday. Friday to Monday when I went to Florida.

Q. You went to Florida?

A. Yes, with my wife. That's the only vacation in eight years on that place.

Q. So you are calling that a vacation day as opposed to a personal day?

A. Yeah, kind of, because I think four days, five days not a vacation. It was like a few days of personal day they gave me finally.

Q. And you were paid for that -- those two days off, right?

A. I don't remember that.

Q. You don't know?

A. No, I don't.

Q. Do you recall in 2000 at any time receiving any deductions from your standard salary check?

A. I don't remember that either.

**107**

Q. Would your paychecks reveal whether you had any deduction for those two days off?

A. No.

Q. They wouldn't?

A. No, it wasn't deducted.

Q. It was not deducted?

A. Yes.

Q. So you got that paid two days off?

A. Yes, for four days, yes, I got paid. The only time in eight years.

Q. There was no other vacation that you took?

A. Never.

Q. Did you take any personal days with respect to your INS issues that you had?

A. Yes, once.

Q. One personal day?

A. Once, yes, and I was getting paged all the time inside the immigration office, paged by Lee Torrey.

Q. By Lee Torrey?

A. Yes.

Q. Were you paid for that one personal day that you took to go to INS?

A. Yes.

**108**

Q. Were you paid for any days that you took to go to doctors' appointments for you and your family in connection --

A. No.

Q. -- with your immigration?

A. No.

Q. No, you were not paid?

A. No, because I went at night, and they paged me, too.

Q. You worked at night?

A. I worked for them that night. I remember. Do you want me to say what happened?

Q. I want you to remember.

A. I was in the doctor for my exams for the immigration, and Lee Torrey paged me many times. He say, Stuart wants you in his house right now to take his girlfriend out of the snow. They was stuck in the snow.

I went there I would say 8 o'clock, working until 1 o'clock in the morning taking her car from there because she's stuck there. He live on a hill driveway. She back up and stuck in the grass full of snow, ice. I spend like five or six hours, I don't know, to

**109**

get her car out of there that day.

**Q.** So you worked six hours that day?

**A.** Approximately.

    MS. HURLEY: I'm going to object.

    MS. ROBERTS: That's his testimony.

**Q.** Did you receive any deductions from your pay for that week for not working a full week?

    MS. HURLEY: I'm going to object.

**A.** I don't understand.

**Q.** Did your salary change that week for not working a full week?

**A.** No.

**Q.** You were paid?

**A.** That day wasn't a personal day.

    MS. HURLEY: I'm going to object.

**Q.** You were paid for all of your time, correct?

**A.** Not for all my time. For 40 hours.

**Q.** So your contention is that you never took vacation with the exception of the two days that you went to Florida, the Friday and the

**110**

Monday? No other vacation?

**A.** No other vacation at all.

**Q.** Was that trip to Florida to Disneyland?

**A.** No -- do I have to say the name of the city?

**Q.** Yes.

**A.** Hollywood in Florida.

**Q.** Hollywood, Florida?

**A.** Yes.

**Q.** Did you go to Disneyland?

**A.** No.

**Q.** At any point during your employment with Sovereign, did you go to Disneyland on vacation?

**A.** No, I never been there.

**Q.** Did you ever while you were employed by Sovereign make any trips to Brazil?

**A.** No.

**Q.** Never?

**A.** Never.

**Q.** During your employment with Sovereign during the workday did you ever go to your lawyer's office in connection with your Green Card?

**A.** After hours, after work hours.

**Q.** In your sworn statement and in your Attorney

**111**

General complaint you're demanding holiday pay for 1999 and 2002. What type of holiday pay do you feel you are entitled to?

**A.** Labor Day, all kind of holidays. Only one that they pay me was the Thanksgiving day if they didn't page me because sometimes they paged me, too, to do some work for them.

**Q.** Did you work on Labor Day?

**A.** Every Labor Day.

**Q.** You worked every Labor Day?

**A.** Eight years every day Labor Day.

**Q.** Were you entitled to take the next day off?

**A.** No.

**Q.** Never?

**A.** Never.

**Q.** Did you ever receive holiday pay while you were employed?

**A.** No.

**Q.** After you received your Green Card from -- after you received your Green Card, could you have quit and gone to work somewhere else?

**A.** No.

**Q.** You couldn't have?

**A.** I could, but I wasn't. I was expecting

**112**

vacation, but I was getting fired before that.

**Q.** Have you ever received any loans from Mr. Roffman?

**A.** Yes.

**Q.** Have you ever received any loans from Sovereign Realty?

**A.** From Stuart Roffman.

**Q.** Have you ever received any loans from Torrey, Mr. Torrey?

**A.** No.

**Q.** What loans have you received from Mr. Roffman?

**A.** I received I think it was $1300 to help my document papers, my Green Card papers, and I had to pay it in a couple of weeks all this money together. I request for a few more months to pay because I wasn't making enough money, but they say, no, you have to pay a couple of weeks.

**Q.** What year was that?

**A.** I would say -- because I used to get paid like once in 15 days, once in two weeks, so I would say for two times they take that money off, $1300 that Stuart loaned me.

**Q.** You are claiming that they deducted from your



113

pay $1300?

A. Yes.

Q. Do any of the documents that you have produced reflect that deduction?

A. No, I have no documents about that.

Q. You produced paychecks, didn't you?

A. They probably have it.

Q. Didn't you produce paychecks?

A. Excuse me?

Q. Didn't you produce paycheck stubs in connection with this?

A. If I produce?

Q. Did you give to your lawyer paycheck stubs?

A. Every one.

Q. Have you reviewed those?

A. If I reviewed those, my check stubs?

Q. Yes.

A. Yes.

Q. Do any of those show a deduction?

A. No.

Q. Is it your contention that you have paid Mr. Roffman back in full?

A. Yes.

Q. Did Mr. Roffman or Sovereign loan you $750 to

114

repair a transmission for your car?

A. No, I work for.

Q. You worked for it?

A. Yes.

Q. Was that -- you claim that they deducted $750 from your paycheck?

A. No, not this time. I pay with work.

Q. You paid with work?

A. Yes.

Q. Did you pay it back in full?

A. I work for Barbara, actually, at this time. I pay back in full, yes.

Q. You worked for --

A. I don't owe them anything.

Q. Mr. Roffman lent you $750 to repair a transmission, correct?

A. I think so, yes.

Q. And then you worked for Barbara Fitzgerald to pay off that amount?

A. Yeah. Barbara and Stuart Roffman is the same, same company, same thing. She wants me to do some work. I was sanding a floor for her to get paid for my transmission on my car.

Q. Do you know if Barbara repaid Mr. Roffman?

115

A. I don't know about that.

Q. Did Mr. Roffman make any payments to John Dvorak for your Green Card?

A. Not a penny.

Q. Did Mr. Roffman pay for any airfare for your wife?

A. Airfare?

Q. Yes.

A. Travel?

Q. Yes.

A. No.

Q. Never?

A. Never.

Q. Have you opened an account for yourself personally at True Value?

A. Not that time. After two years, I would say one year and a half ago, two years ago for myself, yes.

Q. Did you keep that charge account current?

A. No.

Q. Do you still owe True Value money?

A. No, because my partner, he still buys stuff because I put him as a partner. So he is still buying stuff. Sometimes I get like $20 bills,

116

like 20, 30, stuff he buys, supplies, paint, kind of contracting work.

Q. Does your -- who is your partner?

A. His name is Roberto.

Q. What's his last name?

A. I don't remember his last name. They know him. Stuart know him.

Q. Where does Roberto live?

A. Where?

Q. Yes.

A. He still live in Lynn.

Q. And do you know if Roberto owes money to True Value for the account that you opened?

A. Actually, I don't know. I haven't received any bill for months from them.

Q. You have testified that you had a pager, correct?

A. Yes.

Q. You didn't have a cell phone at the time while you were working at Sovereign?

A. No.

Q. No?

A. No. On the end of my termination before my termination I got one so I can call him all the

117

time because he page me like every minute. I
would say that. So I had to get it because I
don't want to be stopped in the pay phone. It
have to be quick.

Q. Is Mr. Torrey the only person who paged you?
A. Mr. Torrey, Stuart, Barbara.
Q. Who paid for the pager?
A. Them (Indicating).
Q. Do you know if -- what was the pager number?
A. I don't remember.
Q. Do you know what company the pager was from?
A. From them (Indicating).
Q. Do you know what service?
A. I don't remember anymore. It's three years
   ago. I cannot remember.
Q. Do you still have the same cell phone that you
   had at the end of your employment?
A. No.
Q. What was the cell-phone number that you had?
A. The number?
Q. Yes.
A. I don't remember anymore because I don't have
   it anymore.
Q. What was the cell-phone service that you used

118

at the end of your employment?
A. I don't remember.
Q. You have no idea?
A. No.
   MS. ROBERTS: I have three
exhibits to mark.
   (Exhibit 4, Check Stubs,
   marked for identification.)
   (Exhibit 5, Pay Stubs,
   marked for identification.)
   (Exhibit 6, Standard Payroll Sheets,
   marked for identification.)
Q. Mr. Souto --
A. Don't call me that, please.
Q. All right. I'm placing before you what's been
   marked as Exhibits 4, 5, and 6. Exhibits 4 and
   5 appear to be paycheck receipts produced by
   you and your attorney. Exhibit 6 are documents
   entitled Standard Payroll for various weeks.
   I'm going to ask you to take a look first at
   Exhibits 4 and 5, and I'm going to ask you
   first some questions about those two first
   documents.
A. (Witness complies).

119

   (Pause).
Q. Have you looked through those documents, Mr.
   Souto?
A. Yeah.
Q. I'm going to represent to you that documents
   marked Exhibit 4 and 5 have been produced by
   your attorney in this case, okay?
A. Okay.
Q. How did you get copies of these documents?
A. Those checks?
Q. Yes.
A. They made the copies, not me. I gave them my
   check stubs.
Q. That's Exhibit 4 that you are referring to?
   Those are check stubs, correct?
A. Yes.
Q. Does Exhibit 4 represent all the check stubs
   that you have in your possession?
A. Yes, I would say so.
Q. And is it fair to say that the check stubs in
   Exhibit 4 represent payments that you actually
   received?
A. Yes.
Q. Did you cash all of these checks?

120

A. I put it in my bank account. Sometimes I
   cashed it, but most of the time I put it in my
   bank account.
Q. That's what I meant. If you could look at
   Exhibit No. 5, could you describe what Exhibit
   No. 5 is for me?
A. I don't see nothing here (Indicating).
Q. It's hard to read, but are these documents that
   you had in your possession?
A. If it was a paycheck stubs, yes.
Q. These are also paycheck stubs?
A. Okay, yes.
Q. Is that correct?
A. Is that correct? They have that because I had
   it. They have them, every one.
Q. Are these paychecks that you received every
   other week?
A. Every other week.
Q. I'm going to ask you to look through every page
   of Exhibit No. 5 and tell me whether your pay
   ever varied from $800?
A. That was my payment.
Q. I want you to look through and tell me whether
   any deductions were ever taken from your salary

**121**

of $800?

