UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

**********************************************

RENATO SOUTO and OTHERS SIMILARLY )
SITUATED, )
                          Plaintiffs, )
 )
v. )
 )
SOVEREIGN REALTY ASSOCIATES, LTD. )
and STUART ROFFMAN, As President of the )
General Partner of Sovereign Realty Associates, )
Ltd., Sovereign Realty Associates G.P., Inc., and )
Individually, )
                       Defendants. )

**********************************************

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS WITH RESPECT TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

       The plaintiff, Renato Souto (hereinafter "Mr. Souto"), hereby submits the following

response to Defendants' Statement of Undisputed Material Facts with Respect to

Defendants' Motion for Summary Judgment. Mr. Souto also refers to the Affidavit of

Lawrence Dorsey and the Affidavit of Philip J. Gordon, Esq. (containing deposition

excerpts), both of which are submitted herewith.

**Disputed Facts**

1.      Mr. Souto disputes that he did not work overtime. Mr. Souto consistently

         worked on average 55-60 hours a week. See Affidavit of Philip J. Gordon

         attached hereto as Exhibit "1" with excerpts of the Deposition Transcript of

         Renato Souto, pp.161, annexed at Exhibit "A". Lawrence Dorsey will

         testify similarly, that,

              "Mr. Souto was a hard worker. He was required to show up at 7:30
              a.m. every morning, Monday through Friday, ready for work. He
              was always on time, and he often worked past 4 p.m. at the request
              of his supervisors to complete all of his duties. At least two times a

week, he would work until 5:00 or 6:00 p.m.  He would also work one weekend (Saturday and Sunday) per month."

"I never heard any complaints about Mr. Souto.  To the best of my knowledge, he always did everything his supervisors, including me, requested.  I gave Mr. Souto an excellent review on is job performance.  He performed his tasks well.  He worked fast, he did not complain and the tenants liked him."

"Given the nature of the apartment industry, we experienced a high turnover of apartments around June and September each year.  Mr. Souto would almost always work many hours after 4 p.m. during these times of high turnover, because we had to repaint and repair units to prepare them for new tenants.  Also, with the additional turnover, there would be significantly more trash and general mess in the halls which Mr. Souto would be required to clean.  During these months, he would generally work from 7:30 a.m. until around 10:00 p.m.  During these periods, he would also work every Saturday and Sunday for at least one month."

"Mr. Souto would also assist Sovereign Realty Associates with snow removal during the winter months at both the commercial buildings and the apartments.  He would be contacted at the onset of a storm, regardless of the hour, and he would remain at the property until he was told to leave, usually after all commercial tenants had left, in the evening between 6 and 8 pm."

"Mr. Souto was also called upon to work on Stuart Roffman's home, drive Mr. Roffman to the airport and perform other personal tasks for Mr. Roffman.  These tasks were not performed during the work day, and as far as I know, Mr. Souto was not paid extra for any of this work."

"Sovereign Realty Associates, Ltd. required Mr. Souto to carry a pager.  He was required to respond to this pager, regardless of the time of day.  Many times he would work late nights in response to an emergency.  This work occur at least 3 to 4 times per month."

Affidavit of Lawrence Dorsey attached hereto as <u>Exhibit "2".</u>

2.    During his employment with Sovereign Realty Associated, Ltd. and Stuart

Roffman (hereinafter collectively "Sovereign"), Sovereign failed to pay Mr.

Souto wages for any his overtime hours.  <u>See</u> Plaintiff's Complaint, ¶ ¶ 1

and 16; <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u>

with excerpts of the Deposition Transcript of Renato Souto, pp.,102-103

annexed at <u>Exhibit "A".</u>

3.      Mr. Souto disputes that he frequently left work early or arrived late. <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u> with excerpts of the Deposition Transcript of Renato Souto, pp.,74 annexed at <u>Exhibit "A"</u>; Affidavit of Lawrence Dorsey attached hereto as <u>Exhibit "2"</u>.

4.      Mr. Souto disputes that he is unable to remember any week in which he worked more than forty hours a week. <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u> with excerpts of the Deposition Transcript of Renato Souto, pp.161.

5.      As a part of Mr. Souto's employment, he was entitled to vacation, holiday, personal and sick days. At the time of Mr. Souto's termination, he had not made use of all such time and was thus owed wages for unpaid vacation, holiday, personal and sick days. <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u> with excerpts of the Deposition Transcript of Renato Souto, pp.103-107; Affidavit of Lawrence Dorsey attached hereto as <u>Exhibit "2"</u>.

6.      Sovereign claims that Mr. Souto has taken time off for vacation, but Mr. Souto disputes that such time off was the full extent of his benefits. <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u> with excerpts of the Deposition Transcript of Stuart Roffman, pp. 153-154 annexed at <u>Exhibit "B"</u> and excerpts of the Deposition Testimony of Lee Torrey pp. 163- 164 annexed at <u>Exhibit "C"</u>.

7.      Sovereign failed to keep track of the hours worked by its employees, despite the fact that its employees were paid on an hourly rate. <u>See</u> Affidavit of Philip J. Gordon attached hereto as <u>Exhibit "1"</u> with excerpts of the

Deposition Transcript of Stuart Roffman, pp. 152-154 annexed at Exhibit "B" and excerpts of the Deposition Testimony of Lee Torrey pp. 163- 164 annexed at Exhibit "C"; Copies of Checks attached hereto as Exhibit "3".

8.    Sovereign failed to keep track of vacation days, personal days and sick days.  See Copies of Checks attached hereto as Exhibit "3".

9.    Defendants refer to documents taken from Defendants' fax machine.  See documents entitled "Stuart", "Christmas Bonuses" and "Employee Work Conditions" attached hereto as Exhibit "4".

Respectfully Submitted,
RENATO SOUTO
By his attorneys,


/s/ Philip J. Gordon_____
Philip J. Gordon (BBO # 630989)
Kristen M. Hurley (BBO # 658237)
Gordon Law Group, LLP
535 Boylston St., 6th Fl.
Phone: 617-536-1800


## CERTIFICATE OF SERVICE

I, Philip J. Gordon, hereby certify that on October 5, 2006, I caused a copy of the foregoing document to be served, upon counsel for the defendants, David Berman, Esq., 100 George P. Hassett Drive, Medford, MA 02155, by electronic notification and first class mail.

/s/ Philip J. Gordon
Philip J. Gordon

EXHIBIT "2"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RENATO SOUTO and OTHERS SIMILARLY )
SITUATED, )
               Plaintiffs, )
 )
v. )
 )
SOVEREIGN REALTY ASSOCIATES, LTD. )
and STUART ROFFMAN, As President of the )
General Partner of Sovereign Realty Associates, )
Ltd., Sovereign Realty Associates G.P., Inc., and )
Individually, )
               Defendants. )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF LAWRENCE DORSEY

I, Lawrence Dorsey, under oath hereby depose and state as follows:

1.     I was employed by Sovereign Realty Associates, Ltd., as a maintenance worker and supervisor from 1997 to 2002. I generally worked daily from 7:00 a.m. through 3:00 p.m. I left the company because I did not enjoy working with Lee Torrey.

2.     I know Renato Souto because we use to work together for Sovereign Realty Associates. Mr. Souto was a maintenance worker, and I was one of his supervisors. I am not related to Mr. Souto, and we do not associate with each other.