A. I'm sure they never deducted from my salary, my paycheck.

Q. You were always paid $800?

A. $800 every two weeks.

Q. If you could look at Exhibit No. 6, have you ever seen that document before?

A. This (Indicating)?

Q. Yes.

A. No.

Q. No?

A. No.

Q. Do you know what it is?

A. That's probably what I received for my expenses in mileage on my car.

Q. You submitted mileage and expenses?

A. To them, yes.

Q. To Mr. Harvey or to Mr. Torrey?

A. To Mr. Harvey first, then to Mr. Torrey after he get the job, after he start working. It was for him.

Q. You previously testified that when you took Mr. Roffman to the airport, sometimes you weren't paid --

**122**

A. Only for the mileage, not for the tolls.

Q. Or for parking?

A. No.

Q. Did you ever submit tolls or parking for repayment?

A. No, I don't think so.

Q. Why not?

A. Because I just put in like mileage. I didn't charge for parking. Many times he asked me to park -- to pay for the parking, for the toll because he didn't have no change or something like that.

Q. Did he --

A. I never submitted to them.

Q. You never submitted those expenses?

A. No.

Q. If you could turn to -- at the bottom it's marked SOV009.

A. Okay.

Q. Before I ask you a question about that document, how much were you paid per mile in your expenses?

A. Usually -- it all depends how much I drive, how much I go to Stuart's house, to Barbara's

**123**

house.

Q. How many cents per mile were you reimbursed for it?

A. I don't remember exactly. It was like 15 cents, something like that.

Q. 15 cents? You don't remember?

A. I don't remember exactly.

Q. Were you always paid for all the expenses that you submitted?

A. Yes.

Q. Looking at Sovereign 0009 at the bottom of the page, the standard payroll form, it's dated December 22 of '01.

A. Okay.

Q. It says, "Petty cash, will catch up after your return." Do you see that?

A. I see that.

Q. Do you know what that refers to?

A. No.

Q. Were you in Florida in December of 2001?

A. Not that I remember.

Q. Do you remember being out of town in December of 2001?

A. I don't remember.

**124**

Q. If you could turn to the next page marked SOV0010 for the week ending January 4, 2002.

A. (Witness complies).

Q. Again, it says, "Will catch up after your return." Were you out of town in January of 2002?

A. I don't remember.

Q. You don't know whether you took a vacation during that time?

A. I never had a vacation. I told you that. I just get four days off for like a personal day.

Q. Do you recall --

A. Never a vacation in eight years.

Q. Do you recall taking two weeks off?

A. Excuse me?

Q. Do you recall taking two weeks off?

A. I don't say that.

Q. Do you know if you took two weeks off?

A. No. I never took two weeks off.

Q. Turn to the next page, if you would.

A. (Witness complies).

Q. Sovereign 0011 dated February 1st of 2002. Do you see a payment to you of $385.62, including petty cash for past pay periods?

125

A. Yes, I see that.
Q. Does that refresh your recollection that you were away for two pay periods?
A. No.
Q. Mr. Souto, if you could look at Exhibit No. 5, your paychecks beginning in December of '01, which is well into Exhibit No. 5.
A. What page?
Q. I will try to count them for you.
        (Pause).
Q. It's 14 pages into Exhibit No. 5 -- excuse me, 15 pages into it. There's a check for pay period beginning -- excuse me, December 8, 2001, ending December 21, 2001, and the check is dated December 21, 2001. Do you have any doubt that you were paid $800 on December 21st of 2001?
A. I don't remember that.
Q. Does this -- do you have any reason to doubt that you were paid $800?
A. If I was paid $800?
Q. Yes.
A. I was paid $800, yes.
Q. Every other week, right?

126

A. Every other week.
Q. If you could turn to the next page.
A. (Witness complies).
Q. The receipt for the period beginning December 22nd through January 5th, do you see that?
A. Not really. It's so dark.
Q. It's very dark.
A. Yes.
Q. Take your time to look at it.
A. (Witness complies).
        MS. HURLEY: Excuse me, what pay period was this?
        MS. ROBERTS: December 22nd to January 5th.
        MS. HURLEY: Of 2001?
        MS. ROBERTS: 2001 to 2002.
        MS. HURLEY: Check number 461?
        MS. ROBERTS: Check number 461, right.
Q. Do you have any reason to doubt that you were paid $800 that date? In fact, you were, weren't you?
A. I don't remember. It's a long time ago. I don't remember those things.

127

Q. You don't dispute you were paid $800 every other week?
A. I cannot remember what happened three years ago exactly.
Q. Mr. Souto, these are documents you produced.
A. Okay.
Q. Do you have any reason to believe that you were not paid as is reflected in this?
A. No, I don't remember.
Q. If you could turn to the next page, check number 497 for the period beginning January 5, 2002, to the period ending January 18, 2002, do you have any reason to believe that you were not paid $800 on January 18, 2002?
A. I don't remember that. The only thing I remember that I never had a vacation, like two weeks' vacation.
Q. I understand that's your testimony. Do you have any reason to believe you weren't paid that amount on that date?
A. No.
Q. If you could -- would you agree from looking at these documents that you were paid for a time period that you were not present?

128

A. I was always present only for that four days I told you about.
Q. So you don't agree with that?
A. No.
Q. If you could look at Exhibit No. 6, please.
A. (Witness complies).
Q. Exhibit No. 6 entitled Standard Payroll, which we've previously looked at, if you could turn to SOV number 12, it says, "Renato Souto, $100 petty cash advance." Do you know what you received it in advance for?
A. I don't remember that, but one thing I know I was spending money out of my pocket on my mileage. They was to pay this for me as out of petty cash.
Q. Did anyone ask for receipts for the petty cash that was advanced to you?
A. Say it again.
Q. Did anyone at Sovereign ask for receipts for the petty cash that was advanced to you?
A. I don't remember that.
Q. If you could turn to SOV16 for the week ending April 12, 2002.
A. (Witness complies).

SOUTO V SOVEREIGN REALTY, ET AL                                    RENATO SOUTO

**129**

**Q.** Again, "$100 petty cash estimated;" do you see that?

**A.** Yeah.

**Q.** Do you ever recall receiving $100 without having to provide receipts to Sovereign?

**A.** Can you say again, please?

**Q.** Sure. Did they ever pay you $100 without you ever having to come up with a receipt for payment?

**A.** I don't know about the receipt. I know they used to pay me, yes, petty cash. I was spending money out of my pocket to buy things for them.

**Q.** They would reimburse you?

**A.** Yes, for the money spend out of my pocket, yes, and for my mileage.

**Q.** Is it fair to say sometimes when you had receipts, they would pay you for the receipts and --

**A.** I was showing the receipts all the time. Whatever I was buying them, I was showing them the receipt.

**Q.** If you didn't have a receipt, they would pay you that, too?

**130**

**A.** I don't remember that. I think so.

**Q.** You think so?

**A.** I had to have the receipt, yes.

**Q.** Did they ever give it to you when you just gave them an estimation of what you spent?

**A.** Say again, please.

**Q.** If you just gave them an estimation of the money you spent, if you verbally said, I estimate that I spent $100 --

**A.** I was to write everything.

**Q.** So you could write it down, and they would pay you?

**A.** Yes.

**Q.** If you could turn to what's marked as Exhibit 4 and turn to the second page of Exhibit No. 4.

**A.** (Witness complies). I got it.

**Q.** At the top of that document do you see a check from Barbara Fitzgerald made payable to you for $270 in July of 2002?

**A.** Yes.

**Q.** Is that for work that you did for Barbara Fitzgerald after your termination from Sovereign?

**A.** Yes.

**131**

**Q.** Is that during the time that you had filed for unemployment?

**A.** Yes.

**Q.** If you could turn to it's a check halfway through --

**A.** What page?

**Q.** Actually, is it your contention that you weren't paid a Christmas bonus?

**A.** Christmas bonus, yes, I was to get it.

**Q.** You got Christmas bonuses?

**A.** Yes, sometimes. They used to give more money for bonuses for everybody than me. I used to get $100 sometimes. $200 once I remember that.
         MS. ROBERTS: If you could mark that as the next exhibit.
              (Exhibit 7, Complaint,
              marked for identification.)

**Q.** Mr. Souto, I'm placing before you your complaint in this action, which has been marked as Exhibit 7. If you could turn to the second page of your complaint and read paragraph 10 to yourself, I would appreciate it.

**A.** Read everything?

**Q.** Just paragraph 10 would be fine.

**132**

**A.** Which one?

**Q.** 10.

**A.** (Witness complies)
              (Pause).

**A.** Yes.

**Q.** Do you claim that you're entitled to a Christmas bonus that you weren't paid?

**A.** No, because at that time he said to me -- he told him not to give nothing to me, not even -- like I say here, not even a lump coal.

**Q.** Not even a lump of coal?

**A.** Yes, but Stuart gave me cash from his pocket.

**Q.** He gave you cash?

**A.** Yes, at that time.

**Q.** If you could turn to the checks, Exhibit 4.

**A.** Number 4?

**Q.** Yes, and go to the sixth page.

**A.** (Witness complies).

**Q.** The first check on that page and the third check on that page indicate that you were paid two Christmas bonuses in 2001, a Christmas bonus of $100 on the 20th and a Christmas bonus of $200 on the 21st; do you see that?

**A.** Yes.

133

**Q.** Do you have any reason to doubt that you received two Christmas bonuses --

**A.** No.

**Q.** Isn't that more than other employees at Sovereign received?

**A.** I don't know.

**Q.** Did you receive that in addition --

**A.** I wasn't asking nobody how much they have, but I know they have more than me.

**Q.** So Mr. Roffman gave you cash, correct?

**A.** Once, yes.

**Q.** How much did he give you?

**A.** It was $100.

**Q.** What year?

**A.** I don't remember.

**Q.** And in 2001 you got $300 in a check drawn on Sovereign Realty's account, right?

**A.** I don't remember that, how much.

**Q.** Is that the year that you think that Mr. Torrey published something saying that you wouldn't even get a lump of coal?

**A.** I don't remember what year it is. I just know that he did.

**Q.** If it's the same year, do you contend that you

134

were mistreated?

**A.** I was mistreated three years from that guy over there (Indicating), from Lee Torrey, and abused from both of them for eight years.

**Q.** Let me ask the question a little bit differently.

**A.** Actually, it was after '99.

**Q.** In 2001 you received $300 as a Christmas bonus.

**A.** I don't remember.

**Q.** These checks refresh your recollection, don't they?

**A.** Okay, yes.

**Q.** Yes, they do, right?

**A.** Yes, it's right here.

**Q.** If Mr. Torrey in 2001 wrote a memo saying that you weren't even going to get a lump of coal, but you still received $300 as a Christmas bonus, do you contend that that was mistreatment?

**A.** I don't remember that.

**Q.** If you could go to the last page of Exhibit No. 4.

**A.** (Witness complies).

**Q.** There's a check dated July 16, 2002, paid from

135

Sovereign Realty to Souto's Trash Removal Service; do you see that?

**A.** Yes, I see that.

**Q.** Does that refresh your recollection that you were employed as a trash removal service in July of 2002?

**A.** That's what they wrote down, not me.

**Q.** You were paid, correct?

**A.** Yeah, a few times, yes.

**Q.** This is after you were --

**A.** This is right here.

**Q.** This is after you were fired by Lee Torrey, correct?

**A.** Yes, after that. I just don't remember exactly what I did as a trash removal service.

**Q.** And this is while you were receiving unemployment, correct?

**A.** No, I wasn't receiving it yet. I just claim, filed the paper. I didn't get anything from that, that date.

          MS. ROBERTS: I think this is a good time to take a lunch break. Does that work with all of you?