3.     Mr. Souto's job duties included cleaning halls, elevators and stairwells, responding to work orders from tenants, changing light bulbs and ceiling tiles, performing basic plumbing services (such as unclogging toilets and drains), trash removal, landscaping, floor sanding, painting and snow removal.

4.     Sovereign Realty Associates managed an apartment complex located at 1440 Beacon Street, in Brookline, Massachusetts, and a set of commercial buildings at 824-826 Boylston Street in Brookline, Massachusetts. Mr. Souto and I worked in both sets of buildings.

5.     Mr. Souto was a hard worker. He was required to show up at 7:30 a.m. every morning, Monday through Friday, ready for work. He was always on time, and he often worked past 4 p.m. at the request of his supervisors to complete all of his duties. At least two times a week, he would work until 5:00 or 6:00 p.m. He would also work one weekend (Saturday and Sunday) per month.

1

6.     I never heard any complaints about Mr. Souto. To the best of my knowledge, he always did everything his supervisors, including me, requested. I gave Mr. Souto an excellent review on is job performance. He performed his tasks well. He worked fast, he did not complain and the tenants liked him

7.     Given the nature of the apartment industry, we experienced a high turnover of apartments around June and September each year. Mr. Souto would almost always work many hours after 4 p.m. during these times of high turnover, because we had to repaint and repair units to prepare them for new tenants. Also, with the additional turnover, there would be significantly more trash and general mess in the halls which Mr. Souto would be required to clean. During these months, he would generally work from 7:30 a.m. until around 10:00 p.m. During these periods, he would also work every Saturday and Sunday for at least one month.

8.     Mr. Souto was often called to work in the Boylston Street commercial buildings too. He would handle routine maintenance requests, park cars, shovel snow and prepare units for new tenants. He traveled back and forth between the commercial units and the Beacon Street apartments in his car.

9.     Mr. Souto would also assist Sovereign Realty Associates with snow removal during the winter months at both the commercial buildings and the apartments. He would be contacted at the onset of a storm, regardless of the hour, and he would remain at the property until he was told to leave, usually after all commercial tenants had left, in the evening between 6 and 8 pm.

10.    Employees of Sovereign Realty Associates would receive sick, personal and vacation days as a benefit of their employment. I do not remember Mr. Souto taking any time off while he was working for Sovereign Realty Associates.

11.    Mr. Souto was also called upon to work on Stuart Roffman's home, drive Mr. Roffman to the airport and perform other personal tasks for Mr. Roffman. These tasks were not performed during the work day, and as far as I know, Mr. Souto was not paid extra for any of this work.

12.    Sovereign Realty Associates, Ltd. required Mr. Souto to carry a pager. He was required to respond to this pager, regardless of the time of day. Many times he would work late nights in response to an emergency. This work occur at least 3 to 4 times per month.

13.    I always recommended to Mr. Roffman that Mr. Souto get a raise, but I was told to mind my own business. Mr. Roffman and Lee Torrey would always bad mouth Mr. Souto and treat him without any respect.

14.    Mr. Souto was terminated in July of 2002. Lee Torrey gave all employees the day off on Friday, July 5th. I understand that Lee Torrey, fired Mr. Souto because he did not show up to work on July 5th.

2

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS $\underline{8}$ DAY OF APRIL, 2006.

Lawrence Dorsey

EXHIBIT "3"



97-2012

RENATO SOUTO

SS# 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    EMP# 0201200018    M/S    Dep 06/06    Per Beg 04/13/2002    Per End 04/26/2002    Check Date 04/26/2002    Check No. 545

| Earnings | | | | Taxes | | Deductions | |
|---|---|---|---|---|---|---|---|
| Earnings Type | Rate | Quantity | Amount | M/M | Year to Date | Deductions | |

| Current | 800.00 | | | 81.20 | .00 | Deductions and Taxes | |
| Y-T-D | 7,200.00 | | | 730.80 | .00 | Amount | Y-T-D Amount |

REGULAR    800.00    80.00    800.00    7,200.00

MEDICARE    11.60    104.40
SOC.SEC    49.60    446.40
MASSACHUSETTS    20.00    180.00

SOVEREIGN REALTY ASSOC. LTD
170 MERIDIAN ST
NEEDHAM MA. 02192

| Accruals | | Balance | Taken |
|---|---|---|---|
| VACATION | | | |
| SICK | | | |
| HOLIDAY | | | |
| PERSONAL | | | |

Direct Deposits and Net Pay

Net Pay    718.80
Check Amt    718.80



FOLD  1192    InfoSeal™ Patent Number 4,951,864    (REV 12/97)    FOLD    CREATIVE IMAGING GROUP - 1-800-370-5200 ▲    110648    B    A

97-2012

**RENATO SOUTO**

SS# 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    EMP# 02012000018    MM 06/06    Dep    04/27/2002 05/10/2002 05/10/2002    551

SOVEREIGN REALTY ASSOC. LTD
170 BEHOLDER ST
NEEDHAM MA, 02192

| Earnings | | | | | Taxes | | Deductions | | | Per Beg | Per End | Check Date | Check No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Earnings Type | Rate | Quantity | Amount | Year to Date | | | | | | | | | |
| REGULAR | | 80.00 | 800.00 | | | | | | | | | | |
| Current | | | 800.00 | | | .00 | .00 | | | | | | |
| Y-T-D | | | 8,000.00 | | | | | | | | | | |

Taxes
| | 81.20 | .00 |
| | 812.00 | .00 |

Year to Date
8,000.00

Deductions and Taxes    YTD Amount
MEDICARE    11.60    116.00
SOC SEC    49.60    496.00
MASSACHUSETTS    20.00    200.00

Deductions and Taxes    Amount

**Accruals** | **Balance** | **Taxen**
VACATION
SICK
HOLIDAY
PERSONAL

**Direct Deposits and Net Pay**
Net Pay    718.80
Check Amt    718.80

DETACH ALONG THE PERFORATION

FOLD    FOLD



InfoSeal® Patent Number 4,961,864    (REV 12/97)    CREATIVE IMAGING GROUP - 1-800-370-6200

RENATO SOUTO
SS# 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    EMP# 0201200018    MS        Dep      Per Beg    Per End    Check Date    Check No.
27-2012                                            M/M    06/06    05/11/2007  05/24/2002  05/24/2002    557

SOVEREIGN REALTY ASSOCI. LTD.
170 NEEDHAM ST.
NEEDHAM MA   02192

| Earnings | | | | | Deductions and Taxes | | |
|---|---|---|---|---|---|---|---|
| Earnings Type | Rate | Quantity | Amount | Year to Date | Deductions | Amount | YTD Amount |
| Current | 800.00 | | | .00 | MEDICARE | 11.60 | 127.60 |
| Y-T-D | 8,800.00 | | | .00 | SOC INS | 49.60 | 545.60 |
| REGULAR | | | | | MASSACHUSETTS | 20.00 | 220.00 |

Taxes
81.20    893.20

Accruals    Balance    Taken
VACATION
SICK
HOLIDAY
PERSONAL

Direct Deposits and Net Pay
Net Pay
Check Amt

97-2012

RENATO SOUTO

SS# 023 84 3154    EMP# 0201200018    MS:    Dep    06/06    Per Beg    05/25/2002  Per End  06/07/2002 06/07/2002    Check Date  Check No.  563