          MS. HURLEY: It does.

136

          (Luncheon break was taken.)

**Q.** Mr. Souto, I have spent a long time earlier this morning going over certain tax returns that you produced in this case. Have you used the same information in tax returns that you produced in connection with any financial aid application for your children?

**A.** Basically, yes.

**Q.** What institutions did you apply for financial aid for?

**A.** The office name?

**Q.** What various schools or other institutions have you applied for your children for financial aid?

**A.** I don't understand what you are asking.

**Q.** You don't understand what I'm asking?

**A.** No.

**Q.** You have used, you just testified, the tax-return information that you produced in connection with certain financial aid applications, correct?

**A.** Financial aid application?

**Q.** Yes.

**A.** For who?

137

**Q.** Yes.
**A.** Financial aid.
**Q.** Which child has financial aid?
**A.** Only one.
**Q.** Which one?
**A.** Filipe Souto. One he is applying for.
**Q.** Where does Filipe have financial aid?
**A.** Where?
**Q.** Yes.
**A.** I don't know.
**Q.** Does he attend school somewhere?
**A.** He is going to school, yes.
**Q.** What school?
**A.** UMass.
**Q.** Does he have financial aid from University of Massachusetts?
**A.** It should be from them, yes.
**Q.** Is that on the basis of the income information that you provided to UMass.?
**A.** No, he does his own income-tax stuff.
**Q.** Did you give your income-tax information for him to use in connection with his application to University of Mass.?
**A.** I did.

138

**Q.** When was that?
**A.** Huh?
**Q.** When did you give him that information?
**A.** Probably when he started school probably three years ago, four years ago, something like that.
**Q.** You said you have another child who is applying for financial aid?
**A.** I think he has been, but he have no answer yet.
**Q.** Which child is applying for financial aid?
**A.** Rodrigo.
**Q.** Where is he applying for financial aid to?
**A.** Emerson College. He was to study over there. Now he quit for a while. Now he is applying again financial aid. I don't know for what school he wants now.
**Q.** Did you give him your tax-return information in connection with Rodrigo's application for financial aid?
**A.** Yes.
**Q.** You had testified regarding Mr. John Harvey, remember that, earlier today?
**A.** Yes. What about?
**Q.** You had said that he had been living with Regina; is that correct?

139

**A.** Yes.
**Q.** Were they ever married?
**A.** Yes.
**Q.** Are they still married?
**A.** No, they split up.
**Q.** When did they split up?
**A.** I would say a year ago.
**Q.** Are they divorced?
**A.** No.
**Q.** Are they separated?
**A.** Yeah.
**Q.** Do you still consider him your brother-in-law?
**A.** Him?
**Q.** Yes.
**A.** No.
**Q.** No?
**A.** He's not my brother-in-law anymore. He used to be.
**Q.** Do you have an understanding of how many miles per week you drove on behalf of the company?
**A.** I have no idea. It was a long time ago.
**Q.** Previously you were looking at the complaint filed in this action, which was marked as Exhibit 7. Is it fair to say that paragraph 10

140

of Exhibit 7 is not accurate because you did, indeed, receive a Christmas bonus in 2001?
        MS. HURLEY: Do you remember what paragraph 10 said? Why don't you read it again just so you can refresh your memory. It's Exhibit 7.
        (Pause).
**A.** Yes.
**Q.** It's not accurate, is it, because you received a bonus in 2001, correct?
**A.** I don't remember that.
**Q.** You saw the checks: one for $100 and one for $200, correct?
**A.** Okay. It is saying Christmas bonus?
**Q.** Yes. You received it, right?
**A.** Yes.
**Q.** So paragraph 10 is not accurate, is it?
**A.** Yes.
        MS. HURLEY: I object. I believe that that paragraph is being read incorrectly into the record.
        MS. ROBERTS: You have stated your objection. Speaking objections are not permitted in Federal court or in the state

141

court. I'm going to ask you to restrict your
objections to the word "objection." Are you
able to do that for the rest of the deposition?
     MS. HURLEY: I will do that,
yes. I apologize.

**Q.** Is paragraph 10 inaccurate?

A. Excuse me?

**Q.** Is paragraph 10 wrong?

A. I don't understand what you're saying.

**Q.** You received a Christmas bonus in 2001.

A. That's what I show there, right?

**Q.** Right. So paragraph 10 is incorrect, isn't it?
     MS. HURLEY: Objection.

A. I don't understand what you're saying, I'm
sorry.

**Q.** Is paragraph 10 incorrect --

A. I don't know --

**Q.** Because it implies that you didn't receive a
Christmas bonus.

A. I don't understand what it is.

**Q.** You don't understand the question?

A. No, I'm sorry.

**Q.** I'll ask it again.

A. Okay. Go ahead.

142

**Q.** You received a Christmas bonus in 2001.

A. That's what I show in the paper, right?

**Q.** Right. And you agree that you did, right?

A. Okay, I agree.

**Q.** Do you disagree with the contention in
paragraph 10 that you did not receive a bonus
because you know you did?

A. I wasn't remember.

**Q.** So you to forgot?

A. I forgot.

**Q.** Is paragraph 10 a mistake?

A. That's what you say.

**Q.** Is that fair?

A. I don't know.

**Q.** I'm asking you.

A. I don't know.

**Q.** You don't know if it's a mistake?

A. I don't know.

**Q.** You think you didn't receive a Christmas bonus?

A. I think I did, but I don't know what you are
asking. I just don't understand. I'm sorry.

**Q.** The last sentence in paragraph 10 reads, "In
addition, Mr. Torrey once published a list of
employee bonuses which stated that Mr. Souto

143

would receive nothing, not even a lump of coal,
even though other employees got bonuses and
were treated with respect." That is wrong
because you got a bonus, didn't you? You
weren't excluded, were you?

A. I wasn't remembering. You show me, okay.

**Q.** You remember now?

A. Yes.

**Q.** So now it's incorrect? You know it's
incorrect?

A. I'm sorry?

**Q.** It's incorrect, correct?

A. What's incorrect?

**Q.** Paragraph 10, the sentence that I just read
you.

A. I just don't remember to get it. I don't
remember if I get it.

**Q.** Now you know, though.

A. There's a paper here, right?

**Q.** Now you know, right?

A. Okay, I see the paper, yes.

**Q.** And you know that you cashed the two checks,
don't you?

A. I'm not remember if I did or what I did.

144

**Q.** You testified previously that you cashed all
the checks. Do you have a memory that's
different for those two bonus checks?

A. I don't remember what I did, if I deposit, if I
cash. I don't remember anymore.

**Q.** But you have no reason to dispute that you got
that money?

A. It was four years ago.

**Q.** You have no reason to dispute that you got that
money, right?

A. I don't know.

**Q.** You don't know?

A. No.

**Q.** Mr. Souto, come on. You cashed the check,
didn't you?

A. Who said that?

**Q.** You got paid, didn't you?

A. Does it say right here, right?

**Q.** Right.

A. Okay.

**Q.** And you don't dispute it, do you?

A. But I don't know what I did, if I cash or if I
deposit.

**Q.** Either way you got the benefit of the money,

**145**

didn't you?

A. Okay, yes. It's showing right there.

Q. If you could go back in time to Exhibit 8 and Exhibit 2, your sworn statement --

    MS. HURLEY: There's no Exhibit 8.

    MS. ROBERTS: The AG complaint, Exhibit 3.

Q. Exhibit 2 and 3, sorry about that. Each one of these claims payment for five days of sick days per year and claims that you weren't paid for five days of sick days per year; do you see that?

A. No. First page?

Q. You can look at the first and second page of the sworn statement and the attachment to your AG complaint, page 1 and 2.

A. (Witness complies).
    (Pause).

Q. Do you see those?

A. Number 2, right.

Q. Yes?

A. Okay.

Q. Previously today you told me that in 2000 you

**146**

received one sick day; do you see that? Do you remember saying that in 2000 you had one sick day?

A. Yeah, one sick day. I don't remember if it was 2000 or 1999. I just don't remember.

Q. In any event, you are still claiming five sick days --

A. It was five years ago.

Q. In any event, you are still claiming that you were not paid for five sick days; do you see that, in Exhibit 2 and Exhibit 3?

A. It should be on that.

Q. That's a misstatement, isn't it, because you were paid for at least one?

A. One, yeah.

Q. So both your sworn statement and your affidavit are incorrect? You were paid --

A. For five days?

Q. Yes.

A. Okay, I would say four days I got paid on this day because I was real sick.

Q. And then in 2000, you testified previously, that you took two days off to go to Florida with your wife, a Friday and a Monday. Yet in

**147**

your sworn statement and in your affidavit you claim that you weren't paid for any personal days in 2000. That's incorrect, too, isn't it?

A. I don't know.

Q. Well, you know that you were paid --

A. I don't remember those things. It's a long time ago. I know one day I got paid for a sick day because I call. I was real sick. That's it. That's how I know.

Q. You reviewed your paychecks for 2000 and you saw that you were always paid $800 every pay period. There were no deductions.

A. That's true.

Q. And you testified that you were not there on a Friday and a Monday because you went to Florida. So you did --

A. That's true.

Q. -- receive two days paid for either personal or vacation days. So Exhibit 2 and 3 are incorrect, also, for that reason, right?

A. I don't know.

Q. You know.

A. No.

Q. You know you were paid.

**148**

A. I don't know. I don't remember anymore five years ago.

Q. You remembered earlier today, Mr. Souto.

A. Okay. Now I'm saying I don't remember anymore.
    MS. ROBERTS: We're going to take a break. Can we talk?
    MS. HURLEY: Yes.
    (Short break was taken.)

Q. Mr. Souto, before our break I asked you some questions about whether Exhibit No. 2 and Exhibit No. 3 were incorrect because they claim that you are demanding vacation time and personal days of four weeks' vacation and five personal days, despite the fact that you've testified here today that you did receive pay for a time that you went to Florida with your wife.

A. Yes, I'm sorry, I apologize. I know I got, but I just don't remember. I'm sorry I say no because you confused me sometimes, but I know. I remember that I got paid. In eight years three days, two days personal.

Q. Two days personal and one day sick?

A. Yes.

149

Q. So your sworn statements, Exhibit No. 2 and Exhibit No. 3, are incorrect; is that right? They are incorrect?

A. That's how you say.

Q. Is that right?

A. I told you that I had one sick day in eight years and two personal days in those eight years.

Q. I'm asking you if Exhibit No. 2 and 3 are incorrect?

A. Yes.

Q. Approximately how many miles per week did you drive while employed by Sovereign Realty?

A. Average of 150, 200, around there. I don't remember. Sometimes it was like 30 miles. Sometimes it was 250. I would say average of 150, 160, something like that, and I got paid.

Q. You were paid for those miles?

A. Yes.

        MS. ROBERTS:  Can you mark this as the next exhibit, please?
        (Exhibit 8, Invoice, marked for identification.)

Q. I place before you what's been marked as

150

Exhibit No. 8 to this deposition. It's a document entitled "Eliana Cleaning Service" dated June 18, 2002. Do you see that document before you?

        (Pause).

A. Yes, I remember she did once.

Q. Does that refresh your recollection that your wife does business under the name Eliana Cleaning Service at least as of 2002?