SOVEREIGN REALTY ASSOC, LTD
170 NEEDHAM ST    NEEDHAM, MA  02192

| Earnings | | | | | | Deductions and Taxes | | |
|---|---|---|---|---|---|---|---|---|
| Earnings Type | Rate | Quantity | Amount | Year to Date | | Deductions | Amount | YTD Amount |
| REGULAR | | 40.00 | 800.00 | 9,600.00 | | MEDICARE | 11.60 | 139.20 |
| | | | | | | SOC SEC | 49.60 | 595.20 |
| | | | | | | MASSACHUSETTS | 20.00 | 240.00 |

Current    800.00    40.00    81.20    .00
Y-T-D    9,600.00    9/4.40    .00    3,600.00

| Accruals | Balance | Taken |
|---|---|---|
| VACATION | | |
| SICK | | |
| HOLIDAY | | |
| PERSONAL | | |

Direct Deposits and Net Pay

Net Pay    718.80
Check Amt.    718.80

DETACH ALONG THIS PERFORATION

97-2012

| RENATO SOTO | | EMP. NO. | Fed | State | Per Beg | Per End | Check Date | Check No. |
|---|---|---|---|---|---|---|---|---|
| SS# 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 | | 0201200018 | M/06 | M/06 | 06/03/2002 | 06/21/2002 | 06/21/2002 | 569 |
| | Earnings | Taxes | | Deductions | Deductions | | Deductions and Taxes Amount | YTD Amount |
| Current | 900.00 | | | .00 | MEDICARE | | 11.60 | 156.60 |
| Y.T.D. | 10,400.00 | 1,055.46 | | | SOC SEC | | 49.60 | 644.80 |
| Earnings Type | Rate | Cur Qty | Cur Amt | Year to Date | MASSACHUSETTS | | 26.00 | 2,760.00 |
| REGULAR | | 45.00 | 900.00 | 10,400.00 | | | | |

SOVEREIGN REALTY ASSOC. LTD
170 NEHOIDEN ST
NEEDHAM MA 02192

Direct Deposit(s)

| Accruals | Balance | Taken | Accruals | Balance | Taken |
|---|---|---|---|---|---|
| VACATION | | | SICK | | |
| HOLIDAY | | | PERSONAL | | |
| BENEFITS | | | BENEFIT6 | | |

Net Pay    718.80
Check Amt  718.80

EXHIBIT "4"

Tuesday, May 8

Stuart:

*I've had it!* But you have heard that before and I know it doesn't work.

So I'm taking the day off to work on my current bender. Practice, practice. If you care to join me killing off those nasty brain cells that make my life miserable, I'll be at the Pour House soon (they start serving at 8am, God bless them). Glass Slipper will be next to catch the early show (I really miss the Naked Eye). Then on to Biba for lunch and to Jeanne's for a nap. I haven't decided about the evening's entertainment. It'll probably be close to what Californians call a rolling blackout.

Before you start the panic thing, I have a little good news. 206, 306, 315, and 417 are off the current Update. Barbara can confirm. Also, I was sufficiently threatening yesterday so that Glen agreed to stay on for one final month.

Bad news is Renato II (brought in by Alton) did not make it today and I suspect he's gone. I'm down to one heart attack patient and one brain dead patient. And I'm now facing 10 (ten) move ins. Disaster looms, but if you kill enough brain cells, it all seems okay after a while.

Now that we are in brutal honesty mode, I gotta tell you that your friends Kenny Barron and Jeff Groper are total assholes. I'm sure you are not happy to hear that from an employee, but I feel much better telling you. Jeanne would call that a corrective emotional experience.

I'm off now. I'll have my beeper and cell phone for total emergencies. If you want to link up and clear your head, page me. After all these years of sobriety, you're probably over due for a visit to the belly of the beast.

Come what may, I remain your friend.

LT

Monday, December 17

**Christmas Bonuses**

**Larry Dorsey:** **$500** is what we gave him last year. Same this year please. He saves us tons of money from electric work to chair rails. And like everyone else: no raise this year. Model employee by any standard.

**Pavel Molkov: $100**

**Arthur Baretto** (aka "R2"): **$100**

**Thomas Mitchell: $100**

**Jermaine Robinson: $100**

**Megan Gallagher: $100**

**Renato Souto: Zero.** Not even a bag of coal.

RENATO

# Employee Work Conditions

Employees must report to work at 7:45 am.

Employees who arrive after 8:00 am shall work until 5:00 pm.

The nominal work day hours are 8:00 am to 4:30 pm.

Employees shall not start "clean up" until 4:00 pm.

Lunch break is 12:00 noon to 12:30 pm.

Morning break is 10:00 am to 10:15 am.

Afternoon break is 2:00 pm to 2:15 pm.

Employees shall not take breaks outside the above times.

All employees are on salary and may be required to work extended hours.

Employees shall receive five paid sick days per year.

Employees shall receive five paid personal days per year.

Employees shall receive one paid week holiday per year,

Accumulating one addition week per year to a maximum of four weeks.

Employees shall receive one written warning prior to termination.

Employees must work Labor Day weekend.

Employees shall submit grievances in writing to the Rent Box.

Work conditions will be vigorously enforced March 1 to October 1.

3-1-02

# Employee Safety Regulations

Employees must adhere to all posted safety regulations.

Employees must wear eye **goggles** when using power tools.

Employees must wear **respirators** when working in dusty environments.

Employees must wear **latex gloves** when handling household garbage.

Employees must wear **heavy gloves** when handling construction debris.

Employees must wear **hard hats** when working in overhead work areas.

Employees are responsible for **ordering safety equipment**.

Employees must report **Worker Compensation claims** with 24 hours.

Employees must immediately **report hazardous conditions**.

Employees must immediately **report faulty equipment**.

Employees who fail to adhere to any safety regulation will be terminated.

3-1-02

EXHIBIT "1"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:2005-10864JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RENATO SOUTO and OTHERS SIMILARLY    )
SITUATED,    )
                              Plaintiffs,    )
    )
v.    )
    )
SOVEREIGN REALTY ASSOCIATES, LTD.    )
and STUART ROFFMAN, As President of the    )
General Partner of Sovereign Realty Associates,    )
Ltd., Sovereign Realty Associates G.P., Inc., and    )
Individually,    )
                              Defendants.    )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>AFFIDAVIT OF PHILIP J. GORDON, ESQ.</u>

I, Philip J. Gordon, under oath hereby depose and state as follows:

1.    I am an attorney licensed to practice law in the Commonwealth of Massachusetts.
    I do so as a partner of the law firm of Gordon Law Group, LLP, 535 Boylston
    Street, 6th Floor, Boston, MA 02116.

2.    I represent the Plaintiff in the above-captioned action.

3.    On December 20, 2005, the defendant deposed Renato Souto.  True and correct
    excerpts from that deposition are annexed hereto as <u>Exhibit "A"</u>.

4.    On February 13, 2006, the plaintiff deposed Stuart Roffman.  True and correct
    excerpts from that deposition are annexed hereto as <u>Exhibit "B"</u>.

5.    On February 24, 2006, the plaintiff deposed Lee Torrey.  True and correct
    excerpts from that deposition are annexed hereto as <u>Exhibit "C"</u>.

    Signed under the pains and penalties of perjury this 5th day of October, 2006.