A. She have to put some name.

Q. Is that a yes?

A. What?

Q. Did she, your wife, do business as Eliana Cleaning Service as of 2002?

A. I don't remember that.

Q. And Exhibit 8 does not refresh your recollection in any way?

A. No.

Q. At the bottom of this document it reads, "Please remit to Eliana Souto at the address above;" do you see that?

A. I see that.

Q. Is it fair to say that any payments made to your wife for her cleaning services are not

151

reported anywhere in your tax returns for 2002?

A. I don't remember that. This is her business, not mine.

Q. You filed a joint tax return, didn't you?

A. Excuse me?

Q. You filed a joint tax return, didn't you?

A. Yes. It's right there.

Q. And you know that your joint tax return for 2002, as you previously testified, didn't include any income made by your wife?

A. I don't know about her. I know about myself.

Q. Is the payment submitted pursuant to this invoice considered unofficial pursuant to your previous testimony?

A. I don't know about that.

Q. You don't know. Is it fair to say that your wife has been operating a cleaning service for several years?

A. You have to ask her.

Q. You don't know?

A. No.

Q. You have no idea what your wife does?

A. No idea.

Q. Does your wife tell you --

152

A. That's her business, not my business.

Q. Does your wife tell you how she spends her time?

A. No.

Q. You don't know whether she has a cleaning service or not, Mr. Souto?

A. No.

Q. Do you dispute that your wife has a cleaning service?

A. I don't know. She's not here for me to ask her. Whatever she does it's her business, not my business.

Q. Do you have a car, Mr. Souto?

A. A car?

Q. Yes.

A. Yes.

Q. In 1999 did you have a car?

A. I don't remember that.

Q. In 2000 did you have a car?

A. Probably I did.

Q. Do you know what type of car you had in 2000?

A. No. I had so many cars before. I don't remember which one.

Q. Did you have a car in 2001?

153

A. Probably.
Q. Do you know what type of car it was?
A. No.
Q. Did you have a car in 2002?
A. Probably.
Q. Do you know what type it was?
A. No.
Q. Do you know approximately what your car payment was in 1999?
A. No.
Q. Do you know approximately what it was in 2000?
A. No.
Q. How about 2001?
A. No.
Q. 2002?
A. No.
Q. Did you have a car payment?
A. No. I bought a car I don't know when. I know I pay for like three years this car.
Q. You have no idea what date you bought a car?
A. No.
Q. And do you have -- you don't have any idea what type of car it was?
A. This car that I bought it?

154

Q. Yes.
A. It was a Geo Prizm.
Q. Were you the primary driver of that car?
A. Yes -- basically, yeah. I drive my son, but I made the primary.
Q. Do you still have that car?
A. No.
Q. When did you get rid of it?
A. A long time ago. I don't remember.
Q. Approximately?
A. I don't remember, I'm sorry.
Q. When you had the car, what were your car payments?
A. Say it again, please.
Q. When you had that Geo Prizm, what were your car payments?
A. How much?
Q. Yes.
A. About $200.
Q. $200 a month?
A. 220, something like that.
Q. $220 a month?
A. Yeah.
Q. You have no idea when you got the car and no

155

idea when you --
A. No.
Q. -- got rid of the car?
A. No.
Q. Do you know that you had that car, the Geo Prizm, when you were employed by Sovereign?
A. Probably.
Q. While you were employed by Sovereign, did your wife have a car?
A. I don't know.
Q. You don't know whether your wife had a car?
A. No.
Q. Do you have insurance for your car?
A. I think I still have it, of course.
Q. Does your wife have insurance for her car?
A. She does.
Q. Do you pay the premiums to your insurance company?
A. Yes.
Q. Who is your insurance company?
A. I don't remember the name.
Q. How much do you pay in insurance per month?
A. About ninety something.
Q. And is that for one car or for two cars?

156

A. My car.
Q. Does your wife pay her insurance?
A. Probably.
Q. You don't know?
A. She probably does.
Q. Have you ever seen your wife drive a car?
A. Yes, I've seen her drive a car, yes.
Q. So you know that she does have a car then?
A. She does have a car, yes.
Q. So you have remembered that she has a car now?
A. Yes, I do.
Q. What color is her car?
A. What color?
Q. Yes.
A. Gold color, something like that.
Q. Gold?
A. Yes, I think so.
Q. What make is it?
A. 2000.
Q. Did your wife have that car while you were employed by Sovereign?
A. No.
Q. When did she first get that car?
A. I don't remember exactly. That's her business.

**157**

Q. Did she have a car before she had the gold car?
A. Yes, I had.
Q. Did she?
A. I don't know.
Q. You don't know whether your wife had a car before that?
A. She probably does. Okay. I would say so, yes.
Q. What color was her car before the gold car?
A. I don't remember.
Q. You don't know what color your wife's car was?
A. No, I don't remember, no.
Q. In 2002?
A. No. Her car is now a Honda.
Q. It's a Honda now?
A. Gold colored, yes.
Q. Do you know the make of the car before the gold Honda?
A. Before?
Q. Before your wife drove the gold Honda, do you have any idea of what make of a car she drove?
A. No.
Q. Did you ever see her in it?
A. No.
Q. You never saw your wife driving her own car?

**158**

A. What about my wife?
Q. Do you live together?
A. I don't speak for her. I speak for me, understand?
Q. Could you answer the question?
MS. HURLEY: Can we take a break?
MS. ROBERTS: Yes.
MS. HURLEY: Thank you.
(Short break was taken.)
Q. Mr. Souto, you've had a chance to talk with your counsel. Do you remember now the kind of car your wife drove while you were employed by Sovereign?
A. I don't speak for my wife. Let me think about it.
Q. Take your time.
(Pause).
A. She had a Ford Explorer.
Q. What color was the Ford Explorer?
A. It was kind of blue, I guess.
Q. Do you know what car payments your wife had per month on the Ford Explorer?
A. No.

**159**

Q. Did you pay those car payments yourself?
A. No.
Q. She paid them, you think?
A. Yes.
Q. Does your wife take care of her own car insurance?
A. Yes.
Q. She pays for the premiums?
A. No.
Q. You don't pay them together?
A. No.
Q. Do you know if your wife leased or owned the Ford Explorer?
A. Owned.
Q. Do you know how much she paid for that Ford Explorer?
A. No.
Q. Do you know what year she bought the Ford Explorer?
A. No.
Q. Did you pay for the Ford Explorer?
A. No.
Q. Do you know where she purchased the Ford Explorer?

**160**

A. Say again, please.
Q. Do you know what car sales place sold the Ford Explorer to your wife?
A. No, I don't remember that.
Q. You don't remember the dealership?
A. No.
Q. Do you remember what town it was in?
A. No.
Q. You testified previously about a conversation you had with Mr. Roffman wherein you wanted to get a raise over and above $10 an hour, and he said no; is that correct?
A. Can you say again?
Q. Earlier on in the morning you had testified regarding a conversation you had with Mr. Roffman where you asked for a raise over the $10 an hour --
A. Yes, I remember.
Q. And you remember testifying that he said no, no raise?
A. He said no.
Q. You didn't have any other conversations with Mr. Roffman regarding pay, did you?
A. No.

**SOUTO V SOVEREIGN REALTY, ET AL**                                    **RENATO SOUTO**

161

**Q.** You didn't have any conversations with Mr. Roffman about being paid time and a half, did you?
**A.** No.
**Q.** Did you have any conversations with Mr. Torrey regarding pay?
**A.** No.
**Q.** You didn't have any conversations with Mr. Torrey about being paid time and a half, did you?
**A.** No. They are supposed to do that by themselves. I don't have to say nothing.
**Q.** Do you have any records of the hours you worked while at Sovereign?
**A.** Approximately I would say 55 to 60 hour a week, including -- that's including nights work, weekends, I'm sorry, holidays. That's what I would say average.
**Q.** Your testimony is that you worked 50 to 60 hours --
**A.** 55 to 60.
**Q.** 55 to 60?
**A.** Yes.
**Q.** Do you have any journals or written time

162

records reflecting the hours that you allege you worked?
**A.** No.
          MS. ROBERTS: Can you mark this as the next exhibit?
          (Exhibit 9, Calendar, marked for identification.)
**Q.** Mr. Souto, before we look at what's been marked as Exhibit No. 9, I'm going to ask you just one more question: Getting back to the mileage that you got paid for, how did you keep track of that mileage? What did you do to make sure that you were submitting accurate mileage?
**A.** I always to write down on payment.
**Q.** You wrote them down on a piece of paper?
**A.** I used to. Yes. I always used to.
**Q.** Who did you give that piece of paper to or did you keep that for yourself?
**A.** I keep it for myself.
**Q.** Do you still have that?
**A.** No.
**Q.** You threw that out?
**A.** Yes.
**Q.** When did you throw that out?

163

**A.** I don't remember.
**Q.** When is the last time you saw that document?
**A.** I don't remember.
**Q.** When you did have it, where did you keep it?
**A.** I don't know anymore.
**Q.** When you had it, where did you keep it?
**A.** Probably my -- some drawer in my house.
**Q.** Would you look to see if you still have that for me and produce it if you do?
**A.** I'm sure I don't have no more. I throw away.
**Q.** Do you know that you threw it away?
**A.** Yes.
**Q.** You have a specific memory of throwing that document away?
**A.** I don't remember when I throw away.
**Q.** But you know that you did?
**A.** I know I throw it away. Yes. Why keep?
**Q.** Do you know if you threw that away before or after you filed this lawsuit?
**A.** Before.
**Q.** Do you know if you threw it away before or after you filed your complaint with the Attorney General's office in March of 2005?
**A.** Say it again, please.

164

**Q.** Do you know whether you threw away those mileage records before or after you filed the complaint with the Attorney General's office in March of 2005?
**A.** Before.
**Q.** Do you have any records of repairs or maintenance that you performed that would document the miles that you drove?
**A.** No.
**Q.** If you could look at what's been marked as number 9 to your deposition, I'm going to represent to you that this document is a calendar that I printed out today of the months in this case where you claim that you were not paid overtime and you are also claiming an additional $5.53 an hour for the time documented in this calendar. I'm going to ask you if you can tell me in any particular week how many hours you worked?
**A.** I don't remember.
**Q.** You can't say, can you?
**A.** No, I just say the average.
**Q.** How did you come up with the average? How did you calculate that?

165

A. Because I took an average because I was working nights, weekends, anytime, holidays. I come up with an average.

Q. What specific weeks did you use to come up with that average?

A. I don't remember that.

Q. Is it --

A. I just know that I was working overtime, weekends, weekdays, nights, weekends, holidays. Never got paid. Only for 40 hours.

Q. Approximately in July of 1999 can you tell me with any specificity how many hours you worked in any particular week?

A. In eight years I worked for them, that was my average.

Q. How did you come up with that average, Mr. Souto?

A. I calculated in my mind.

Q. Is it a best guess?

A. Excuse me?

Q. Is it a guess?

A. No, it's not a guess.

Q. Well, how did you know what the high number was and how did you know what the low number was to

166

come up with an average?