                               /s/ Philip J. Gordon                               .
                              Philip J. Gordon (BBO# 630989)
                              Gordon Law Group, LLP
                              535 Boylston Street, 6th Floor
                              Boston, MA 02116
                              (617)536-1800

EXHIBIT "A"

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005-CV-10864-JLT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *
RENATO SOUTO and OTHERS SIMILARLY     *
SITUATED,                             *
            Plaintiff,                *
                                      *
    V                                 *
                                      *
SOVEREIGN REALTY ASSOCIATES LTD. and  *
STUART ROFFMAN, as President, of the  *
General Partner of Sovereign Realty   *
Associates, Ltd., Sovereign Realty    *
Associates G.P., Inc., and Individually *
            Defendants.               *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of RENATO SOUTO,

taken on behalf of the Defendants, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Duane Morris, LLP, 470 Atlantic Avenue,

Boston, Massachusetts, on December 20, 2005,

commencing at 9:10 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

---

2

APPEARANCES:

Duane Morris, LLP
[By Bronwyn L. Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
    On behalf of the Defendants.

Gordon & Balikian, LLP
[By Philip J. Gordon, Esq.]
[By Kristen M. Hurley, Esq.]
535 Boylston Street
Boston, Massachusetts 02116
    On behalf of the Plaintiff.

ALSO PRESENT:    Stuart Roffman.
                 Lee Torrey.

---

3

INDEX

Witness    Direct  Cross  Redirect  Recross

Renato Souto

By Ms. Roberts   4

EXHIBITS

| Id. | Description | Page |
|-----|-------------|------|
| 1 | Tax Returns | 9 |
| 2 | Plaintiff's Sworn Statement | 98 |
| 3 | Letter March 11, 2005 | 100 |
| 4 | Copies of Checks | 118 |
| 5 | Check Stubs | 118 |
| 6 | Standard Payroll Sheets | 118 |
| 7 | Complaint | 131 |
| 8 | Invoice | 149 |
| 9 | Calendar | 162 |

---

4

STIPULATION

It is agreed by and between counsel
for the respective parties that the reading
and signing of the deposition will not be
waived. All objections, except as to the form
of the question, and motions to strike will be
reserved until the time of trial.

        MS. ROBERTS:  Could you swear in
Mr. Souto?

RENATO SOUTO,
        having been satisfactorily
        identified and duly sworn by the
        Notary Public, was examined and
        testified as follows:
        EXAMINATION BY MS. ROBERTS

Q.  Good afternoon, Mr. Souto.

A.  How are you doing?

Q.  I'm well, thank you.  My name is Bronwyn
    Roberts.  I'm an attorney here at Duane Morris.
    I represent Stuart Roffman and Sovereign
    Realty.  Do you understand that?

A.  Yes.

Q.  Are you represented here today?  Do you have a

---

101

second page of that document?

A. Yes.

**Q.** It should be 7 what?

A. 7/5 or 6. It was after the holiday.

**Q.** 7/5 or 6?

A. Yeah. 5 or 6.

**Q.** Of 2002?

A. I think it was 6, yes.

**Q.** Other than that, does everything in this nonpayment of wage complaint form filed with the Attorney General's office accurately reflect the damages that you claim you are owed in this case with respect to wages?

A. Yes, everything is okay.

**Q.** Do you see your signature on the third page of that document?

A. Yes.

**Q.** Did you sign that?

A. This one or the other one?

**Q.** On what's been marked as Exhibit No. 3, do you see your signature there?

A. No -- oh, right here (Indicating).

**Q.** And do you see your signature on the document that's been marked as Exhibit No. 2?

102

A. Yes, I do.

**Q.** You've signed that today, correct?

A. Yes, number 4, right (Indicating).

**Q.** On the first page of Exhibit No. 2 and the fourth page of Exhibit No. 1 -- I'm sorry, Exhibit No. 3 --

A. Which page this again, please?

**Q.** That's the first page of that document, Exhibit No. 2, and the fourth page of what's been marked as Exhibit No. 3 you write, "Sovereign Realty Associates Limited promised to pay me $15.53 an hour," and you say that again on the first page of Exhibit No. 2. That's not correct, right? Stuart Roffman told you that he was only going to pay you $10 an hour?

         MS. HURLEY: Objection.

A. That's correct.

**Q.** You have demanded overtime payment in both the sworn statement and the complaint filed with the Attorney General's office for overtime payments between 1999 and 2002. Do you contend that you never received any payment for hours worked over 40?

A. No, I never received it.

103

**Q.** You never received it?

A. No.

**Q.** Did you ever work over 40 hours a week between 1999 and 2002?

A. Yes.

**Q.** When? What days?

A. A few days a week, Saturdays, Sundays. They call me, page me to go do some work, and I not get paid.

**Q.** Did you ever receive straight time for hours worked over 40?

A. No, I never received nothing after 40.

**Q.** You also have a demand here for sick pay; is that correct?

A. Correct.

**Q.** Is it your contention that you never received pay for any days that you were sick?

A. I never get sick day. I never get sick. I was working for eight years straight, no days off -- I mean, days off, yes, but on call on the pager, and I never got paid ever 40 hours.

**Q.** Did you ever call in sick while you were employed by Sovereign?

A. Once.

104

**Q.** Did you get paid for that day?

A. Only once. No.

**Q.** You didn't?

A. No.

**Q.** When was that?

A. I cannot remember.

**Q.** What year?

A. I would say 2000.

**Q.** 2000?

A. Yes. I would say that.

**Q.** And you contend that you were not paid that day?

A. I don't remember that. I'm sorry.

**Q.** You might have been paid for that day?

A. One day?

**Q.** Yes.

A. Yes, I got paid for that day.

**Q.** You did?

A. One day in eight years.

**Q.** And that's the only time you ever did call in sick, correct?

A. Excuse me?

**Q.** That one day that you were paid for sick time is the only day that you ever called in sick,

105

correct?

A. Yes.

Q. You never received any deductions from your standard paycheck for days that you didn't come in because you were sick, did you?

A. No. It wasn't deduct.

Q. You always --

A. It was only one day in eight years.

Q. You always got the same salary, the same paycheck, right?

A. Yes.

Q. And for that one day there was no deduction?

A. No, I don't think so.

Q. And there were no other sick days that you ever took?

A. No.

Q. In your sworn statement, Exhibit No. 2, and in your Attorney General complaint, Exhibit No. 3, you make a claim for payment for personal days; is that accurate?

A. Yeah, personal days, vacation, sick days.

Q. Did you ever take a personal day between --

A. No.

Q. -- between 1999 and 2002?

106

A. Only once, and I went from Friday to Tuesday, I think it was 2000.

Q. So you took Friday off, Monday off, and Tuesday off?

A. Yes.

Q. When did you --

A. Not Tuesday, though. Monday. Friday to Monday when I went to Florida.

Q. You went to Florida?

A. Yes, with my wife. That's the only vacation in eight years on that place.

Q. So you are calling that a vacation day as opposed to a personal day?

A. Yeah, kind of, because I think four days, five days not a vacation. It was like a few days of personal day they gave me finally.