A. I figured out.

Q. How did you figure it out?

A. In my mind because I know how much I work.

Q. You don't have any records?

A. No, no records.

Q. And you don't know how many hours you worked in any particular week, right?

A. No.

MS. ROBERTS: I'm going to suspend this deposition. I think that there's some tax-return information that's out there that you guys haven't produced that I think is absolutely relevant. You guys have agreed to produce it. If we need to bring him back for -- to talk about that tax-return stuff and any questions that would flow from that, I think -- well, I'm going to certainly reserve my right to do that.

MS. HURLEY: Okay.

MS. ROBERTS: Do you have any questions?

MS. HURLEY: No. Are we going to get a copy of this and 30 days to review?

167

MS. ROBERTS: You have asked not to receive a copy. So it depends --

MS. HURLEY: If you want him to review and sign it. We asked the court reporter to call us before, and we'll make that decision, but yes, I would like him to review and sign it.

(Deposition of RENATO SOUTO suspended.)

168

I hereby certify that I have read the foregoing deposition transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony.

_____

RENATO SOUTO

Signed under the pains and penalties of perjury this ____ day of _____, 2005.

169

Commonwealth of Massachusetts
Suffolk, ss.

I, Janice A. Maggioli, a Registered
Professional Reporter and Notary Public duly
commissioned and qualified within and for the
Commonwealth of Massachusetts, do hereby
certify that there came before me on the 20th
day of December 2005 at 9:10 a.m., the person
hereinbefore named, who was by me duly sworn to
testify to the truth and nothing but the truth
of his knowledge touching and concerning the
matters in controversy in this cause; that he
was thereupon carefully examined upon his oath
and his examination reduced to typewriting
under my direction; and that the deposition is
a true record of the testimony given by the
witness.  I further certify that I am not
interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this 3rd day
of January 2006.


_____
Notary Public

Renato Souto, et al. v.
Sovereign Realty Associates, Ltd., et al.

Case 1:05-cv-10864-JLT    Document 43-3    Filed 09/21/2006    Page 21 of 24

Renato Souto
Vol. 2, June 30, 2006

Page 1

Volume II
Pages 2-1 to 2-24
Exhibits 1 to 2
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864-JLT
RENATO SOUTO and OTHERS SIMILARLY  :
SITUATED,                          :
          Plaintiffs,              :
vs.                                :
SOVEREIGN REALTY ASSOCIATES,       :
LTD., and STUART ROFFMAN, As       :
President of the General Partner   :
of Sovereign Realty Associates,    :
Ltd., Sovereign Realty Associates  :
G.P., Inc., and Individually,      :
          Defendants.              :

CONTINUED DEPOSITION OF RENATO SOUTO, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Susan E. DiFraia, Certified Shorthand
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Office of
David Berman, 100 George P. Hassett Drive, Medford,
Massachusetts, on Friday, June 30, 2006, commencing
at 10:30 a.m.
PRESENT:
    Gordon Law Group LLP
        (by Philip J. Gordon, Esq.)
    535 Boylston Street, 6th Floor,
    Boston, MA 02116, for the Plaintiffs.
    Law Office of David Berman
        (by David Berman, Esq.)
    100 George P. Hassett Drive,
    Medford, MA 02155, for the Defendants.

Page 2

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| RENATO SOUTO, Resumed | | | | |
| BY MR. BERMAN | 2-3 | 2-21 | | |
| BY MR. GORDON | 2-21 | 2-22 | | |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Document | 2-16 |
| 2 | Document | 2-18 |

Page 3

[1]                     **PROCEEDINGS**
[2] RENATO SOUTO, Resumed
[3] a witness called for examination by counsel for the
[4] Defendants, being previously duly identified and
[5] sworn, was examined and testified as follows:
[6]     **MR. BERMAN:** This is the second session of
[7] the deposition of the Plaintiff. The first
[8] deposition was suspended on December 20th, 2005.
[9]     DIRECT EXAMINATION, Continued
[10] BY MR. BERMAN:
[11]    Q: By whom are you employed at the present
[12] time?
[13]    A: Excuse me?
[14]    Q: Whom do you work for?
[15]    A: Right now?
[16]    Q: Right now.
[17]    A: Home Depot.
[18]    Q: What is the address of that Home Depot?
[19]    A: One Mystic in Everett.
[20]    Q: What is the name again?
[21]    A: It's a big mall. Everett.
[22]    Q: Yes. And does it have an address in that
[23] mall?
[24]    A: Yes; something like One Mystic. Something

Page 4

[1] like that. I'm not completely sure.
[2]    Q: What is the name of the mall?
[3]    A: There's no name, just a lot of stores like
[4] Target, Home Depot. A lot of stores. OfficeMax.
[5]    Q: But the mall has no name?
[6]    A: Not that I know.
[7]    Q: What is your job?
[8]    A: My job is I work in the paint department.
[9]    Q: What do you do in the paint department?
[10]    A: I mix paint. I sell — salesman.
[11]    Q: And how long have you been employed there?
[12]    A: Two years April. Approximately two years,
[13] two months.
[14]    Q: And so you started in April of 2004; is
[15] that correct?
[16]    A: Correct.
[17]    Q: Now, what's the name of the person to whom
[18] you report at Home Depot?
[19]    A: The person?
[20]    Q: Your boss.
[21]    A: My boss is Rene. I don't know her last
[22] name. Rene, the store manager.
[23]    Q: Do you report to the store manager?
[24]    A: About what?

Renato Souto
Vol. 2, June 30, 2006

Renato Souto, et al.    v.
Sovereign Realty Associates, Ltd., et al.

Page 5

[1]  Q: Does she tell you what to do?
[2]  A: Yes; she tells the assistant managers and
[3] the assistant managers tell me.
[4]  Q: What is the name of the assistant manager?
[5]  A: The one in my department, his name is
[6] Richard.
[7]  Q: What is his last name?
[8]  A: I don't know. Everybody calls him Rich. I
[9] know he's Richard. I don't know his last name.
[10]  Q: By the way, did you know that your
[11] deposition was scheduled to be taken at 10:30 a.m.
[12] on March 23, 2006?
[13]  A: The past month?
[14]  Q: No. Did you understand that on March 23 of
[15] this year, 2006, you had a deposition scheduled?
[16]  A: Yes; I was told by my lawyer. But you
[17] didn't set up — you didn't schedule, you know, with
[18] me. I'm working. I cannot just leave the job, you
[19] know.
[20]  Q: Well, when were you told this by your
[21] lawyer?
[22]  A: I don't know. I just know that we couldn't
[23] make it. I couldn't make it. That's all I know.
[24]  Q: Did your lawyer tell you by telephone?

Page 6

[1]  A: Yes, but I said I could not make it. I'd
[2] lose my job.
[3]  Q: When you did work for Sovereign — let me
[4] ask you this: Did you ask your boss if you could
[5] have the day off so that you could go to a
[6] deposition?
[7]  A: On my job this time?
[8]  Q: Yes.
[9]  A: At this time, yes.
[10]  Q: No. Back when it was scheduled in March
[11] did you ask Richard if you could take the day off to
[12] go to a deposition?
[13]  A: No. No.
[14]  Q: Did you ask Rene if you could take the day
[15] off?
[16]  A: No.
[17]  Q: You want to let me finish before you
[18] answer. Okay?
[19]  A: Sorry.
[20]  Q: So you don't know whether they would have
[21] given you the day off to go to a deposition or not;
[22] isn't that right?
[23]  A: I didn't schedule.
[24]  Q: You didn't ask them?

Page 7

[1]  A: I didn't.
[2]  Q: When you worked for Sovereign, from whom
[3] did you take orders?
[4]  A: From — first of all, when I start over
[5] there it was from John Harvey. And then after that
[6] Lee Torrey take over, and it was taken on from him
[7] and from Larry Dorsey, too.
[8]  Q: Okay.
[9]  A: Larry Dorsey was his foreman, something
[10] like that. And from Stuart.
[11]  Q: And from Mr. Roffman?
[12]  A: No.
[13]  Q: Did you carry out the orders that these
[14] people gave you?
[15]  A: Say it again, please.
[16]  Q: Did you do what they told you to do?
[17]  A: Always.
[18]  Q: Did you ever tell these people that you
[19] couldn't understand them?
[20]  A: No.
[21]  Q: And all the orders that you got from Mr.
[22] Torrey were given to you in English, weren't they?
[23]  A: Yes, in English.
[24]  Q: And all the orders that you got from Mr.

Page 8

[1] Roffman were given to you in English, weren't they?
[2]  A: Yes.
[3]  Q: And all the orders that you got from Mr.
[4] Dorsey were in English, weren't they?
[5]  A: Yes.
[6]  Q: And all the orders that were given to you
[7] from Mr. Roffman were given to you in English,
[8] weren't they?
[9]  A: Yes.
[10]  Q: Did anyone else give you orders besides Mr.
[11] Dorsey, Mr. Torrey, Mr. Harvey and Mr. Roffman?
[12]  A: No.
[13]  Q: Do you recall that on December 20, 2005,
[14] your deposition was taken in the office of Dwayne
[15] Morris in Boston?
[16]  A: Yes, I do.
[17]  Q: And do you recall that in the beginning of
[18] the deposition you took an oath that everything that
[19] you said would be the truth?
[20]  A: Yes.
[21]  Q: Have you had occasion to look at a
[22] transcript of your deposition taken on December 20,
[23] 2005?
[24]  A: Say it again, please.

Page 9

[1] **Q:** Have you had occasion to look at a
[2] transcript of the deposition —
[3] **A:** No.
[4] **Q:** — that you gave? You've never seen a
[5] transcript of your —
[6] **A:** No occasion, no.
[7] **Q:** Did you know that the transcript was made
[8] of your deposition?
[9] **A:** The what?
[10] **Q:** Do you know what I mean by a "transcript,"
[11] sir?
[12] **A:** "Transfer"?
[13] **Q:** "Transcript." Do you know what I mean by
[14] that word?
[15] **THE WITNESS:** What's "transcript"?
[16] **MR. GORDON:** He'll explain.
[17] **A:** A transcript is a written statement taken
[18] down by the stenographer and she types it out, and
[19] that says — shows what you said, what the questions
[20] were, and how you answered them. Have you seen a
[21] copy of the deposition that you took on December 20,
[22] 2005?
[23] **A:** No.
[24] **Q:** Never saw one?

Page 10

[1] **A:** No.
[2] **Q:** Did you know it existed?
[3] **A:** No.
[4] **Q:** At some point you applied to become a
[5] lawful resident of the United States; isn't that
[6] true?
[7] **A:** Can you say it again, please.
[8] **Q:** At some point you applied to become a
[9] lawful resident of the United States; is that true?
[10] **A:** Yes.
[11] **Q:** And you asked for a green card; is that
[12] right?
[13] **A:** Yes.
[14] **Q:** When was that?
[15] **A:** It was 1998.
[16] **Q:** In connection with that application, did
[17] you have an attorney?
[18] **A:** Yes.
[19] **Q:** What was his name?
[20] **A:** John K. Dvorak.
[21] **Q:** Would you spell the last name if you can,
[22] please.
[23] **A:** D-v-o-r-a-k.
[24] **Q:** And what city or town did he practice in?