Q. And you were paid for that -- those two days off, right?

A. I don't remember that.

Q. You don't know?

A. No, I don't.

Q. Do you recall in 2000 at any time receiving any deductions from your standard salary check?

A. I don't remember that either.

107

Q. Would your paychecks reveal whether you had any deduction for those two days off?

A. No.

Q. They wouldn't?

A. No, it wasn't deducted.

Q. It was not deducted?

A. Yes.

Q. So you got that paid two days off?

A. Yes, for four days, yes, I got paid. The only time in eight years.

Q. There was no other vacation that you took?

A. Never.

Q. Did you take any personal days with respect to your INS issues that you had?

A. Yes, once.

Q. One personal day?

A. Once, yes, and I was getting paged all the time inside the immigration office, paged by Lee Torrey.

Q. By Lee Torrey?

A. Yes.

Q. Were you paid for that one personal day that you took to go to INS?

A. Yes.

108

Q. Were you paid for any days that you took to go to doctors' appointments for you and your family in connection --

A. No.

Q. -- with your immigration?

A. No.

Q. No, you were not paid?

A. No, because I went at night, and they paged me, too.

Q. You worked at night?

A. I worked for them that night. I remember. Do you want me to say what happened?

Q. I want you to remember.

A. I was in the doctor for my exams for the immigration, and Lee Torrey paged me many times. He say, Stuart wants you in his house right now to take his girlfriend out of the snow. They was stuck in the snow.

     I went there I would say 8 o'clock, working until 1 o'clock in the morning taking her car from there because she's stuck there. He live on a hill driveway. She back up and stuck in the grass full of snow, ice. I spend like five or six hours, I don't know, to

73

why I say the average is like 11 to 12 hours a
day if you put an average. I was working
Saturday, Sunday. I was not getting paid.

**Q.** Approximately how many times a week did you
work at night?

A. Probably three, four times average.

**Q.** Approximately how many times a month did you
work --

A. Some Saturdays, some Sundays.

**Q.** How many Saturdays and Sundays per month?

A. I cannot remember, maybe I would say 100.

**Q.** 100?

A. In eight years, yes.

**Q.** In eight years?

A. Probably hundreds.

**Q.** Hundreds in eight years?

A. Yes.

**Q.** You said that you sometimes were responsible
for driving Mr. Roffman to the airport; is that
correct?

A. Yes.

**Q.** If Mr. Roffman needed a ride to work during the
day --

A. Not to work.

74

**Q.** Were you permitted to go home after dropping
him off at the airport?

A. Yes.

**Q.** Were you permitted to leave early after
dropping him off at the airport?

A. No, because every time I was dropping him at
the airport, if it was my working time, I was
back into the building, and sometime -- many
times he called me at night to pick him up like
11 o'clock at night and come back like 2
o'clock in the morning home, sometimes more
than that.

**Q.** Mr. Souto, if you could answer the question
that I pose to you, that would be helpful.

A. Okay.

**Q.** If Mr. Roffman had an afternoon flight before 4
o'clock and you drove him to the airport, were
you permitted to go home early?

A. No.

**Q.** You never were permitted to go home early?

A. No.

**Q.** Not once?

A. Not once.

**Q.** Did you have any conversations with anyone at

75

Sovereign regarding your wage?

A. Yes.

**Q.** Who did you discuss your wage with?

A. $10 an hour.

**Q.** Who? Which person?

A. Tenants, friends to tenants.

**Q.** Other than friends and tenants --

A. John Harvey.

**Q.** You discussed your wage with John Harvey?

A. Yeah.

**Q.** Your wage went from $8 an hour to $10 an hour?

A. Yes.

**Q.** Did you have any discussions with Mr. Harvey
about that raise?

A. Yes.

**Q.** What did he say to you?

A. He said that's not enough.

**Q.** He said that's not enough?

A. Yeah.

**Q.** What did you say to him?

A. I say, "I agree with you," but I have to take
it.

**Q.** Did you have any conversations with Mr. Roffman
when you got an increase from $8 an hour to $10

76

an hour regarding your wage?

A. Yes. I ask him for a raise.

**Q.** You asked him for a raise?

A. Yes.

**Q.** And he gave you a raise, right?

A. He gave me like four or five years before I get
another job.

**Q.** You made $8 an hour?

A. In the beginning.

**Q.** And then you got $10?

A. Yes.

**Q.** And you asked for that $2 an hour raise from
Mr. Roffman?

A. I didn't ask how much. I don't say how much I
want. He give me from 8 to 10. After I would
say about six years, he gave me $2 raise, and
never again.

**Q.** Did he have any conversations with you about
that raise?

A. Not really.

**Q.** You requested an increase?

A. I requested an increase.

**Q.** Do you remember when that request took place?

A. I don't remember.

161

Q. You didn't have any conversations with Mr.
Roffman about being paid time and a half, did
you?

A. No.

Q. Did you have any conversations with Mr. Torrey
regarding pay?

A. No.

Q. You didn't have any conversations with Mr.
Torrey about being paid time and a half, did
you?

A. No. They are supposed to do that by
themselves. I don't have to say nothing.

Q. Do you have any records of the hours you worked
while at Sovereign?

A. Approximately I would say 55 to 60 hour a week,
including -- that's including nights work,
weekends, I'm sorry, holidays. That's what I
would say average.

Q. Your testimony is that you worked 50 to 60
hours --

A. 55 to 60.

Q. 55 to 60?

A. Yes.

Q. Do you have any journals or written time

162

records reflecting the hours that you allege
you worked?

A. No.

            MS. ROBERTS: Can you mark this
as the next exhibit?

        (Exhibit 9, Calendar,
        marked for identification.)

Q. Mr. Souto, before we look at what's been marked
as Exhibit No. 9, I'm going to ask you just one
more question: Getting back to the mileage
that you got paid for, how did you keep track
of that mileage? What did you do to make sure
that you were submitting accurate mileage?

A. I always to write down on payment.

Q. You wrote them down on a piece of paper?

A. I used to. Yes. I always used to.

Q. Who did you give that piece of paper to or did
you keep that for yourself?

A. I keep it for myself.

Q. Do you still have that?

A. No.

Q. You threw that out?

A. Yes.

Q. When did you throw that out?

163

A. I don't remember.

Q. When is the last time you saw that document?

A. I don't remember.

Q. When you did have it, where did you keep it?

A. I don't know anymore.

Q. When you had it, where did you keep it?

A. Probably my -- some drawer in my house.

Q. Would you look to see if you still have that
for me and produce it if you do?

A. I'm sure I don't have no more. I throw away.

Q. Do you know that you threw it away?

A. Yes.

Q. You have a specific memory of throwing that
document away?

A. I don't remember when I throw away.

Q. But you know that you did?

A. I know I throw it away. Yes. Why keep?

Q. Do you know if you threw that away before or
after you filed this lawsuit?

A. Before.

Q. Do you know if you threw it away before or
after you filed your complaint with the
Attorney General's office in March of 2005?

A. Say it again, please.

164

Q. Do you know whether you threw away those
mileage records before or after you filed the
complaint with the Attorney General's office in
March of 2005?

A. Before.

Q. Do you have any records of repairs or
maintenance that you performed that would
document the miles that you drove?

A. No.

Q. If you could look at what's been marked as
number 9 to your deposition, I'm going to
represent to you that this document is a
calendar that I printed out today of the months
in this case where you claim that you were not
paid overtime and you are also claiming an
additional $5.53 an hour for the time
documented in this calendar. I'm going to ask
you if you can tell me in any particular week
how many hours you worked?