Page 11

[1] **A:** Boston. South — North Station.
[2] **Q:** And do you remember his address?
[3] **A:** No, I don't.
[4] **Q:** How many times did you meet with him?
[5] **A:** I would say with him three times and with
[6] his staff more than that. Six times, about.
[7] **Q:** Did he send you a bill?
[8] **A:** Yes.
[9] **Q:** How much?
[10] **A:** It was different bills. One for $2,000,
[11] one for 15, one for $3,000. All different bills.
[12] **Q:** Did you pay those bills?
[13] **A:** Yes, I did.
[14] **Q:** Mr. Souto, did you understand when you
[15] applied for your green card that you wouldn't be
[16] able to get it if the job you were performing was a
[17] job that a person already living in this country
[18] could do?
[19] **A:** Say it again, please.
[20] **Q:** Did you understand that — first of all,
[21] let me break the question down.
[22] **A:** Okay.
[23] **Q:** Did you understand that in order to get a
[24] green card you had to show that you were working?

Page 12

[1] **A:** Yes.
[2] **Q:** And did you understand that you had to be
[3] working at a job that Americans, people who were
[4] born here or were citizens of this country, didn't
[5] want to do?
[6] **A:** Yes, kind of. Maintenance.
[7] **Q:** And did you understand that you wouldn't
[8] get a green card if you were willing to do a job at
[9] less than the going rate for that job in Greater
[10] Boston?
[11] **MR. GORDON:** Objection.
[12] **THE WITNESS:** I don't understand what he
[13] said.
[14] **Q:** Mr. Souto, at no time did Sovereign ever
[15] pay you $15.53 an hour, isn't that true?
[16] **A:** Say it again, please.
[17] **Q:** At no time did Sovereign ever pay you
[18] $15.53 an hour; isn't that true?
[19] **A:** Yes; they never paid me.
[20] **Q:** They never paid you that at any time?
[21] **A:** They never paid me that at any time.
[22] **Q:** And isn't it true that in the year 2000
[23] Sovereign paid you at the rate of $10 an hour?
[24] **A:** Yes, about.

Renato Souto
Vol. 2, June 30, 2006

Renato Souto, et al.  v.
Sovereign Realty Associates, Ltd., et al.

Page 13

[1]  Q: And throughout 2001 Sovereign continued to
[2] pay you at the rate of $10 an hour; isn't that true?
[3]  A: Yes.
[4]  Q: And in 2002 while you were employed by
[5] Sovereign, you were still paid at the rate of $10 an
[6] hour; isn't that right?
[7]  A: Yes.
[8]  Q: Do you remember that when Mr. Torrey told
[9] you you were fired, you asked him not to fire you?
[10]  A: Yes.
[11]  Q: And at this time you were being paid $10 an
[12] hour; isn't that right?
[13]  A: Yes.
[14]  Q: And do you remember testifying back in
[15] December that after Mr. Torrey fired you you asked
[16] Mr. Roffman to give you back your job?
[17]  A: Yes.
[18]  Q: And is that true, by the way?
[19]  A: That's true. I asked him to give the job
[20] back.
[21]  Q: Did you think that if Mr. Roffman hired you
[22] back, that he was going to pay you more than $10 an
[23] hour?
[24]  A: No.

Page 14

[1]  Q: In 2000 when you were receiving $10 an
[2] hour, did you ever tell Mr. Torrey that there was a
[3] mistake in your paycheck?
[4]  A: No.
[5]  Q: Did you ever tell that to Mr. Roffman?
[6]  A: No; all the checks they gave me was right.
[7] No overtime, but $10 an hour, 40 hours. I would
[8] work 60 hours, I would get paid for 40 hours.
[9]  Q: So you understood at all times, isn't that
[10] true, from 2000 to 2002, that you were going to be
[11] paid $10 an hour; isn't that correct?
[12]  A: Yes.
[13]  Q: And that's why you never told anyone there
[14] was a mistake in your paycheck?
[15]  A: I never told anyone there was a mistake in
[16] my paycheck.
[17]  Q: Between the time that you worked for
[18] Sovereign and the time that you started work for
[19] Home Depot, were you employed elsewhere?
[20]  A: No.
[21]  Q: Between 2002 and 2004, did you attempt to
[22] get a job as a building mechanic?
[23]  A: I did.
[24]  Q: Did you get any offers?

Page 15

[1]  A: No.
[2]  Q: Did you try to get any job that would pay
[3] you at least $15.53 an hour?
[4]  A: I tried.
[5]  Q: Did you ever get such a job?
[6]  A: No.
[7]  Q: What are you earning currently at Home
[8] Depot?
[9]  A: $10.05 an hour.
[10]  Q: And that's an increase of 30 cents per hour
[11] since December; is that right?
[12]  A: Say it again, please.
[13]  Q: Is that an increase of 30 cents an hour
[14] since December?
[15]  A: Yes; they gave me 30 cents raise.
[16]  Q: When did you get that raise?
[17]  A: I would say two or three months ago.
[18]  Q: Now, you're a salesman at Home Depot; is
[19] that right?
[20]  A: Yes.
[21]  Q: What language do your customers use when
[22] they speak to you?
[23]  A: English, Spanish, Portuguese.
[24]  Q: The majority of them use English, don't

Page 16

[1] they?
[2]  A: Excuse me?
[3]  Q: The majority of your customers speak
[4] English, don't they?
[5]  A: Yes.
[6]  Q: Do you speak Spanish, by the way?
[7]  A: I do.
[8]  Q: And when your customers speak to you in
[9] English, what language do you answer them?
[10]  A: In English, of course.
[11]  Q: You said you took orders from Mr. Dorsey
[12] when you were at Sovereign; is that right?
[13]  A: That's right.
[14]  Q: Were there things that Mr. Dorsey could do
[15] that you couldn't do?
[16]  A: Say it again.
[17]  Q: Were there jobs at Sovereign that Mr.
[18] Dorsey could do and you couldn't do?
[19]  A: Electrical.
[20]  Q: Any others?
[21]  A: Big jobs, electrical for wiring. Small
[22] jobs I could do.
[23]     (Document marked as Souto
[24] Exhibit 1 for identification)

Page 17

[1]    Q: I'm going to show you what's been marked as
[2] Exhibit 1. Do you recognize this sheet?
[3]    A: Yes.
[4]    Q: How did you get this?
[5]    A: I just — I read it in Stuart's office in
[6] his fax machine.
[7]    Q: Did you ever ask Stuart if you could take
[8] stuff from his fax machine?
[9]    A: No.
[10]    Q: You had the keys to his office, didn't you?
[11]    A: Yes.
[12]    Q: And you went into his office when he wasn't
[13] there, didn't you?
[14]    A: I always because I had to check the
[15] temperature and stuff. Not just to get in. I had
[16] work to do.
[17]    Q: And while you were in his office you
[18] decided that you would look at it and see what was
[19] on his fax machine; is that right?
[20]    A: Just this once. This time.
[21]    Q: This once?
[22]    A: I found a note. I don't remember. It was
[23] a long time ago.
[24]    Q: Well, let me ask you this: When you got

Page 18

[1] this sheet off the fax machine, did you make a copy
[2] of it?
[3]    A: Yes, I did.
[4]    Q: And whose copying machine did you use to
[5] make a copy of it?
[6]    A: Outside.
[7]    Q: Pardon?
[8]    A: In the store.
[9]    Q: In which store?
[10]    A: I don't remember.
[11]    Q: So, now, you took the sheet off the fax
[12] machine, you made a copy of it, and then did you put
[13] the sheet back in the fax machine?
[14]    A: Yes.
[15]    Q: And you never told Mr. Roffman that you had
[16] taken this; isn't that right?
[17]    A: That's right.
[18]    (Document marked as Souto
[19] Exhibit 2 for identification)
[20]    Q: I'm going to show you what's been marked as
[21] Exhibit 2 and ask if you can identify it, please.
[22] Do you know what it is?
[23]    A: (Reviewing document) Yes.
[24]    Q: What is it?

Page 19

[1]    A: This?
[2]    Q: It was a fax, wasn't it, that you took off
[3] Mr. Roffman's fax machine?
[4]    A: Yes.
[5]    Q: So that was the second time you took a fax
[6] off his fax machine; is that right?
[7]    A: Yes; I have to tell the truth.
[8]    Q: And I went and you made a copy of that;
[9] isn't that correct?
[10]    A: Yes.
[11]    Q: And then you put the original fax back in
[12] his machine so that you wouldn't — he wouldn't know
[13] that you made a copy of it; isn't that right?
[14]    A: Yes.
[15]    Q: And you understood, didn't you, that if Mr.
[16] Roffman knew you were copying things on his fax
[17] machine, he might fire you; is that right?
[18]    A: That's right.
[19]    Q: Let me show you a paper and ask you if you
[20] can tell me what it is.
[21]    A: Say it again.
[22]    Q: Can you tell me what that paper is?
[23]    A: (Reviewing document) Yes.
[24]    Q: What is it?

Page 20

[1]    A: It's an employee work condition that Lee
[2] made for us, for all the employee.
[3]    Q: Did Lee give you this?
[4]    A: No, he didn't give me. He put it on the
[5] board.
[6]    Q: Would it be fair to say that whenever you
[7] were in Mr. Roffman's office you looked to see what
[8] was on his fax machine if he wasn't there?
[9]    A: Once. Twice only.
[10]    Q: Just twice?
[11]    A: Yes; as far as I know. As far as I remember.
[12]    Q: So it may have been more than twice; is
[13] that correct?
[14]    A: I don't know.
[15]    Q: And when you saw something that would be of
[16] interest to you, you took it and you made a copy of
[17] it; isn't that right?
[18]    A: I did twice because that was — I was
[19] planning to fight against Lee Torrey because he was
[20] abusing me. That's why I did that.
[21]    Q: So you —
[22]    A: I don't do that usually, because I was
[23] trying to get some evidence for one day I can sue
[24] him for all the suffering he's making me go through,

Renato Souto
Vol. 2, June 30, 2006

Case 1:05-cv-10864-JLT    Document 43-4    Filed 09/21/2006    Page 2 of 24

Renato Souto, et al.    v.
Sovereign Realty Associates, Ltd., et al.

Page 21

[1] all the torture, mental torture. That's why I did
[2] that. I don't do that usually. I'm an honest guy.
[3]    Q: And that's why you thought you had a right
[4] to look at Mr. Roffman's fax machine?
[5]    A: I didn't say that.
[6]    Q: You didn't have the right?
[7]    A: I didn't say I had the right. I said I was
[8] trying to get some evidence against Lee Torrey
[9] because he was killing me. He was killing me, I'm
[10] telling you.
[11]    MR. BERMAN: I have no further questions
[12] for this witness.
[13]    MR. GORDON: I just have one question.
[14]         **CROSS EXAMINATION**
[15]         **BY MR. GORDON:**
[16]    Q: Did Mrs. Fitzgerald ever give you
[17] directions to do things?
[18]    A: Mrs. —
[19]    Q: Mrs. Fitzgerald?
[20]    A: Yes.
[21]         **REDIRECT EXAMINATION**
[22]         **BY MR. BERMAN:**
[23]    Q: What did she give you directions to do.
[24]    A: To post checks, take papers back to

Page 22

[1] Sovereign, to do errands.
[2]    Q: She told you to do things of that nature;
[3] is that right?
[4]    A: What nature?
[5]    Q: She told you to take papers back from
[6] Reservoir Office Park to Sovereign; is that correct?
[7]    A: Yes; from her house. Office.
[8]    Q: Thank you. Those are the things she told
[9] you to do; is that right?
[10]    A: Yes; deposit checks for Sovereign, rent
[11] checks.
[12]         **RECROSS EXAMINATION**
[13]         **BY MR. GORDON:**
[14]    Q: Did she ever tell you what work to do on
[15] the buildings?
[16]    A: No.
[17]    Q: Okay.
[18]    A: She works in the — her office is in
[19] Needham, so she had nothing to do with the building.
[20] She never been in the building.
[21]    MR. BERMAN: No further questions.
[22]    MR. GORDON: I have no questions.
[23]    (Whereupon, the deposition was
[24] concluded at 10:57 a.m.)