A. I don't remember.

Q. You can't say, can you?

A. No, I just say the average.

Q. How did you come up with the average? How did
you calculate that?

EXHIBIT "B"

## In The Matter Of:

*Renato Souto, et al.   v.*
*Sovereign Realty Associates, Ltd., et al.*

---

*Stuart A. Roffman*
*Vol. 1, February 13, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA   02110*
*(617) 426-2432*

Original File ROFFMAN.V1, 223 Pages
Min-U-Script® File ID: 3101948853

## Word Index included with this Min-U-Script®

**Page 1**

Volume I

Pages 1 to 223

Exhibits 1 to 11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 2005-10864JLT

RENATO SOUTO and OTHERS SIMILARLY :

SITUATED, :

Plaintiffs, :

vs. :

SOVEREIGN REALTY ASSOCIATES, LTD. :

and STUART ROFFMAN, As President :

of the General Partner of :

Sovereign Realty Associates, :

Ltd., Sovereign Realty Associates :

G.P., Inc., and Individually, :

Defendants. :

DEPOSITION OF STUART A. ROFFMAN, a witness

called on behalf of the Plaintiffs, taken pursuant

to the Federal Rules of Civil Procedure, before

Susan E. DiFraia, Certified Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Gordon Law Group

LLP, 535 Boylston Street, 6th Floor, Boston,

Massachusetts, on Monday, February 13, 2006,

commencing at 11:02 a.m.

PRESENT:

Gordon Law Group LLP

(by Philip J. Gordon, Esq.,

and Kristen M. Hurley, Esq.)

535 Boylston Street, 6th Floor, Boston, MA

02116, for the Plaintiffs.

Law Offices of David Berman

(by David Berman, Esq.)

100 George P. Hassett Drive,

Medford, MA 02155, for the Defendants.

**Page 2**

INDEX

WITNESS     DIRECT  CROSS  REDIRECT  RECROSS

STUART A. ROFFMAN

BY MR. GORDON       5

EXHIBITS

NO.  DESCRIPTION  PAGE

1 Letter to Stuart Roffman from John    104
  K. Dvorak, dated 7/20/99

2 Document addressed "To Whom it May    106
  Concern" from Stuart Roffman dated
  7/26/99

3 Boston Herald advertisement, Tuesday  107
  July 27, 1999

4 Document with heading "The United     115
  States of America" Form I-797C

5 Letter "To Whom it May Concern" 143

6 2002 Schedule E and Statement 7 165
  Supplemental Income and Loss
  Statement for 2002 of Stuart Roffman

7 Copies of payroll records of Renato   168
  Souto

8 Second set of payroll records for     175
  Renato Souto

9 Letter addressed to "Stuart" from     180
  LT, dated Tuesday, May 8

**Page 3**

EXHIBITS, Continued

NO.   DESCRIPTION   PAGE

10  Document entitled "Employee Work    197
    Conditions"

11  Document entitled "Christmas        209
    Bonuses" dated Monday, December 17

**Page 4**

[1]                PROCEEDINGS

[2]     MR. BERMAN: It is 11:02 a.m. on Monday,

[3] February 13, 2006. We are here for the deposition

[4] of Stuart A. Roffman in the case of Souto versus

[5] Sovereign Realty Associates. Present in the room,

[6] also, is Lee Torrey, the managing director of

[7] Sovereign Realty Associates. Plaintiffs' attorney

[8] has objected to Mr. Torrey's presence. Defendants'

[9] attorney has declined to proceed without Mr. Torrey.

[10] The parties will, therefore, proceed to the United

[11] States District Court for the District of

[12] Massachusetts, at the Offices of Gordon Law Group

[13] will seek to have Mr. Torrey excluded from the room.

[14]     MR. GORDON: That's it.

[15]     (Recess taken)

[16]     MR. BERMAN: We should point out that there

[17] will be no need to make a motion for a protective

[18] order. Mr. Torrey has voluntarily left, and we have

[19] decided to order an expedited copy of the transcript

[20] without setting any precedent as to whether or not

[21] he has a right to be present for it.

[22]     MR. GORDON: Sounds good to me. Counsel,

[23] just open stipulations. Reserve —

[24]     MR. BERMAN: Well, because it's Federal

**Page 5**

[1] Court you really can't stipulate to very much under

[2] the rules. So the only thing I would ask for a

[3] stipulation is that the witness sign under penalties

[4] of perjury — read and sign under penalties of

[5] perjury, rather than have to hunt up the notary

[6] before whom this is taken.

[7]     MR. GORDON: That's fine. Just as a

[8] preliminary, do you carry a cell phone?

[9]     THE WITNESS: Yes.

[10]     MR. GORDON: Do you want to turn that off

[11] or turn it to vibrate?

[12]     THE WITNESS: It's on vibrate.

[13]     MR. GORDON: Okay. Terrific.

[14]         STUART A. ROFFMAN

[15] a witness called for examination by counsel for the

[16] Plaintiffs, having been satisfactorily identified by

[17] the production of his driver's license and being

[18] first duly sworn by the Notary Public, was examined

[19] and testified as follows:

[20]         DIRECT EXAMINATION

[21]         BY MR. GORDON:

[22]     Q: Would you state your name and address for

[23] the record.

[24]     A: Stuart Roffman, 124 Farm Street, Dover,

Stuart A. Roffman
Renato Souto, et al.  v.
Vol. 1, February 2005 Case 1:05-cv-10864-JLT    Document 49-6    Filed 10/05/2006 Sovereign Realty Associates, Ltd., et al.

Page 150

[1]  **Q:** All maintenance workers, if they worked
[2]  more than 10 hours that day, they could take two
[3]  hours off the next day?
[4]  **A:** Absolutely.
[5]  **Q:** And if they ever worked over 40 hours in a
[6]  week, did you compensate them for the overtime?
[7]  **A:** I don't know.
[8]  **Q:** Has a maintenance worker ever worked more
[9]  than 40 hours a week for Sovereign Realty
[10] Associates?
[11]  **A:** Perhaps.
[12]  **Q:** Who would know that?
[13]  **A:** I don't know. They would, I guess.
[14]  **Q:** Would Sovereign Realty Associates know what
[15] hours the maintenance workers worked?
[16]  **A:** I don't know.
[17]  **Q:** Would the managers know what hours their
[18] employees worked?
[19]  **A:** I don't know. The employees were
[20] responsible to keep track of their own time, and it
[21] was up to them to keep track of their own time.
[22]  **Q:** And how would they do that?
[23]  **A:** I don't know.
[24]  **Q:** Did they submit time cards to you?