Page 23

[1]         **CERTIFICATE**
[2] I, RENATO SOUTO, do hereby certify that I have
[3] read the foregoing transcript of my testimony, and
[4] further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]    Dated at __, this day of ,
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 24

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                           )
[3]    I, Susan E. DiFraia, Certified Shorthand
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 30th day of June,
[7] 2006, at 10:30 a.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]    I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]    In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this  day of July,
[21] 2006.
[22]
[23]         Notary Public
[24]         My commission expires  10/17/08

1

Volume I
Pages 1 to 223
Exhibits 1 to 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864JLT

- - - - - - - - - - - - - - - - - -x
                                    :
RENATO SOUTO and OTHERS SIMILARLY   :
SITUATED,                           :
            Plaintiffs,             :
                                    :
        vs.                         :
                                    :
SOVEREIGN REALTY ASSOCIATES, LTD.   :
and STUART ROFFMAN, As President    :
of the General Partner of          :
Sovereign Realty Associates,        :
Ltd., Sovereign Realty Associates   :
G.P., Inc., and Individually,       :
            Defendants.             :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF STUART A. ROFFMAN, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Susan E. DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gordon Law Group
LLP, 535 Boylston Street, 6th Floor, Boston,
Massachusetts, on Monday, February 13, 2006,
commencing at 11:02 a.m.

PRESENT:

    Gordon Law Group LLP
        (by Philip J. Gordon, Esq.,
        and Kristen M. Hurley, Esq.)
        535 Boylston Street, 6th Floor, Boston, MA
        02116, for the Plaintiffs.

    Law Offices of David Berman
        (by David Berman, Esq.)
        100 George P. Hassett Drive,
        Medford, MA 02155, for the Defendants.
                    * * * * *

104

1   your recollection that she did that at your home,
2   maybe when she was cleaning?

3       A.    Perhaps.

4           THE WITNESS:    I'm going to take a bathroom
5   break.

6           MR. GORDON:    Sounds good to me.

7           (Recess taken)

8       BY MR. GORDON:

9       Q.    I understand John Harvey did all the hiring
10  of Renato Souto.    I just have a couple of issues
11  because it seems you may have a little bit of
12  involvement with that.

13                  (Document marked as Roffman
14                  Exhibit 1 for identification)

15      Q.    Do you recognize that letter?

16      A.    (Reviewing document)    Yes.

17      Q.    And who is that letter from?

18      A.    John K. Dvorak.

19      Q.    And that letter is addressed to you?

20      A.    Yes.

21      Q.    And why don't you take a moment to review
22  that letter.

23          MR. BERMAN:    This is going to be Exhibit 1?

24          MR. GORDON:    Exhibit 1.    Thank you.

105

1     Q.   And is this a letter that was part of your
2     sponsorship of Mr. Souto?
3     A.   I assume so.
4     Q.   Do you remember receiving this letter?
5     A.   No, I do not.
6     Q.   The letter is addressed to you at 822
7     Boylston Street.  Did it go to you?
8     A.   Usually.
9     Q.   Sometimes yes; sometimes no?
10    A.   If it pertained to Renato's sponsorship, I
11    may have just given it to John Harvey or to Renato.
12    Q.   And there is a posting on the back; is
13    there not?
14    A.   It says "posting."
15    Q.   And there's a line at the bottom for Stuart
16    Roffman, manager, do you see that?
17    A.   I do.
18    Q.   Would you have signed that?
19    A.   I do not recall signing it, nor do I recall
20    seeing it.  I saw it in relation to this suit.  It
21    was part of your documents that you produced, but I
22    do not recall seeing this.  I have no recollection
23    of whether I received this or not.
24    Q.   Would John Harvey have had authorization to

1   sign your name to that?

2       A.    No.

3             MR. GORDON:  Could you mark that as Exhibit

4   2, please.

5                    (Document marked as Roffman

6                    Exhibit 2 for identification)

7       Q.    Before you as Exhibit 2 is a letter dated

8   July 26, 1999.  Would you take a moment to review

9   that.

10      A.    (Reviewing document)  Yes.

11      Q.    This letter says, "Please be advised that I

12  placed the advertisement in the Boston Herald for

13  three consecutive days.  I also posted this position

14  at our business."  Is that correct?

15      A.    Do you want me to read it or --

16      Q.    You can.  Please read that.

17      A.    (Reviewing document)  Yes, that's what it

18  says.

19      Q.    And there's a space at the bottom of this

20  letter for your signature; is that correct?

21      A.    Yes.

22      Q.    Do you recall seeing this letter?

23      A.    No.

24            MR. GORDON:  Would you mark that as Exhibit

# JOHN K. DVORAK

---

ATTORNEY-AT-LAW

123 NORTH WASHINGTON STREET • BOSTON, MA 02114 • (617) 723-4422 • FAX (617) 723-8305

July 20, 1999

Mr. Stuart Roffman, Owner
Soverign Realty Associates
822 Boylston Street
Chestnut Hill, MA 02167

      Re:    Renato Souto
              Employment Sponsorship

Dear Mr. Roffman:

      Enclosed for your review, please find recent letter from the Department of
Employment and Training, advising us that your Application for Labor Certification
has been accepted. The Department of Employment & Training has assigned a
wrap-up date of September 28, 1999. Therefore, we will place an advertisement in
the **Boston Herald immediately.**

      Please place the posting (enclosed) on a bulletin board visible to anyone for a
period of at least twelve days from receipt of this letter. Finally, enclosed is a "letter
of compliance" which states that you have advertised and posted this position and no
one has applied. We have prepared this on the premise that no one does apply,
however, it may have to be amended. This office must receive the posting and letter
of compliance at least **three weeks prior to September 28, 1999. Failure to do so
will result in a denial of this application.** If you have any questions, please feel
free to contact me, or in the alternative, my legal assistant, Ms. Lanza, at 617-723-
5551.

Sincerely,

John K. Dvorak

JKD:rr

# POSTING

## Maintenance Repairer

1.   Repair & maintain rental units, including total reconditioning & repair of all aspects of unit - electrical/plumbing/carpentry/fixtures/tile/linoleum - as well as plastering, painting, cleaning, rug shampooing and basic repairs for unit occupancy. Respond to maintenance complaints & requests with 24-hr. turnaround repairs.

2.   Rate of Pay - Basic: . $15.53/hr, 35 hrs/wk. 7:00 a.m. - 3:00 p.m.; no overtime.

3.   Minimum Experience:  2 years experience required.

4.   The posting herein is being provided as a result of the filing of an Application for Permanent Alien Labor Certification for the job opportunity above stated in accordance with 20 CFR 656.

5.   Any applicant or person may provide documentary evidence bearing on the application to the local Employment Service Office at the Charles F. Hurley Building, 19 Staniford Street, Government Center, Boston, MA 02114.

6.   All applicants should apply to Soverign Realty Associates, 822 Boylston Street, Chestnut Hill, MA 02167.

7.   The within posting is herein submitted in accordance with Title 20 Code of Federal Regulations, Section 656.


The within posting was placed at our business in an area visible to anyone from _____ to _____ . No one applied for this position.


_____

Stuart Roffman, Manager

Ex 2

July 26, 1999

TO WHOM IT MAY CONCERN:

     Re:     Employee:     Renato Souto
               Position:      Maintenance Repairer

     Please be advised that I placed the advertisement in the Boston Herald for three consecutive days. I also posted this position at our business. Our business has actively attempted to fill this position for quite some time. We have had no success and no one has applied for this position. If you require anything further, please do not hesitate to contact me.

                       Sincerely,

                       Stuart Roffman, Owner
                       Soverign Realty Associates
                       Chestnut Hill, MA 02167

1

Volume I
Pages 1 to 192
Exhibits 1 to 18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864JLT

- - - - - - - - - - - - - - - - - -x
                                    :
RENATO SOUTO and OTHERS SIMILARLY   :
SITUATED,                           :
                Plaintiffs,         :
        vs.                         :
                                    :
SOVEREIGN REALTY ASSOCIATES, LTD.   :
and STUART ROFFMAN, As President    :
of the General Partner of          :
Sovereign Realty Associates,        :
Ltd., Sovereign Realty Associates   :
G.P., Inc., and Individually,       :
                Defendants.         :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF LEE A. TORREY, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Susan E. DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gordon Law Group
LLP, 535 Boylston Street, 6th Floor, Boston,
Massachusetts, on Friday, February 24, 2006,
commencing at 10:10 a.m.

PRESENT:

    Gordon Law Group LLP
        (by Philip J. Gordon, Esq.,
        and Kristen M. Hurley, Esq.)
        535 Boylston Street, 6th Floor, Boston, MA
        02116, for the Plaintiffs.

    Law Offices of David Berman
        (by David Berman, Esq.)
        100 George P. Hassett Drive,
        Medford, MA 02155, for the Defendants.

50

1   because I'm not an expert in this area.

2       Q.   Well, you did it a couple of times each
3   summer?

4       A.   That's correct.

5       Q.   But you don't recall this past summer --
6    you don't recall filling out forms?

7       A.   I recall filling out forms.  I just don't
8   recall their exact title.

9       Q.   Do you keep copies of those forms?

10      A.   We may at 1440 Beacon Street.

11      Q.   Would they be kept anywhere else?

12      A.   Not during my time.  Prior to me would be
13   with Barbara Fitzgerald.

14      Q.   So any immigration forms would be with
15   Barbara, correct?

16      A.   If you're referring to the Plaintiff, yes.

17      Q.   Well, I'm referring to any of your other
18   employees.

19      A.   I don't have any other immigration people.

20      Q.   Would anyone else have those forms other
21   than Barbara and you?

22      A.   Mike O'Keefe may have.

23      Q.   When did you first meet Renato?

24      A.   June, 1999.

51

1      Q.    How did you meet him?

2      A.    He let me into the building the first day.

3      Q.    So he was already working there?

4      A.    That's correct.

5      Q.    And what did that morning look like?

6      A.    It was a sunny day.  The walls were mint

7  green.  Glass doors.  It was the front lobby of 1440

8  Beacon.

9      Q.    You showed up at work on your own?

10     A.    Yes, I did.

11     Q.    What time was that?

12     A.    In the morning, 9:00 or 10:00.

13     Q.    And you rang the doorbell?

14     A.    No.  Renato was supposed to meet me at the

15  front door, and he did.

16     Q.    And showed you to your unit?

17     A.    Showed me around the building, gave me the

18  keys, gave me the introductory tour.

19     Q.    What was Renato doing there that day?

20     A.    I don't know what Renato was doing there

21  that day.