Page 151

[1]  **A:** I believe at some point they submitted time
[2]  cards. I don't know if that's still a policy.
[3]  **Q:** All maintenance workers would submit time
[4]  cards?
[5]  **A:** I can't say all maintenance workers would
[6]  submit time cards.
[7]  **Q:** Was there a policy for keeping time in that
[8]  regard?
[9]  **A:** At one point there was an overabundance of
[10] overtime. And I believe this may have been back to
[11] John Harvey or his predecessor, and my philosophy
[12] always was I don't want to pay somebody time
[13] and-a-half when they already worked a full day and
[14] they're tired and really not performing well. So I
[15] just said, "Hire more workers. I don't want
[16] overtime."
[17]  So it was a hard and fast rule. I did not
[18] want overtime. If you notice the ad that you
[19] showed, and I don't know who wrote it, it said "no
[20] overtime." So it was not our policy to have anybody
[21] work over 40 hours a week. Could it have happened,
[22] yes.
[23]  **Q:** But for a period of time, at least, that
[24] caused you to get this policy going if maintenance

Page 152

[1]  workers were working over 40 hours a week?
[2]  **A:** At some point.
[3]  **Q:** Was that at Sovereign Realty Associates?
[4]  **A:** Yes.
[5]  **Q:** But you don't recall the time?
[6]  **A:** No, I do not.
[7]  **Q:** How would you have announced this to John
[8]  Harvey and Lee Torrey?
[9]  **A:** Very vocally.
[10]  **Q:** I have no doubt.
[11]  **A:** It would not have been Lee Torrey, and it
[12] may have been before John Harvey. It may have been
[13] John Harvey's predecessor.
[14]  **Q:** But during that period of time when they
[15] were working the overtime hours, you were paying
[16] them overtime, correct?
[17]  **A:** Yes, that's correct.
[18]  **Q:** But each of them was responsible for
[19] keeping their own hours, each of the maintenance
[20] workers?
[21]  **A:** To the best of my recollection.
[22]  **Q:** And the managers didn't keep track of the
[23] hours?
[24]  **A:** That's correct.

Page 153

[1]  **Q:** How did you keep track of personal or
[2]  vacation days that Mr. Souto took?
[3]  **A:** I'm not sure. We had a very loose policy.
[4]  They were just permitted to take whatever time
[5]  necessary within reason.
[6]  **Q:** What does that mean "take whatever time is
[7]  necessary?" If they took six weeks, is that too
[8]  much?
[9]  **A:** No, obviously not. They're allowed X weeks
[10] of vacation. And they, I assume, have to arrange it
[11] so we have the coverage.
[12]  **Q:** And how much advance notice would a
[13] maintenance worker have to give?
[14]  **A:** I don't know.
[15]  **Q:** Do you know if Mr. Souto took vacation?
[16]  **A:** I know he did.
[17]  **Q:** When did he take vacation?
[18]  **A:** I don't know. My recollection is he took
[19] several. During his deposition we reviewed the
[20] payroll records, and there were two or three weeks
[21] of his pay that said we'll cover your expenses when
[22] you return. I believe it was the end of 2001. It
[23] was a two or three week period that he took.
[24]  **Q:** He was permitted to take that vacation

Page 154

[1] time?

[2] **A:** He was.

[3] **Q:** Did you have a written policy at all?

[4] **A:** I don't — not that I know of.

[5] **Q:** How would an employee learn of your

[6] vacation policy?

[7] **A:** I don't — I assume when they were engaged.

[8] **Q:** A manager would tell them; is that it?

[9] **A:** Yes, a manager would tell them. Or I hope

[10] they would ask.

[11] **Q:** Do you know if Mr. Souto asked?

[12] **A:** I really don't know if Mr. Souto asked.

[13] **Q:** Do you know what Sovereign Realty

[14] Associates actually paid Mr. Souto for the course of

[15] his engagement, whether by employee or independent

[16] contractor with Sovereign Realty Associates?

[17] **A:** I believe there was — again, I've had the

[18] privilege of looking at the payroll records during

[19] his deposition. I believe there was a check of $800

[20] every other week, plus there were various other

[21] checks, varying amounts for expenses or whatever,

[22] that were not itemized. Anywhere from a few hundred

[23] dollars to several hundred dollars.

[24] **Q:** But those additional checks were always for

Page 155

[1] expense reimbursement checks; they weren't always

[2] for hours or wages?

[3] **A:** I believe it was categorized as expenses.

[4] I believe there was a fixed amount given to him

[5] weekly, whether toward his car or whatever. There

[6] was some amount I believe that was just given to him

[7] routinely, and add on above that.

[8] **Q:** There was a —

[9] **A:** Specifically he submitted his own expenses.

[10] We always paid whatever he submitted.

[11] **Q:** When you talk about "he was paid

[12] routinely," you mean there was routine expenses he

[13] was reimbursed for; is that correct?

[14] **A:** My recollection was that he was given an

[15] amount of money, whether it was accounted for or

[16] not. I don't know whether it was for use of his

[17] car. I don't know. I'm not sure what it was for.

[18] **Q:** How often did you give him additional

[19] checks?

[20] **A:** Biweekly.

[21] **Q:** To cover his expenses?

[22] **A:** That's correct.

[23] **Q:** And every two weeks you gave him an amount

[24] of money to cover wages?

Page 156

[1] **A:** I don't know whether it's characterized

[2] as — categorized as wages, but he was given a check

[3] biweekly. $800.

[4] **Q:** $800 was his wage payment?

[5] **A:** I don't know if it was categorized as

[6] wages.

[7] **Q:** But he received an additional biweekly

[8] check for expenses; is that correct?

[9] **A:** Yes.

[10] **Q:** Is there any other reason he would receive

[11] a check, if it was not for wages?

[12] **A:** I'm not categorizing it as wages.

[13] **Q:** Is it possible it might include something

[14] other than wages?

[15] **A:** Yes, it's possible that it's for his — as

[16] a general — whatever you call it, independent

[17] contractor.

[18] **Q:** Those checks, which entity actually wrote

[19] those checks, do you recall?

[20] **A:** Sovereign. I don't know whether it was

[21] Sovereign Realty Associates G.P. or —

[22] **Q:** Mr. Souto received W-2s?

[23] **A:** I don't know.

[24] **Q:** Did he receive 1099s?

Page 157

[1] **A:** I don't know.

[2] **Q:** Do you know who signed the checks?

[3] **A:** I believe I signed the checks.

[4] **Q:** Did anybody else sign checks that would go

[5] to Mr. Souto?

[6] **A:** I believe the bookkeeper had authority to

[7] sign my name.

[8] **Q:** The bookkeeper, meaning Barbara Fitzgerald?

[9] **A:** Barbara Fitzgerald.

[10] **Q:** And how did Barbara Fitzgerald have

[11] authority to sign her name?

[12] **A:** I think she took it upon herself — no, she

[13] had my authority. I'd be out of town, and I'd say

[14] she could just sign my name on the checks.

[15] **Q:** And you gave that authority to Barbara

[16] Fitzgerald verbally?

[17] **A:** At some point.

[18] **Q:** And did she sign your name or her name?

[19] **A:** She signed a facsimile of my name.

[20] **Q:** Did she do this with anything else, as far

[21] as you know, other than checks?

[22] **A:** Not that I know of.

[23] **Q:** Did she sign anyone else's names to

[24] documents?

EXHIBIT "C"

# In The Matter Of:

*Renato Souto, et al.   v.*
*Sovereign Realty Associates, Ltd., et al.*

---

*Lee A. Torrey*
*Vol. 1, February 24, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA   02110*
*(617) 426-2432*

Original File TORREY.V1, 192 Pages
Min-U-Script® File ID: 2941437210

# Word Index included with this Min-U-Script®

Page 1

Volume I
Pages 1 to 192
Exhibits 1 to 18
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 2005-10864JLT
RENATO SOUTO and OTHERS SIMILARLY   :
SITUATED,
Plaintiffs,                          :
vs.                                  :
SOVEREIGN REALTY ASSOCIATES, LTD.    :
and STUART ROFFMAN, As President     :
of the General Partner of            :
Sovereign Realty Associates,         :
Ltd., Sovereign Realty Associates    :
G.P., Inc., and Individually,        :
Defendants.                          :

DEPOSITION OF LEE A. TORREY, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Susan E. DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gordon Law Group
LLP, 535 Boylston Street, 6th Floor, Boston,
Massachusetts, on Friday, February 24, 2006,
commencing at 10:10 a.m.