22     Q.    Do you know if Renato is married?

23     A.    Yes, I do.

24     Q.    Do you know his wife's name?

52

```
 1        A.    I forget.
 2        Q.    Have you met her?
 3        A.    Yes, I have.
 4        Q.    On more than one occasion?
 5        A.    Yes, I have.
 6        Q.    On how many occasions did you meet Renato's
 7    wife?
 8        A.    Maybe half a dozen.  I'd take them
 9    shopping.
10        Q.    Do you know if he has any kids?
11        A.    Yes, I do.
12        Q.    Do you know how many kids he has?
13        A.    I don't know for a fact.  I think at least
14    three.
15        Q.    Have you met the children?
16        A.    Yes, I have.
17        Q.    How many times?
18        A.    A few.
19        Q.    Three or four over the past --
20        A.    That's correct.
21        Q.    Do you know where he lives?
22        A.    I believe he lives in Somerville, but I do
23    not know that for a fact.  I've never been to his
24    house.
```

53

1      Q.    Do you know his telephone number?

2      A.    Not now.

3      Q.    Did you at any point?

4      A.    Yes.

5      Q.    Did you ever call his home phone?

6      A.    Yes.

7      Q.    How many times?

8      A.    A few every year.

9      Q.    When would you call his home phone?

10     A.    "Where are you?"

11     Q.    Let's talk about one time, specifically.

12     A.    If he did not show up for work I'd call his

13  home, if he overslept, or whatever.  If he went home

14  early, I'd call and say, "Why did you leave early?

15  You haven't finished your work yet."

16     Q.    Let's recall one of the times you made a

17  phone call to him.

18     A.    I'd get a phone call from the office park

19  from a vendor or employee saying, "Renato is not

20  here.  Do you know where he is?  He's supposed to be

21  taking out the garbage?"  I'd say, "I don't know."

22  I would then have to call the employee at home and

23  say, "Renato, where are you?"  "Oh, I just woke up."

24  "Would you go to work, please.  Thank you."  Or

54

1  conversely, he'd leave early.  Sneak out.  So I'd
2  call and say, "Did you finish this or that?  Would
3  you tell me, please, did you finish your job?  Did
4  you take out the rubbish?"  "Oh, no, I forgot."  So
5  we'd send somebody there to finish his work for him.
6      Q.  What time did he work?
7      A.  To the best of my recollection, he was an
8  8:00 to 4:00 worker.  But he would often sneak out
9  early because he had another job.
10     Q.  Where did he work?
11     A.  He was a cleaner.
12     Q.  Where did he work?
13     A.  I don't know.
14     Q.  How do you know that?
15     A.  Because he told everyone he had a cleaning
16 business, so does his wife.
17     Q.  That was the case during his employment at
18 Sovereign?
19     A.  I didn't track his every move, but that was
20 my belief.
21     Q.  When do you recall that he left the job
22 early to work for his other job?
23     A.  He did this regularly.  It was a source of
24 irritation for other workers and myself.

55

1    Q.    Can you recall the first time he did it?

2    A.    No.

3    Q.    Can you recall the second time?

4    A.    No, absolutely not.

5    Q.    Can you recall any of the times?

6    A.    Yes.

7    Q.    Recall for me one of the times.

8    A.    I remember one Friday it was snowing out

9    and he was supposed to -- we had an open air parking

10   garage at 822-826 Boylston Street, and he was

11   supposed to be shoveling snow so people don't slip

12   and we get lawsuits. And he left early and the job

13   had not been done. And I remember I was cross with

14   him, and I remember talking to him on the phone and

15   saying, "Look you've got to talk to me before you

16   leave. You just can't do this." I forget which

17   storm that was. I think it was like three or four

18   years ago, and we had a bad winter, and it was

19   back-to-back storms from Thanksgiving to Christmas.

20   You'd have to look up the weather. You asked me a

21   specific instance.

22   Q.    That was in 2003, 2004?

23   A.    Whatever the bad winter was.

24         MR. BERMAN:  We've had a lot of bad

56

1  winters.

2      Q.    That was a Friday afternoon?

3      A.    Yes, it was a Friday.

4      Q.    What time do you think you called him?

5      A.    I don't know.

6      Q.    What time do you think he left?

7      A.    Too early.

8      Q.    What time is too early?

9      A.    Before 4:00.

10     Q.    Do you --

11     A.    I'm sorry.  I just remember clearly being

12  irritated.  I remember calling him.  I remember it

13  was a snowstorm.  We could probably find out for

14  you.

15     Q.    Where did you reach him?

16     A.    At his home.

17     Q.    How did he know he was supposed to go over

18  to 822-826 Boylston Street?

19     A.    He had a regular schedule that by far and

20  large on most days between 8:00 and 12:00 he worked

21  at 822-826 Boylston Street doing garbage, parking

22  cars and so forth, and then he'd take a lunch break.

23  After his lunch break he'd go to 1440 Beacon Street

24  and put in the rest of the day and leave at 4:00

57

1   with the rest of the workers.  But if there was an

2   emergency, like a snowstorm, we'd reassign him to

3   822 Boylston Street and say, "Hey, don't come over

4   here at all.  Stay at the parking lot."  So it

5   wasn't hard and fast, but that was his usual

6   schedule.

7       Q.    When did he start that schedule?

8       A.    He had that schedule prior to my coming on

9   board and basically he did until he left.

10      Q.    So all the time you were there he was

11  supposed to go in the morning at 8:00 a.m. to

12  822-826 Boylston Street, work until noon, and then

13  come back to 1440 after lunch break and work with

14  you until 4:00; is that correct?

15      A.    That's correct.

16      Q.    And this snowstorm occurs on some Friday

17  around Christmastime --

18      A.    Between Thanksgiving and Christmas.  I

19  forget.

20      Q.    -- and on that particular day you tell him

21  at 1:00, "Don't come back here?"

22      A.    Yes.  "Stay there."  Now I may not have

23  communicated this directly with him.  It may have

24  been with another worker.  "All you guys stay there.

58

1    Keep the parking lot safe, clean, salted, sanded."
2    We had a clinical care facility there.  We had
3    patients, so it had to be done right.
4        Q.   So you had other employees that worked
5    alongside Renato?
6        A.   I forget.  It was just, "You guys stay
7    there."
8        Q.   Until when?
9        A.   Until it was done.
10       Q.   6:00?  7:00?
11       A.   No.  These guys are not going to work OT.
12   They're going to stop at 4:00.
13       Q.   And then how would you know when Renato had
14   left?
15       A.   I wouldn't.  That was a problem.
16       Q.   How did you know in this particular
17   instance that Renato had left?
18       A.   Because I got a call from one of the
19   tenants.  I think it was Dr. Bernstein or something,
20   and said, "Hey, look your guys left and my patients
21   can't get in the building."  So I would send
22   somebody over there and say, "What happened?"  "I
23   don't know.  Renato left."  So I would call Renato
24   at home and say, "Hey, what's up?"

59

1     Q.    But you don't remember what time you

2  called?

3     A.    I don't know.

4     Q.    What time did the patients come until?

5     A.    I don't know.

6     Q.    Until 5:00?

7     A.    Yes, until the doctors' office closed.

8  Various physicians had different hours of operation.

9  But we were only responsible for taking care of the

10  office park between 8:00 and 4:00.  After that I

11  don't know what the deal was.  They were on their

12  own.  I was in a separate building.

13     Q.    Could the doctor have called after 4:00

14  saying, "My patients --

15     A.    That's always a possibility.  I don't want

16  to get locked down to something that happened years

17  ago.

18     Q.    I have to lock you down a little bit

19  because you only remember --

20     A.    I don't remember what time the call came

21  in.

22     Q.    It could have been after 4:00?

23     A.    No.  Because I remember being miffed

24  because he had not worked the full day which was a

60

1   pattern, unfortunately.  So I remember being angry.
2   I shouldn't have been, but I was, and I called him.
3   And it was before he was supposed to be at home.
4   And I said, "What the heck?"
5       Q.   But you just don't remember the times or
6   who you got the calls from?
7       A.   No.
8       Q.   Can you recall any other time Renato left
9   early?
10      A.   I'd have to think about it so I don't get
11  in a jam here.  But it was a pattern in his
12  employment, to the best of my knowledge.  And he
13  often left early.  We had to give him a pager so we
14  could find the guy so he wouldn't disappear.
15      Q.   When did you give him a pager?
16      A.   He always had a pager.
17      Q.   Since when?
18      A.   Since I started in June 1999.
19      Q.   So when you say, "We had to give him a
20  pager" --
21      A.   I should say "I."  I'm sorry.  I speak in
22  the second person.
23      Q.   Who gave him the pager?
24      A.   He had a pager from his prior boss who I

61

1    believe was his brother-in-law.

2        Q.    When did you use the pager?

3        A.    If I could not find him, or if he needed

4    him because he didn't have a cell phone -- and

5    everybody didn't have a cell phone back then -- we'd

6    call him and say, "I need you here."  Or usually,

7    "Where are you?"

8        Q.    Who used the pager?

9        A.    I did.

10       Q.    Did anybody else use the pager number?

11       A.    If I was busy, I'd say, "Please page

12   Renato.  Find out where he is."

13       Q.    Was anybody authorized to initiate the call

14   to the pager other than you?

15       A.    Anyone could.  I mean, the boys could page

16   each other if they wanted to.  It wasn't a

17   formality.  It was just a convenience to find out

18   where people were.

19       Q.    Did you ever use that pager after 4:00?

20       A.    I may have.

21       Q.    Under what circumstances?

22       A.    Don't remember.

23       Q.    How often do you think you used that pager

24   after 4:00?

1        A.    I may have once a year, or something, if it
2    was an emergency or I had to find a worker, or if
3    the keys were lost and sometimes they take a key
4    home and you have to do key counts.  And if you have
5    a full set of keys and someone has a heart attack in
6    an apartment, I'm in big trouble.  So I'd call and
7    say, "Do you have the keys to apartment X," and
8    they'd say, "Oh, yes, they're in my pocket," and I'd
9    say, "Bring them back."

10       Q.    If I showed you records from Page Net and
11   they showed a lot of phone calls after 4:00 would
12   you be surprised?

13       A.    No.

14       Q.    Why not?

15       A.    Because people call each other all the
16   time.

17       Q.    Who could --

18       A.    Me, Stuart, other employees would call for
19   work or non-work related stuff.  Back then, prior to
20   cell phones, Stuart would page me around the clock
21   about routine stuff or social stuff, and this was
22   before the cell phone era.  It was a matter of
23   convenience.  It wasn't always work related but
24   people used pagers all the time.

63

1      Q.     Did Stuart ever use that pager after 4:00
2    to call Renato?
3      A.     I don't know about Renato, but he certainly
4    called me.
5      Q.     You only recall one or two occasions where
6    you used the pager after 4:00 p.m.?
7      A.     I'm guessing.  I don't remember
8    specifically.  On a usual basis he would keep the
9    keys home.  So I'd call and ask him to please bring
10   them back.  And that was after 4:00 after a key
11   count would be done, and he left early.
12     Q.     Did you ever call him about an emergency
13   after hours?
14     A.     I don't know about after hours, but I would
15   often call him from 1440, from the office park,
16   "Please come.  We have a problem here."
17     Q.     But after 4:00 p.m. he did no additional
18   work at 1440 Beacon Street?
19     A.     Not to the best of my knowledge, because he
20   had this other job.
21     Q.     Can you tell me any day when Renato Souto
22   was working at 1440 Beacon Street from 1999 until
23   2002 that he had to be called back?
24     A.     Can I recall a day?  No, I cannot, but in