PRESENT:
Gordon Law Group LLP
(by Philip J. Gordon, Esq.,
and Kristen M. Hurley, Esq.)
535 Boylston Street, 6th Floor, Boston, MA
02116, for the Plaintiffs.
Law Offices of David Berman
(by David Berman, Esq.)
100 George P. Hassett Drive,
Medford, MA 02155, for the Defendants.

Page 2

INDEX
WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
LEE A. TORREY
BY MR. GORDON      4           190
BY MR. BERMAN         189

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Boston Herald advertisement | 69 |
| 2 | Letter from John Dvorak to Stuart Roffman | 71 |
| 3 | Copies of paystubs | 109 |
| 4 | Copies of payroll checks | 114 |
| 5 | Copies of payroll checks | 117 |
| 6 | Copies of payroll checks | 120 |
| 7 | Copies of payroll checks | 131 |
| 8 | Copies of payroll checks | 139 |
| 9 | Copies of payroll checks | 149 |
| 10 | Copies of payroll checks | 150 |
| 11 | Copies of payroll checks | 152 |

Page 3

EXHIBITS, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Copies of payroll checks | 162 |
| 13 | Copies of payroll checks | 164 |
| 14 | Copies of payroll checks | 170 |
| 15 | Letter "To Whom it May Concern" | 180 |
| 16 | Document entitled "Employee Work Conditions" | 181 |
| 17 | Document describing Christmas Bonuses | 184 |
| 18 | Letter to Stuart Roffman from Lee Torrey | 186 |

Page 4

PROCEEDINGS
LEE A. TORREY

[1]
[2]
[3] a witness called for examination by counsel for the
[4] Plaintiffs, whose identify was attested to by David
[5] Berman, and being first duly sworn by the Notary
[6] Public, was examined and testified as follows:
[7]      MR. BERMAN: My name is David Berman, and I
[8] am counsel for the Defendants in the case now
[9] pending. I know Lee A. Torrey from several previous
[10] meetings with him and can identify him positively
[11] for the record.
[12]      MR. GORDON: Thank you, Mr. Berman. Do you
[13] want to waive notarization?
[14]      MR. BERMAN: He can sign it under penalties
[15] of perjury, and I don't think he has to sign it in
[16] front of Ms. DiFraia. I think he can just sign it.
[17]      MR. GORDON: Acceptable with us.
[18]                    DIRECT EXAMINATION
[19]                    BY MR. GORDON:
[20]      Q: Could you state your name for the record.
[21]      A: Lee A. Torrey. My residence currently is
[22] at 1440 Beacon Street in Brookline, Massachusetts,
[23] 02446.
[24]      Q: You have counsel representing you today?

Renato Souto, et al. v.
Sovereign Case 1:05-cv-10864-JLT al. Document 49-7    Filed 10/05/2006    Page 1 of 4 February 24, 2006
Lee A. Torrey

Page 161

[1]    **A:** No.

[2]    **Q:** Do you remember talking with Tito about

[3] what he would do for you?

[4]    **A:** No.

[5]    **Q:** Did you hire Tito from an ad?

[6]    **A:** Probably.

[7]    **Q:** From a Boston Globe ad?

[8]    **A:** Correct.

[9]    **Q:** Do you remember what Tito did?

[10]    **A:** He was a maintenance worker. He may have

[11] been a cleaner, or both.

[12]    **Q:** Okay. So he was sort of a combination of

[13] Renato and Pavel, if you will?

[14]    **A:** Possibly.

[15]    **Q:** Do you know what Tito's hours were?

[16]    **A:** Not offhand.

[17]    **Q:** Do you know what his pay rate was?

[18]    **A:** Not offhand.

[19]    **Q:** Would something help refresh your

[20] recollection?

[21]    **A:** Sure.

[22]    **Q:** What would help you?

[23]    **A:** Let's see his paychecks.

[24]    **Q:** Sure. Let's take a look at them.

Page 163

[1]    **Q:** Do you have a vacation policy at Sovereign

[2] Realty Associates?

[3]    **A:** Yes.

[4]    **Q:** What was that policy?

[5]    **A:** One week paid per year.

[6]    **Q:** How would you get one week paid per year?

[7] How would an employee accrue that time?

[8]    **A:** They'd just say they wanted some time off

[9] or they needed a week off.

[10]    **Q:** Was it a written policy?

[11]    **A:** No.

[12]    **Q:** How did you communicate the policy to your

[13] employees?

[14]    **A:** Verbally.

[15]    **Q:** Was that for all employees?

[16]    **A:** Yes, sure.

[17]    **Q:** Was Mr. Souto one of those employees

[18] entitled to one week paid vacation per year?

[19]    **A:** I believe so.

[20]    **Q:** Did you keep track of when your employees

[21] took paid vacation?

[22]    **A:** No, it was pretty loose.

[23]    **MR. GORDON:** Off the record.

[24]    (Discussion off the record)

Page 162

[1]    **MR. GORDON:** Would you mark that, please.

[2]    (Document marked as Torrey

[3] Exhibit 12 for identification)

[4]    **Q:** I place before you a document entitled

[5] Exhibit 12. It is a four-page document. Have you

[6] had a chance to review the document?

[7]    **A:** (Reviewing document) Yes, I have.

[8]    **Q:** And do you recognize any of these pages?

[9]    **A:** No, I don't.

[10]    **Q:** Are these paychecks from Sovereign Realty

[11] Associates to Tito Carderelli?

[12]    **A:** Certainly appear to be.

[13]    **Q:** It looks like Tito started working with you

[14] sometime in September 2001. Does this refresh your

[15] recollection of when he started with you?

[16]    **A:** No, it does not.

[17]    **Q:** Do you know what building Tito worked in?

[18]    **A:** I think he was 1440, but he may have had

[19] 822-826 responsibilities as well. I forget.

[20]    **Q:** But you don't recall hiring Tito?

[21]    **A:** No.

[22]    **Q:** Would Barbara have hired Tito?

[23]    **A:** No, I would have hired him. I just don't

[24] have a specific memory.

Page 164

[1]    **Q:** We were talking about Mr. Souto's

[2] vacations. You said that Mr. Souto had received one

[3] week paid vacation per year?

[4]    **A:** To the best of my recollection.

[5]    **Q:** Do you recall any of the days that Mr.

[6] Souto took?

[7]    **A:** I don't remember specific days.

[8]    **Q:** Did you keep records on what days your

[9] employees take?

[10]    **A:** No, we're too loose.

[11]    **Q:** Do you remember conversations regarding

[12] putting Mr. Souto on payroll with Barbara

[13] Fitzgerald, Payroll Services, or anybody else?

[14]    **A:** No.

[15]    **MR. GORDON:** Would you mark that as Exhibit

[16] 13.

[17]    (Document marked as Torrey

[18] Exhibit 13 for identification)

[19]    **Q:** For identification purposes this is a — I

[20] put before you a document entitled Exhibit 13. Have

[21] you had a chance to look at that document?

[22]    **A:** (Reviewing document) Yes, I have.

[23]    **Q:** Do you recognize it?

[24]    **A:** Yes, I do.